# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN, MILWAUKEE DIVISION

JOHN COX, M.D. and SARAH DOBROZSI, M.D.,

        Plaintiffs,

    v.

THE MEDICAL COLLEGE OF WISCONSIN, INC., CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC., CHILDREN'S HOSPITAL OF WISCONSIN, INC. A/K/A CHILDREN'S WISCONSIN, A/K/A MILWAUKEE HOSPITAL – CHILDREN'S WISCONSIN A/K/A CHILDREN'S HOSPITAL WISCONSIN A/K/A CHILDREN'S WISCONSIN – MILWAUKEE HOSPITAL, DIVISION OF MILWAUKEE CHILD PROTECTIVE SERVICES, RITA VENTURA, A.P.N.P., HILARY PETSKA, M.D., LYNN SHEETS, M.D., MICHAEL GUTZEIT, M.D., ERICA STUCKERT, DEMETRA PARR-NELSON, JESSICA BARBER, NOAH GILBERT, AMY SCHERBARTH, STEPHANIE JEWELL, and LORRAINE HARTMANN,

        Defendants.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs John Cox, M.D. and Sarah Dobrozsi, M.D., by their attorneys, HALE & MONICO, LLC and LOEVY & LOEVY, complain of the Defendants The Medical College of Wisconsin, Inc., Children's Hospital and Health System, Inc., Children's Hospital of Wisconsin, Inc. a/k/a Children's Wisconsin, a/k/a Milwaukee Hospital – Children's Wisconsin a/k/a Children's Hospital Wisconsin a/k/a Children's Wisconsin – Milwaukee Hospital, Division of

Milwaukee Child Protective Services, Rita Ventura, A.P.N.P., Hilary Petska, M.D., Lynn Sheets M.D., Michael Gutzeit, M.D., Erica Stuckert, Demetra Parr-Nelson, Jessica Barber, Noah Gilbert, Amy Scherbarth, Stephanie Jewell, and Lorraine Hartmann, and state as follows:

## FACTS COMMON TO ALL COUNTS

### Introduction

1.      In early 2019, John Cox, M.D. ("Dr. Cox") and his wife Sarah Dobrozsi, M.D. ("Dr. Dobrozsi") (collectively, "Plaintiffs") were happily married with a loving family consisting of themselves and their two young children, a 4-year-old boy and a 2-year-old boy. Plaintiffs had decided to build their family through adoption, and both boys are adopted.

2.      Eager to continue to grow their family, Plaintiffs decided to adopt another young child.

3.      L.G. was born on April 10, 2019. With the complete and total support of L.G.'s birth parents, Plaintiffs planned to adopt L.G. In the meantime, Plaintiffs welcomed L.G. into their home and began to care for her as their own child, as they were pre-adoptive parents. They acted for all practical purposes as L.G.'s adoptive parents until the legal formalities of adoption could be completed as required under Wisconsin law.

4.      On May 9, 2019, L.G. suffered a minor accidental injury while in Dr. Cox's care.

5.      From May 9, 2019, to May 13, 2019, L.G. was evaluated by three physicians and one nurse practitioner.

6.      These three physicians who evaluated L.G. followed standard medical procedures in performing their evaluations, obtaining a detailed medical history, performing a thorough physical examination, and reaching an overall diagnosis. Two of the three physicians who

2

performed these complete evaluations all concluded that L.G.'s injuries were a result of the accident that occurred with Dr. Cox. The third physician cited a conflict of interest and did not offer a conclusion.

7. The nurse practitioner who evaluated L.G., Defendant Rita Ventura, failed to follow standard medical procedures for the evaluation of possible child abuse. As a result, Defendant Ventura incorrectly concluded that L.G. was the victim of abuse.

8. As described in greater detail below, during the course of what should have been a quick and routine investigation into this incident, Defendants—through their knowing, intentional, and malicious use of inappropriate, incomplete, and misleading medical and investigative techniques—falsely portrayed this accidental injury as an instance of abuse.

9. As described in greater detail below, Defendants used this spurious and unfounded allegation of suspected abuse to begin an unprecedented campaign of targeted harassment against Plaintiffs, tarnishing Plaintiffs' personal reputations as loving parents and their professional reputations as skilled and reliable medical caregivers.

10. Tragically, as a result of Defendants' misconduct, Plaintiffs were not able to finalize their adoption of L.G., and L.G. was permanently removed from Plaintiffs' home.

11. The misconduct perpetrated by Defendants has severely harmed Plaintiffs, causing them intense emotional distress and permanently altering the growth and development of their family, of which L.G. had already become a beloved, valued and integral member.

12. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and Wisconsin law to hold Defendants accountable for their misconduct and for violating Plaintiffs' constitutional rights, to redress the loss caused to Plaintiffs and their family by Defendants' outrageous and

3

inexcusable conduct, and to shine a light on these events to ensure the necessary changes are made so that no future family has to suffer the same pain and anguish Plaintiffs have suffered as a result of Defendants' misconduct as alleged below.

## Jurisdiction and Venue

13. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

14. Venue is proper under 28 U.S.C. § 1391(b). On information and belief, at least one Defendant resides in this judicial district and the events giving rise to the claims asserted here all occurred within this district.

## Parties

15. Plaintiffs Dr. Cox and Dr. Dobrozsi are physicians licensed by the State of Wisconsin, and the loving parents of two young boys, both adopted. At all times relevant to the events described below, Plaintiffs lived in the city of Wauwatosa in Milwaukee County, Wisconsin. Plaintiffs currently live in Wilmette, Illinois.

16. At all times relevant to the events described below, The Medical College of Wisconsin, Inc. ("MCW") was a Wisconsin non-stock corporation that employed medical doctors, advance practice nurse practitioners, physician assistants, registered nurses, medical technicians, administrators, and various other people to run its business and work in the medical healthcare system within Wisconsin.

17. At all times relevant to the events described below, Children's Hospital and Health System, Inc. ("CHHS") was a Wisconsin corporation that ran, owned, operated, managed, and controlled hospitals and clinics throughout Wisconsin, including at 8915 W. Connell Ct., Milwaukee, Wisconsin, Milwaukee County.

4

18.     At all times relevant to the events described below, Children's Hospital of Wisconsin, Inc. ("CHW"), a/k/a Children's Wisconsin, a/k/a Milwaukee Hospital – Children's Wisconsin a/k/a Children's Hospital Wisconsin a/k/a Children's Wisconsin – Milwaukee Hospital was a Wisconsin corporation that ran, owned, operated, managed, controlled hospitals and clinics throughout Wisconsin, including, but not limited to, at 8915 W. Connell Ct., Milwaukee, Milwaukee County, Wisconsin, 9000 W. Wisconsin Ave., Milwaukee, Milwaukee County, Wisconsin, and 999 N. 92nd St., M.S. C760, Wauwatosa, Milwaukee County, Wisconsin.

19.     At all times relevant to the events described below, CHW also ran, owned, operated, managed, and controlled Milwaukee Child Advocacy Center, located at 619 W. Walnut St., Milwaukee, Wisconsin, Milwaukee County.

20.     At all times relevant to the events described below, Division of Milwaukee Child Protective Services ("DMCPS") was a division of the Wisconsin Department of Children and Families, a Wisconsin State Agency.

21.     Defendants MCW, CHHS, CHW and DMCPS are hereinafter collectively referred to as the "Entity Defendants."

22.     At all times relevant to the events described below, Rita Ventura, A.P.N.P. ("Ventura") was a licensed advance practice nurse practitioner in the State of Wisconsin, and was an employee, agent, or apparent agent of MCW and/or CHHS and/or CHW.

23.     At all times relevant to the events described below, Dr. Hilary Petska ("Dr. Petska") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of MCW and/or CHHS and/or CHW.

5

24.     At all times relevant to the events described below, Dr. Lynn Sheets ("Dr. Sheets") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of MCW and/or CHHS and/or CHW. Dr. Sheets served as Defendant Ventura's supervising physician.

25.     At all times relevant to the events described below, Dr. Michael Gutzeit ("Dr. Gutzeit") was licensed to practice medicine in the State of Wisconsin, and was an employee, agent, or apparent agent of MCW and/or CHHS and/or CHW. Dr. Gutzeit served as Chief Medical Officer of CHW and as its Vice President of Quality and Safety, and accordingly was the physician responsible for ensuring the quality of the care that was provided at Defendant CHW.

26.     At all times relevant to the events described below, Demetra Parr-Nelson ("Parr-Nelson") was an employee, agent, or apparent agent of DMCPS. Defendant Parr-Nelson served as the agency's Initial Assessment Bureau Director.

27.     At all times relevant to the events described below, Jessica Barber ("Barber"), Noah Gilbert ("Gilbert"), and Amy Scherbarth (" Scherbarth") were employees, agents, or apparent agents of DMCPS. Defendants Barber and Gilbert served as an Initial Assessment Specialist and Defendant Scherbarth served as an Initial Assessment Social Worker for the agency.

28.     At all times relevant to the events described below, Stephanie Jewell ("Jewell"), and Lorraine Hartmann ("Hartmann") were employees, agents, or apparent agents of DMCPS. Defendants Jewell and Hartmann had supervisory authority over one or more of Defendants Barber, Gilbert and Scherbarth.

29.     Defendants Ventura, Petska, Sheets, Gutzeit, Stuckert, Parr-Nelson, Barber, Gilbert, Scherbarth, Jewell and Hartmann are hereinafter collectively referred to as the "Individual Defendants." At all times relevant to the events described below, each of the Individual Defendants acted under color of law and within the scope of their employment.

**Factual Allegations**

<u>Planned adoption of L.G.</u>

30.     L.G., a beautiful and healthy baby girl, was born on April 10, 2019.

31.     Plaintiffs, who already were loving parents to two young boys, wanted to grow their family. Prior to April 10, 2019, after a rigorous process, Plaintiffs were selected by L.G.'s birth parents to adopt their newborn baby. Both parties utilized Catholic Charites to facilitate this private adoption.

32.     As is common when arranging an adoption, Plaintiffs entered into an agreement with L.G.'s birth parents and with the agency supervising L.G.'s adoption for Plaintiffs to begin serving as pre-adoptive foster parents to L.G. immediately following her birth, while the formal adoption process was being completed.

33.     On April 11, 2019, Plaintiffs took their newborn baby home from the hospital, and L.G. began living full-time at Plaintiffs' home. In Wisconsin, there is a six month statutory waiting period before adoption can actually happen. Following this procedure, Plaintiff's were pre-adoptive foster parents who were pre-selected and pre-approved to adopt L.G. once the statutory waiting period had expired.

34.     From April 11, 2019 until May 9, 2019, L.G. lived with Plaintiffs without incident. During this time, Plaintiffs provided L.G. with all of the love, care, affection, nurturing, material necessities, emotional support, and intellectual stimulation that newborn children need

7

to thrive and grow—just as they had done with their two adopted sons. During this time, Plaintiffs acted as L.G.'s parents in all meaningful and practical ways, providing her with the same devoted care as their other two children. During this time, Plaintiffs and their other two children developed strong bonds of love, care and affection with L.G.

L.G.'s Minor Accidental Injury

35.     On May 9, 2019, Dr. Cox was caring for L.G.

36.     Early that morning at approximately 5am, L.G. awoke and Dr. Cox removed her from her bassinet and held her on her side facing him supported by his bicep while he read the news on his phone in his bed.

37.     Dr. Cox fell back asleep while L.G. was in his arm. While Dr. Cox was asleep, L.G. suffered a minor accidental injury.

38.     At no point during the entirety of their care for L.G., or for either of their other children, have Plaintiffs ever done anything to abuse, intentionally harm, or intentionally subject to a risk of harm any child in their care.

39.     This accident was of similar magnitude and severity to incidents routinely experienced by countless other loving, skilled, careful and caring parents who, despite their best efforts, experience a momentary lapse of attention which results in an accidental minor injury to their child.

40.     The May 9 accident, and the resulting injury to L.G., provided no basis to conclude that Plaintiffs were not loving, devoted and skilled caregivers for L.G., and provided no basis to alter the planned completion of Plaintiffs' adoption of L.G.

41.     On May 9, 2019, in order to ensure that L.G. had not been harmed during this incident, Dr. Cox brought L.G. to be evaluated by Plaintiffs' pediatrician, Dr. Albert Pomeranz.

8

42.     During this visit with Dr. Pomeranz, and in every subsequent interaction regarding L.G.'s injury, Dr. Cox was candid and truthful about the circumstances leading up to the injury.

43.     Given the nature of the accident—in particular, that Dr. Cox had inadvertently fallen asleep and thus did not know the exact cause of the minor skin injuries to L.G.—Dr. Pomeranz followed standard practice and referred L.G. to be seen by Defendant Petska, a pediatrician with a specialization in cases of possible child abuse. Dr. Pomeranz also referred L.G. to be seen by a pediatric dermatologist, believing that this specific expertise was necessary to appropriately evaluate certain skin lesions present on L.G..

44.     On May 9, 2019, Dr. Pomeranz called Defendant Petska and spoke with her. As a result of this conversation, Dr. Pomeranz ordered imaging studies of L.G.'s shoulder and clavicle. Subsequently, the plan was to go from Dr. Pomeranz's outpatient clinic to Defendant CHW for these imaging studies of the shoulder and clavicle.

45.     On May 9, 2019, prior to going to CHW, Dr. Cox went home and coordinated with his wife, Dr. Dobrozsi, who had just returned from out of town and was going to bring L.G. to CHW.

46.     On May 9, 2019, Dr. Dobrozsi brought L.G. to CHW.

47.     On May 9, 2019, Dr. Dobrozsi was informed by Dr. Pomeranz that the plan had changed, and that Defendant Petska was requiring a full child abuse screening workup, including full body skeletal survey, head Computed Tomography (CT) scan, and blood work.

9

48.     Upon hearing this information, Dr. Dobrozsi requested that Defendant Petska come examine L.G. and perform a full medical evaluation, and explain the next steps and the need for the screening workup.

Defendants' Misconduct

49.     On May 9, 2019, Defendant Petska came to perform the evaluation of L.G. In taking the history, Defendant Petska spoke to Dr. Cox over the phone to obtain information regarding how the injury occurred.

50.     At the end of Defendant Petska's evaluation she agreed that a head CT was not required at that time, but the blood work and skeletal survey would be completed.

51.     On May 9, 2019, Defendant Petska coordinated to complete L.G.'s shoulder and clavicle x-rays, blood work, and skeletal survey, and then permitted Dr. Dobrozsi to return home with L.G.

52.     Defendant Petska's evaluation of L.G. did not reveal any definitive evidence of abuse or mistreatment, and did not conclude that Plaintiffs had done anything to intentionally harm L.G.

53.     Sometime after examining L.G., Defendant Petska, in conjunction with Defendant Sheets and other employees, agents, or apparent agents at MCW, CHW, and/or CHHS, determined that Defendant Petska would recuse herself from the care and treatment of L.G. on the basis of a supposed conflict of interest. Because Defendant Petska and Plaintiffs worked for the same hospital system, Defendant Petska and Defendant Sheets determined that L.G. would need to be evaluated by a medical provider other than Defendant Petska.

54.     In deciding to transfer L.G. for evaluation and care by another provider as a result of this self-identified conflict of interest, Defendant Petska had an obligation to ensure that L.G.

10

was seen by a provider who could provide the same or higher level of care, and to continue to care for L.G. until such transfer was complete.

55.     Defendant Petska failed to satisfy this obligation by transferring care to a nurse practitioner rather than a board-certified child advocacy pediatrician.

56.     As a result of the determination that Defendant Petska had a conflict of interest, Defendants referred Plaintiffs to have L.G. evaluated by someone else affiliated with the Milwaukee Child Advocacy Center.

57.     On May 9, 2019, Defendant Petska called Plaintiffs to give them the results of the lab work that had been completed for L.G. Defendant Petska falsely stated that the results of the lab work were normal, when they were not.

58.     Defendant Petska told Plaintiffs to go to an outpatient clinic run and operated by Defendants CHW and CHHS the next day, on May 10, 2019, so Dr. Cox could provide an in-person history of the mechanism of injury to L.G. to the healthcare provider doing the assessment.

59.     Additionally, Defendant Petska told Plaintiffs that they would be able to have all of their questions answered by the healthcare provider doing the assessment at that visit.

60.     On May 9, 2019, DMCPS sent a social worker to Plaintiffs' home to interview them and assess the home and L.G. The social worker concluded that there was no reason to intervene and that any bruises on L.G. were "underwhelming."

61.     On May 10, 2019, L.G. was scheduled to be seen by Defendant Ventura at the Milwaukee Child Advocacy Center.

62.     Without Plaintiffs knowledge, Defendants, including Defendant Parr-Nelson, determined that Plaintiffs would not be allowed to attend or participate in L.G.'s medical visit with the Child Advocacy Center provider because Plaintiffs were physicians. Defendant Parr-Nelson wrote an email to identify a social worker to bring the child to the visit, stating that "[t]he adoptive parent is a children's medical doctor and because of the sensitive nature of this relationship/circumstance CAC requested that an IAS bring the infant this morning without the foster parents."

63.     In the morning on May 10, Defendant Barber informed Plaintiffs that officials at DMCPS and CHW had determined that Plaintiffs would not be allowed to attend L.G.'s medical visit that morning, which contradicted standard medical practice and hospital policy and procedure.

64.     Defendant Barber assured Plaintiffs that while they could not attend the visit, they would have the opportunity to speak with the provider during the medical visit and to participate in the medical care and evaluation of L.G. Despite this assurance, Defendants had no intention of permitting Plaintiffs to participate in any way in this medical visit.

65.     Defendant Barber, acting at the direction of other Defendants, took L.G. from Plaintiffs' home without any lawful authority or justification and in violation of DMCPS policies.

66.     Plaintiffs allowed Defendant Barber to take L.G. from their home and brought to a medical visit with a Child Advocacy Center provider solely based on Defendants' fraudulent and false misrepresentation that Plaintiffs would be allowed to participate in the medical visit by

telephone, and by the clear implication that Plaintiffs had no choice in the matter if they did not want to permanently have L.G. taken from them.

67.      At that time, Plaintiffs had provided CHW with signed consents from L.G.'s birth mother and the private adoption agency facilitating the adoption, which gave Plaintiffs consent to fully participate in all medical care. In light of these signed consents, DMCPS and CHW policies and procedures permitted Plaintiffs to be present for any and all care, treatment, and assessments related to L.G..

68.      Defendants CHW and CHHS did not inquire of L.G.'s birth parents whether or not they wanted Plaintiffs present at the appointment.

69.      On May 10, 2019, Defendant Stuckert, an agent, employee, or apparent agent administrator with Defendant CHW, CHHS and/or MCW, directed DMCPS to deny Plaintiffs the right to be present for L.G.'s medical examination.

70.      Defendant Barber called Plaintiffs after L.G.'s appointment was over, and told them for the first time that they would not be able to participate in the medical visit and indeed that it was already over. Defendant Barber refused to provide the name of the person who evaluated L.G., or to provide any details about the visit other than that the provider had recommended a follow-up head CT scan, which was to be completed that day at 1pm. CT scans are typically part of evaluating a child for potential abuse because they can reveal bleeding in the head, which commonly results from abuse.

71.      Unbeknownst to Plaintiffs at that time, L.G. had been seen at the Child Advocacy Center by Defendant Ventura.

13

72.     Defendant Ventura is not a medical doctor. Under Wisconsin law, Defendant Ventura is not authorized to practice independently and requires supervision by a licensed physician. Under hospital policy that defines the scope of practice of advanced practice providers in the child advocacy department, Defendant Ventura requires supervision by a supervising physician in situations where the history, physical examination, or laboratory findings are inconsistent with the clinical presentation or upon request of the parent or guardian. Additionally, this hospital policy requires any abnormal finding be discussed with the supervising physician and documented in the patient's chart.

73.     Defendant Ventura misrepresented written history provided by Dr. Dobrozsi via email regarding L.G.'s skin findings, changing Dr. Dobrozsi's written words describing marks on L.G.'s arms from "birthmarks" to "bruises" in the medical record. This false entry in the medical record changed the narrative from one in which an infant had had an accident to one involving an infant who had been abused on multiple occasions.

74.     Defendant Ventura conducted an inappropriate, incomplete and deeply flawed examination of L.G., including through her failure to take any steps to obtain a complete and accurate patient history, which violates standard medical practice, multiple written hospital policies and procedures, and clinical practice guidelines developed by Defendant Petska.

75.     As a result of this inappropriate and flawed examination, Defendant Ventura purportedly reached the inaccurate and entirely unwarranted conclusion that certain marks on L.G.'s body were bruises, which demonstrated that L.G. had been abused.

76.     Defendant Ventura took photographs to document these purported "bruises."

77.     Three marks on L.G.'s skin were bruises that treating physicians concluded were explained by the accident Dr. Cox had with L.G. The additional marks were not bruises at all, but were birthmarks, as described by Dr. Dobrozsi, which Defendants would have correctly determined if they had completed an appropriate evaluation of L.G. following the applicable standards of care.

78.     Defendant Ventura's purported "examination" of L.G. violated the standard of care applicable to her as a nurse practitioner, established standards of care for the evaluation of child maltreatment by the American Academy of Pediatrics, and multiple hospital policies and procedures, including but not limited to her failure to obtain a complete and accurate patient history, her incorrect interpretation of laboratory results, her failure to properly document injuries to L.G. (including improper labeling of marks on L.G.'s body, improper photographs which were insufficient to document alleged injuries and did not include grayscale for color to properly document any alleged injuries), her inaccurate documentation in the medical record, and in her obviously erroneous determinations that L.G.'s birthmarks were bruises, and that these marks provided adequate basis to suspect that L.G. had been subjected to abuse.

79.     At all relevant times, Defendant Sheets was Defendant Ventura's supervising physician.

80.     At all relevant times, Defendant CHW and CHHS were responsible for ensuring there was a supervising physician for Defendant Ventura.

81.     Defendants Sheets and Gutzeit violated the applicable standards of care by failing to ensure that Defendant Ventura's erroneous and inappropriate examination and conclusions were supervised, reviewed, and corrected by a licensed physician.

15

82.    On May 10, 2019, Plaintiffs requested to speak to the person performing the medical examination of L.G., Defendant Ventura. Defendant Ventura refused to speak with Plaintiffs.

83.    Defendant Ventura documented in L.G.'s medical record that the "History of present illness, review of systems, and past medical, family and social histories are limited because patient was brought to the Child Advocacy Center by a CPS worker who does not have complete information." In doing so, Defendant Ventura acknowledged that medical information is not complete when a medical history is not obtained directly from the child's caregivers.

84.    Defendant Ventura failed to document that hospital personnel had prohibited Plaintiffs from attending the medical visit, and failed to document her refusal to speak with Plaintiffs by telephone.

85.    Defendant Ventura falsely stated to Defendant Barber that L.G. was "covered in bruises from head to toe."

86.    On May 10, 2019 Defendant Ventura concluded and diagnosed child abuse of L.G. based upon her evaluation, which was subsequently charted on May 15, 2019.

87.    Defendant Ventura called or ordered someone to call the police.

88.    Dr. Dobrozsi was permitted to attend L.G.'s appointment for a head CT, which took place in the afternoon of May 10. The head CT was completely normal, confirmed that L.G. had no bleeding in her head, and provided no basis whatsoever to believe that L.G. had suffered any abuse.

89.    After the CT scan was complete, Defendant Barber discussed L.G.'s examination at the Child Advocacy Center with Dr. Dobrozsi. Defendant Barber told Dr. Dobrozsi that she

16

believed Plaintiffs had not been allowed to participate in the examination because Plaintiffs were both physicians, who would be able to ask informed questions and who had the knowledge to be able to question the assessment made by the Child Advocacy Center provider.

90.     Unbeknownst to Plaintiffs, Defendants had contacted the police to ask them to investigate purported "unexplained injuries" on L.G. In making this determination to involve police, Defendants relied on Defendant Ventura's inappropriate and incomplete examination, and lacked any legitimate factual basis to suspect abuse.

91.     Dr. Dobrozsi's conversation with Defendant Barber was interrupted by the arrival of police.

92.     After police arrived, Dr. Dobrozsi was subjected to a lengthy period of invasive and humiliating questioning by police, touching on intimate details of Plaintiffs' relationship with each other, their family life, and their care for L.G. These interactions took place at Dr. Dobrozsi's place of employment, where her professional colleagues could observe her being interviewed by a uniformed police officer.

93.     While Dr. Dobrozsi, the police officer, and Defendant Barber were talking, the officer requested that Dr. Dobrozsi undress L.G. to show him the bruises that Defendant Ventura had purportedly identified.

94.     At that time, Dr. Dobrozsi undressed L.G. and showed him three small bruises. The police officer stated that Defendant Ventura had said there were "bruises from head to toe" and asked Defendant Barber where they were. Defendant Barber stated that she did not know and was not qualified to identify any bruises.

17

95.    The police did not find any evidence to substantiate the allegations of abuse, telling Plaintiffs that they were surprised by the benign and unremarkable circumstances they found, which contradicted the information given to them by Defendants who initiated the police investigation. Police told Plaintiffs that they believed L.G. was not showing any indication of having been injured.

96.    Defendant Scherbarth documented that "IASW spoke with Det. Donovan privately. He stated at this point, he wasn't sure why they were even out there as he did not see anything criminal."

97.    Defendant Barber and Defendant Gilbert told Dr. Dobrozsi that, going forward and for an indefinite period of time, Plaintiffs would not be permitted to be around any of their children, including L.G. and both of their other two children, without direct supervision.

98.    Plaintiffs were improperly forced to submit to a "protection plan," pursuant to which Dr. Dobrozsi's parents were required to come to Plaintiffs' home and be available 24/7 to "supervise" all of Plaintiffs' interactions with any of their children.

99.    Plaintiffs took their children home with supervision from Dr. Dobrozsi's parents.

100.    Later that evening, Plaintiffs called Dr. Pomeranz to inform him of what occurred. Dr. Pomeranz requested that Plaintiffs take L.G. to see a dermatologist first thing on Monday, May 13, 2019 to get an expert to look at her skin given the significant discrepancies between his examination of L.G.'s skin, Defendant Petska's examination of the skin, and Defendant Ventura's examination of the skin (with the latter identifying significantly more bruises than either physician).

18

101.    On May 11, 2019, Catholic Charities and L.G.'s birth parents were informed of what occurred.

102.    On May 12, 2019, two Catholic Charities social workers and L.G.'s birth parents came to Plaintiffs' home.

103.    On May 13, 2019, Plaintiffs took L.G. to the pediatric dermatologist Dr. Yvonne Chiu for an examination of L.G. After a thorough examination of L.G., Dr. Chiu concluded that most of the marks on L.G.'s skin were birthmarks and not bruises, and that the three small bruises on L.G.'s skin were consistent with Dr. Cox's detailed description of what had happened on May 9, 2019.

104.    In violation of the applicable standard of care and applicable hospital policies and procedures, Defendants withheld the photographs taken by Defendant Ventura from Dr. Chiu. Indeed, Defendants withheld the photographs entirely from L.G.'s medical record, storing them on a server solely accessible to providers affiliated with the Child Advocacy Center, although Defendants shared the photos immediately with DMCPS. This violated both standard medical practice and Defendant CHW's policy, which required that all patient records be maintained in the medical record.

105.    By violating standard practice and hospital policy in this way, Defendants guaranteed that L.G.'s treating physicians with expertise in relevant areas would not have the benefit of the full medical file, preserving Defendant's ability to seek to discredit any contrary conclusions by those physicians.

106.    By withholding the photographs taken by Defendant Ventura from the medical file and from Plaintiffs, Defendants effectively thwarted Plaintiffs' efforts to advocate for

19

themselves, for L.G., and for their family, and thwarted Plaintiffs' efforts to rebut the false allegations that L.G.'s injury was the result of abuse.

107. Despite being hampered by Defendants' misconduct, throughout the process, Plaintiffs engaged in advocacy protected by the First Amendment to rebut the spurious allegations of abuse, to keep L.G. as a valued and beloved member of their family, and ultimately with the goal of reaching a truthful resolution to the investigation and completing their planned adoption of L.G.

108. On May 14, 2019, Plaintiffs filed a grievance with Defendant CHW and CHHS complaining of the medical examination performed by Defendant Ventura, for her failure to take a medical history and mechanism of injury from Dr. Cox. Plaintiffs also sought to find out who performed any medical examination and what physician was responsible for that examination or reviewed Defendant Ventura's findings. Plaintiffs' grievance was brought to Defendant Gutzeit by hospital personnel on May 15, 2019.

109. On at least six separate occasions, Plaintiffs brought their concerns about the substandard medical care to Defendants through various formal mechanisms available to all parents and caregivers of patients. These included in-person meetings on May 13, May 17, May 27 and August 12, a written grievance filed on May 28 and a written grievance appeal filed on July 2. Several of the in-person meetings were attended by hospital leadership, including Defendant Gutzeit, and resulted in written responses from Defendants Sheets, Ventura and Gutzeit.

110.     During the course of this constitutionally-protected advocacy, Plaintiffs directed a substantial quantity of factual and entire justified criticism towards Defendants and their conduct.

111.     Plaintiffs repeatedly questioned why they were not allowed to participate in L.G.'s medical visit on May 10, 2019 due to their status as physicians.

112.     Defendants Sheets, Ventura, and Gutzeit responded in writing that "Your employment as pediatricians at MCW and your membership on the CHW medical staff had no impact on decisions regarding being present at the time of the CAPS medical evaluation." This statement clearly contradicted earlier statements by Defendant Parr-Neslon and others citing Plaintiffs' employment as the sole reason for prohibiting their participation in the medical visit.

113.     Plaintiffs repeatedly requested the name of the physician who supervised Defendant Ventura for the medical care provided on May 10, 2019, based on the requirements for physician supervision of nurse practitioners contained in CHW's policies and procedures. Defendants Sheets, Ventura and Gutzeit declined to name a physician responsible for the care and instead responded only that "[t]he collaborating physicians for the CAPS nurse practitioners are the physicians on the CAPS team."

114.     At some point after Defendant Ventura's inappropriate and incomplete examination of L.G., Defendants came to realize that the conclusion that L.G. had been subjected to abuse was wrong, and was the result of their violations of the applicable standards of care, their violations of applicable policies and procedures, and their inappropriate and unjustifiable conduct during the course of their investigation into L.G.'s injury.

21

115.    Rather than admit the truth, in order to cover up and obscure the evidence of their wrongdoing and of these violations, and in retaliation for Plaintiffs' advocacy and criticism, Defendants conspired with one another to take whatever steps were necessary to smear Plaintiffs' reputations, to generate false substantiation for the allegations of abuse, and to support the decision to remove L.G. from Plaintiffs' care.

116.    On May 21, 2019, Plaintiffs met with Defendants Scherbarth, Jewell and Hartmann at the offices of Child Protective Services. During this meeting, Defendants repeatedly rebuffed Plaintiffs efforts to provide truthful information about the circumstances of L.G.'s injury, rejected the medical evidence of other providers who had concluded that L.G. was not abused, and continually referred back to and relied on the inappropriate and inaccurate evaluation completed by Defendant Ventura.

117.    Defendants additionally refused to let Plaintiffs see the photographs taken by Defendant Ventura and refused to provide information about Defendant Ventura's evaluation, while at the same time demanded that Plaintiffs provide explanations for Defendant Ventura's findings.

118.    On May 24, 2019, Defendant Scherbarth, at the direction of the other Defendants, came to Plaintiffs' home and removed L.G. from their care.

119.    Defendants caused L.G. to be removed from Plaintiffs' home without any legal authority or factual justification, without a court order or any emergency circumstances justifying such removal, and without the consent of Plaintiffs or of L.G.'s birth parents to remove L.G. from the home.

22

120. Defendants' decision to remove L.G. from Plaintiffs' home was based solely on the results of Defendant Ventura's inappropriate and incomplete examination, which she conducted without the supervision of a licensed physician. Defendants relied on Defendant Ventura's findings despite multiple treating physicians' conclusions that Dr. Cox's account of what happened was consistent with L.G.'s injuries, and that there was no medical basis to conclude that the injuries were caused by abuse.

121. Defendants knew at the time they took these actions that Defendant Ventura's examination was deeply flawed, that the resulting report purportedly documenting abuse was inaccurate and not drafted by a licensed physician, and that multiple treating physicians had concluded that there was no medical basis to suspect abuse.

122. Defendants repeatedly attempted to justify their unjustifiable conduct and their deviations from standard procedures by stating that Plaintiffs did not deserve the protections and rights afforded by those procedures because Plaintiffs were acting in the capacity as foster parents. For example, Defendant Gutzeit supported Defendant Ventura's disregard for standard medical practice, stating that Plaintiffs' status as foster parents justified their exclusion from L.G.'s medical evaluation.

123. Defendants' actions were taken in furtherance of their conspiracy to avoid accountability for their misconduct and to retaliate against Plaintiffs for their outspoken advocacy.

124. Defendants would not have, and would not have been able to, remove L.G. from Plaintiffs home in this manner, had L.G. been Plaintiffs' biological child or if the accident had occurred a few months later after Plaintiffs had completed the formal process of adoption.

23

Defendants took the unprecedented and unjustifiable step of removing L.G. from Plaintiffs'

home without judicial oversight because Plaintiffs were pre-adoptive parents to L.G., a

relationship which Defendants did not view as having any meaning or importance that was worth

protecting.

125.    Following the removal of L.G. from Plaintiff's home, Defendants repeatedly

failed to adhere to statutory timelines to complete the initial and final determinations, and

violated the procedures required by statute and DMCPS policies in order to gain additional

information outside of the administrative process afforded to Plaintiffs by law to support their

baseless allegations of abuse.

126.    Tragically, the end result of Defendants' conspiracy was that L.G. was removed

from the loving home and loving family she had begun to make with Plaintiffs and their other

two children, never to return to their care. Plaintiffs' intentions to adopt L.G. and to make her a

permanent member of their family were unjustifiably and irreversibly thwarted by Defendants.

127.    Defendants' above misconduct took place without any due process whatsoever

provided to Plaintiffs. Any apparent "process" or procedural protections provided to Plaintiffs

were intentionally tainted and thwarted by Defendants' deliberate acts and omissions to

perpetuate the false narrative that L.G. had been subjected to abuse.

### Plaintiffs' Damages

128.    As a result of Defendants' misconduct, Plaintiffs suffered a series of catastrophic

harms, including one of the most severe harms imaginable—the permanent loss of a child.

129.    Plaintiffs seeks to recover for the severe harms caused by Defendants, including

but not limited to damages for the severe emotional pain and suffering, mental anguish,

humiliation, degradation and anxiety they suffered and continue to suffer as a result of the false

24

allegations of abuse and the permanent loss of L.G. as a member of their family; the loss of society and companionship that Plaintiffs and their family have suffered and continue to suffer; and the serious and ongoing damage to Plaintiffs' personal and professional reputations as a result of Defendants' false allegations of abuse.

**COUNT I**
**42 U.S.C. § 1983—Due Process—All Defendants**

130.  Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

131.  As a result of their status as L.G.'s pre-adoptive parents and as supported by the facts alleged above, Plaintiffs had a liberty interest in their existing and anticipated future familial relationship with L.G.

132.  In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, acted to deprive Plaintiffs of their liberty interest in their existing and anticipated future familial relationship with L.G., without due process of law and in violation of their rights secured by the U.S. Constitution.

133.  The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

134.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

135.  As a result of the Defendants' misconduct described in this Count, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

25

136.     WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT II
### 42 U.S.C. § 1983—Equal Protection (Status as pre-adoptive parents)—All Defendants

137.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

138.     In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, treated Plaintiffs less favorably, afforded them fewer rights, privileges, and procedural protections, and acted in a manner violative of Plaintiffs' dignity and basic human and civil rights on account of Plaintiffs' status as pre-adoptive parents.

139.     In doing so, the Individual Defendants acted with discriminatory animus towards Plaintiffs on account of their status as pre-adoptive parents, a status which the Individual Defendants did not view as worthy of their care, attention or respect.

140.     There was no rational basis for the manner in which the Individual Defendants treated Plaintiffs less favorably on account of their status as pre-adoptive parents.

141.     The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

142.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

143.     As a result of the Defendants' misconduct described in this Count, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

26

144.     WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT III
**42 U.S.C. § 1983—Equal Protection (Status as physicians)—All Defendants**

145.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

146.     In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, treated Plaintiffs less favorably, afforded them fewer rights, privileges, and procedural protections, and acted in a manner violative of Plaintiffs' dignity and basic human and civil rights on account of Plaintiffs' employment status as physicians.

147.     In doing so, the Individual Defendants acted with discriminatory animus towards Plaintiffs on account of their employment status as physicians.

148.     There was no rational basis for the manner in which the Individual Defendants treated Plaintiffs less favorably on account of their employment status as physicians.

149.     The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

150.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

151.     As a result of the Defendants' misconduct described in this Count, Plaintiffs' were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

152.     WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

27

## COUNT IV
### 42 U.S.C. § 1983—Equal Protection ("Class of one")—All Defendants

153. Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

154. In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, treated Plaintiffs less favorably and afforded them fewer rights, privileges, and procedural protections than similarly situated individuals were treated.

155. In doing so, the Individual Defendants acted with illegitimate animus towards Plaintiffs.

156. There was no rational basis for the manner in which the Individual Defendants treated Plaintiffs less favorably.

157. The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

158. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

159. As a result of the Defendants' misconduct described in this Count, Plaintiffs' were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

160. WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT V
### 42 U.S.C. § 1983—Retaliation—All Defendants

161. Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

28

162. In the manner described more fully above, Plaintiffs engaged in constitutionally-protected speech and advocacy, and petitioned for the redress of their grievances related to their egregious mistreatment at the hands of Defendants.

163. In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, acted intentionally to perpetuate baseless allegations of abuse against Plaintiffs, to remove L.G. from Plaintiffs' home, and ultimately to sever Plaintiffs' present and expected future familial relationship with L.G.

164. In doing so, the Individual Defendants acted in retaliation for Plaintiffs' constitutionally-protected speech.

165. The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

166. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

167. As a result of the Defendants' misconduct described in this Count, Plaintiffs' were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

168. WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT VI
### 42 U.S.C. § 1983—Failure to Intervene—All Defendants

169. Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

29

170.     In the manner described more fully above, during the Constitutional violations described above, one or more of the Individual Defendants stood by without intervening to prevent the misconduct.

171.     The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

172.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.

173.     As a direct and proximate result of the Individual Defendants' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

174.     WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

<u>**COUNT VII**</u>
**42 U.S.C. § 1983—Conspiracy—All Defendants**

175.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

176.     All of the Individual Defendants reached an agreement amongst themselves to deprive Plaintiffs of their constitutional rights, as described in greater detail above.

177.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint action.

178.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

30

179. The Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of one or more of the Entity Defendants.

180. As a direct and proximate result of the illicit agreement referenced above, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

181. WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT VIII
### 42 U.S.C. § 1983—Supervisory Liability—Defendants Petska, Sheets, Gutzeit, Parr-Nelson, Jewell, and Hartmann

182. Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

183. The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Individual Defendants who acted in a supervisory capacity, such that these such that these Defendants personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

184. As a direct and proximate result of the misconduct referenced above, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

185. WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT IX
### Negligence—All Defendants

186.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

187.    At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of MCW, CHHS, CHW and DMCPS had a duty to exercise ordinary care to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

188.    At all times relevant to the events described above, each of the Individual Defendants had a duty to exercise ordinary care to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

189.    The Defendants breached their duty of ordinary care in one or more of the following ways:

   a. Negligently conducted a child welfare exam in violation of policies and procedures;

   b. Negligently transferred the care of L.G. to an advance practice nurse practitioner rather than a board-certified child abuse physician;

   c. Improperly "identified" eight bruises on L.G. that were not bruises;

   d. Misinterpreted abnormal bloodwork as normal;

   e. Failed to get the appropriate specialties or consultations prior to concluding that child abuse had occurred;

   f. Failed to consider Dr. Cox's medical history regarding mechanism of injury to L.G.;

   g. Failed to obtain Dr. Cox's medical history regarding mechanism of injury to L.G.;

   h. Failed to properly and appropriately document and photograph marks on L.G.'s body;

32

    i.    Made allegations of abuse on the basis of medical findings tainted by one or more of the above failures;

    j.    Removed L.G. from Plaintiffs' home on the basis of medical findings tainted by one or more of the above failures; and

    k.    Terminated Plaintiffs' familial relationship with L.G. on the basis of medical findings tainted by one or more of the above failures.

190.    As a result of the Defendants' misconduct described in this Count, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

191.    WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT X
### Willful & Wanton Misconduct—All Defendants

192.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

193.    At all times relevant to the events described above, Defendants failure to discuss their findings with Plaintiffs, other consultants, and L.G.'s birth parents, showed a conscious disregard for the truth and malicious intent.

194.    Plaintiffs were requesting the opportunity of all Defendants to describe the mechanism of injury, to which the Defendants ignored the request and/or denied Plaintiffs the opportunity to provide the mechanism of injury to Defendants.

195.    At all relevant times, each Defendant's reckless conduct resulted in Defendants acting with malicious intent towards Plaintiffs.

196.    Defendants acted with an intentional disregard for the rights of Plaintiffs.

33

197. At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of MCW, CHHS, CHW and DMCPS had a duty to not intentionally disregard the rights of Plaintiffs, to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

198. At all times relevant to the events described above, each of the Individual Defendants had a duty to not intentionally disregard the rights of Plaintiffs, to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

199. The Defendants breached their duty of care in one or more of the following ways:

    a. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs conducted a child welfare exam in violation of policies and procedures;

    b. Purposely transferred the care of L.G. to an advance practice nurse practitioner rather than a board-certified child abuse physician;

    c. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs improperly "identified" eight bruises on L.G. that were not bruises;

    d. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs misinterpreted abnormal bloodwork as normal;

    e. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs failed to get the appropriate specialties or consultations prior to concluding that child abuse had occurred;

    f. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs failed to consider Dr. Cox's medical history regarding mechanism of injury to L.G.;

    g. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs failed to obtain Dr. Cox's medical history regarding mechanism of injury to L.G.;

    h. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs failed to properly and appropriately document and photograph marks on L.G.'s body;

    i. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs made allegations of abuse on the basis of medical findings tainted by one or more of the above failures;

34

j. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs removed L.G. from Plaintiffs' home on the basis of medical findings tainted by one or more of the above failures; and

k. Willfully, wantonly, and with reckless disregard for the rights of Plaintiffs terminated Plaintiffs' familial relationship with L.G. on the basis of medical findings tainted by one or more of the above failures.

200.    As a result of the Defendants' misconduct described in this Count, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

201.    WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

<u>COUNT XI</u>
**Professional Negligence—All Defendants**

202.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

203.    At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of MCW, CHHS, CHW and DMCPS had a duty to exercise ordinary care and its employees, agents, and/or apparent agents had a duty to act as a reasonably careful person in the same or similar circumstances and to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

204.    At all times relevant to the events described above, Defendant Ventura had a duty to exercise ordinary care and had a duty to act as a reasonably careful advance practice nurse practitioner in the same or similar circumstances and to refrain from any act which will cause

35

foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

205.    At all times relevant to the events described above, Defendants Petska, Sheets, and Gutzeit had a duty to exercise ordinary care and had a duty to act as a reasonably careful physician in the same or similar circumstances and to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

206.    At all times relevant to the events described above, Defendants Gutzeit, Stuckert, Parr-Nelson, Jewell, and Hartmann had a duty to exercise ordinary care and had a duty to act as a reasonably careful administrator in the same or similar circumstances and to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

207.    At all times relevant to the events described above, Defendants Parr-Nelson, Barber, Gilbert, Scherbarth, Jewell, and Hartmann had a duty to exercise ordinary care and had a duty to act as a reasonably careful child protection worker in the same or similar circumstances and to refrain from any act which will cause foreseeable harm to Plaintiffs, and to refrain from any act which creates an unreasonable risk to Plaintiffs.

208.    The Defendants breached their duty of care in one or more of the following ways:

   a.   Negligently conducted a child welfare exam in violation of policies and procedures;

   b.   Negligently transferred the care of L.G. to an advance practice nurse practitioner rather than a board-certified child abuse physician;

   c.   Improperly "identified" eight bruises on L.G. that were not bruises;

   d.   Misinterpreted abnormal bloodwork as normal;

36

e. Failed to get the appropriate specialties or consultations prior to concluding that child abuse had occurred;

f. Failed to consider Dr. Cox's medical history regarding mechanism of injury to L.G.;

g. Failed to obtain Dr. Cox's medical history regarding mechanism of injury to L.G.;

h. Failed to properly and appropriately document and photograph marks on L.G.'s body;

i. Made allegations of abuse on the basis of medical findings tainted by one or more of the above failures;

j. Removed L.G. from Plaintiffs' home on the basis of medical findings tainted by one or more of the above failures; and

k. Terminated Plaintiffs' familial relationship with L.G. on the basis of medical findings tainted by one or more of the above failures.

209. As a result of the Defendants' misconduct described in this Count, Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish and other grievous and continuing injuries and damages as set forth above.

210. WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT XII
### Negligent Infliction of Emotional Distress—All Defendants

211. Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

212. At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of MCW, CHHS, CHW and DMCPS acted without ordinary care or as a person in their conduct described herein.

37

213.    At all times relevant to the events described above, each of the Individual Defendants acted without ordinary care or as a reasonable person in her conduct described herein.

214.    All of the conduct described herein by Defendants, a reasonable person would recognize as creating an unreasonable risk of injury to Plaintiffs.

215.    As a proximate result of Defendants' negligent conduct, Plaintiffs suffered severe emotional distress.

216.    WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

### COUNT XIII
### Intentional Infliction of Emotional Distress—All Defendants

217.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

218.    At all times relevant to the events described above, the physicians, advance practice nurse practitioners, physician assistants, registered nurses, administrators, employees, agents, and apparent agents of MCW, CHHS, CHW and DMCPS intentionally and/or recklessly in their conduct described herein.

219.    At all times relevant to the events described above, each of the Individual Defendants acted intentionally and/or recklessly in their conduct described herein.

220.    All of the conduct described herein by Defendants was extreme and outrageous.

221.    As a proximate result of Defendants' intentional and/or reckless extreme and outrageous conduct, Plaintiffs suffered severe emotional distress.

222.    WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

38

## COUNT XIV
### Tortious Interference—All Defendants

223.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

224.    At all relevant times, prior to May 10, 2019, Plaintiffs had a reasonable expectancy of entering into a valid adoption with Catholic Charities and L.G.'s birth parents.

225.    Prior to May 10, 2019, Plaintiffs undertook to formally adopt L.G.

226.    At all times relevant to the events described above, Defendants knew of the Plaintiffs' intentions to adopt L.G. and Plaintiffs' status as pre-adoptive foster parents.

227.    Defendants' negligent, willful and wanton, reckless, and false representations related to Plaintiffs resulted in Plaintiffs inability to adopt L.G.

228.    Defendants' interfering acts were done willfully, or with a wanton disregard for the rights of Plaintiffs.

229.    Plaintiffs suffered personal and pecuniary damages, and harm to their reputation as a result of Defendants' tortious interference in that they were not able to fulfill the adoption of L.G.

230.    WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.


## COUNT XV
### Defamation / Dr. Cox—All Defendants

231.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

232.    At all relevant to the events described above, a physician, advance practice nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of MCW, CHHS, CHW, and/or DMCPS stated that Dr. Cox had abused his child.

39

233.    At all relevant to the events described above, a physician, advance practice nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of MCW, CHHS, CHW, and/or DMCPS published the statement that Dr. Cox had abused his child.

234.    At all times relevant to the events described above, each of the Individual Defendants stated and/or adopted the statement that Dr. Cox had abused his child.

235.    At all times relevant to the events described above, each of the Individual Defendants published the statement that Dr. Cox had abused his child.

236.    The statement that Dr. Cox had abused his child is false.

237.    No recognized privilege exists for any Defendant stating Dr. Cox had abused his child.

238.    As a direct and proximate result of Defendants' actions, Dr. Cox suffered injury of a personal and pecuniary nature.

239.    WHEREFORE, Dr. Cox demands judgment against Defendants in an amount in excess of Jurisdictional limits.


## COUNT XVI
### Defamation / Loss of Consortium—All Defendants

240.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

241.    At all times relevant to the events described above, Dr. Dobrozsi was the lawful spouse of Dr. Cox.

242.    As a direct and proximate result of the negligence suffered by Dr. Cox, Dr. Dobrozsi has suffered an injury to her relationship, companionship and support.

40

243.    At all relevant to the events described above, a physician, advance practice nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of MCW, CHHS, CHW, and/or DMCPS stated that Dr. Cox had abused his child.

244.    At all relevant to the events described above, a physician, advance practice nurse practitioner, physician assistant, registered nurse, administrator, employee, agent, and/or apparent agent of MCW, CHHS, CHW, and/or DMCPS published the statement that Dr. Cox had abused his child.

245.    At all times relevant to the events described above, each of the Individual Defendants stated and/or adopted the statement that Dr. Cox had abused his child.

246.    At all times relevant to the events described above, each of the Individual Defendants published the statement that Dr. Cox had abused his child.

247.    The statement that Dr. Cox had abused his child is false.

248.    No recognized privilege exists for any Defendant stating Dr. Cox had abused his child.

249.    As a direct and proximate result of Defendants' actions, Dr. Dobrozsi suffered injury of a personal and pecuniary nature.

250.    WHEREFORE, Dr. Dobrozsi demands judgment against Defendants in an amount in excess of Jurisdictional limits.

## COUNT XVII
### Indemnification—Defendants MCW, CHHS, CHW and DMCPS

251.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

41

252.    Each of the Entity Defendants are required by law, contract or other obligation to pay any tort judgment for compensatory damages for which their employees are liable within the scope of their employment activities.

253.    WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of Jurisdictional limits.

*       *       *

WHEREFORE, Plaintiffs John Cox, M.D. and Sarah Dobrozsi, M.D. respectfully request that this Court enter judgement in their favor and against Defendants, awarding compensatory damages, punitive damages, attorney's fees and costs, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiffs John Cox, M.D. and Sarah Dobrozsi, M.D. hereby demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Plaintiffs John Cox, M.D. and Sarah Dobrozsi, M.D.

_/s/ Sam Heppell_

42

One of the Attorneys for the Plaintiffs

Brian Monico
HALE & MONICO, LLC
53 W. Jackson Blvd.
Suite 330
Chicago, IL 60604
(312) 341-9646
BTM@HaleMonico.com

Jon Loevy
Sam Heppell
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
sam@loevy.com