# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN COX and SARAH DOBROZSI,

               Plaintiffs,

v.

THE MEDICAL COLLEGE OF
WISCONSIN INC., CHILDREN'S
HOSPITAL AND HEALTH SYSTEM
INC., CHILDREN'S HOSPITAL OF
WISCONSIN INC., RITA VENTURA,
HILARY PETSKA, LYNN SHEETS,
MICHAEL GUTZEIT, DEMETRA
PARR-NELSON, JESSICA BARBER,
AMY SCHERBARTH, STEPHANIE
JEWELL, LORRAINE HARTMANN,
MICHELLE URBAN, HEATHER
MILLER, and REBECCA CHAGALL,

               Defendants.

Case No. 22-CV-553-JPS

**ORDER**

## 1.      INTRODUCTION

Plaintiffs John Cox ("Cox") and Sarah Dobrozsi ("Dobrozsi") (jointly, "Plaintiffs") filed an amended complaint in this action on July 18, 2022. ECF No. 37.[1] On August 12, 2022, three groups of Defendants submitted separate motions to dismiss. ECF Nos. 41, 43, 46. The Court refers to the groups of Defendants as follows:

- Jessica Barber ("Barber"), Rebecca Chagall ("Chagall"), Lorraine Hartmann ("Hartmann"), Stephanie Jewell ("Jewell"), Heather

---

[1] The amended complaint adds several Defendants and terminates several others. The amended complaint, ECF No. 37, serves as the operative complaint in this action.

Miller ("Miller"), Demetra Parr-Nelson ("Parr-Nelson"), Amy Scherbarth ("Scherbarth"), and Michelle Urban ("Urban") (collectively, the **"CPS Defendants"**)

- Medical College of Wisconsin ("MCW"), Lynn Sheets ("Sheets"), and Hillary Petska ("Petska") (collectively, the **"MCW Defendants"**)
- Children's Hospital and Health System, Inc. ("CHHS"), Children's Hospital of Wisconsin, Inc. ("CHW"), Rita Ventura ("Ventura"), and Michael Gutzeit ("Gutzeit") (collectively, the **"Children's Defendants"**)

As of October 14, 2022, and after extensions of time to respond and reply, *see* text only orders on September 6, 2022; September 19, 2022; and September 29, 2022, and an order granting a request to file an oversized brief, *see* text only order on September 22, 2022, the motions to dismiss are now fully briefed. ECF Nos. 42, 44, 47, 61, 63, 64, 66. On August 12, 2022, Defendants also filed a joint motion to stay discovery, ECF No. 51, which is now also fully briefed, ECF Nos. 52, 56, 57. For the reasons discussed herein, the Court will grant in part and deny in part the motions to dismiss and will deny as moot the motion to stay discovery.

## 2. FACTUAL BACKGROUND[2]

Cox and Dobrozsi, spouses, are both medical doctors licensed to practice by the State of Wisconsin. At the time of the relevant events, Plaintiffs resided in Wauwatosa, Wisconsin, worked as physicians in Wisconsin, and had two adopted children.

In 2019, Plaintiffs decided to adopt another child. That child is referred to herein as L.G. In coordination with L.G.'s birth parents and a

---

[2]As required at the motion to dismiss stage, the following facts are drawn solely from the amended complaint, ECF No. 37. *See* ECF No. 10 at 2 ("[T]he Court will consider only the facts as they are stated in the complaint; the parties should omit a facts section from their briefing.").

private adoption agency, Catholic Charities, prior to L.G.'s birth in April of 2019, Plaintiffs planned to adopt her. Plaintiffs entered into an agreement with Catholic Charities and with L.G.'s birth parents to that effect. Under that plan, Plaintiffs would become "pre-adoptive parents" immediately following L.G.'s birth. That phrase represents a period prior to formal, official adoption, required by Wisconsin law. Plaintiffs brought L.G. to their home on April 11, 2019. During this pre-adoptive period, L.G. lived in Plaintiff's home.

On May 9, 2019, an incident occurred in Plaintiffs' home, resulting in injuries to L.G. That morning around 5 A.M., Cox was holding L.G. in his arm while he read on his bed. Cox fell asleep while holding L.G. L.G. was later determined to have resulting skin lesions on her arms as well as having suffered a broken clavicle.

The same day as the incident, as well as several times in the following days, L.G. was evaluated by medical professionals. In total, L.G. was seen by three separate physicians, two of whom performed a physical examination on L.G., obtained L.G.'s medical history, and reached a diagnosis. L.G. was first taken to Dr. Pomeranz, the family's pediatrician. Dr. Pomeranz referred L.G. to be seen by another physician, Petska, who specialized in cases of possible child abuse. This referral was standard procedure. Dr. Pomeranz also referred L.G. to be seen by a pediatric dermatologist. As a result of Dr. Pomeranz's communication with Petska, Dr. Pomeranz ordered imaging studies of L.G.'s clavicle and shoulder. Cox was instructed to take L.G. to CHW[3] for these imaging studies.

---

[3] CHHW owns and operates CHW. ECF No. 37 at 4–5.

Dobrozsi brought L.G. to CHW. Dobrozsi was then informed by Dr. Pomeranz that the plan had changed, and that Petska was requiring not just imaging studies of the shoulder and clavicle, but a "full child abuse screening workup, including full body skeletal survey, head Computed Tomography (CT) scan, and blood work." Upon learning this from Dr. Pomeranz, Dobrozsi requested that Petska perform a full medical evaluation and explain the next steps. Petska agreed and spoke with Cox over the phone about how the incident occurred. Petska performed a full medical evaluation and concluded that a head CT would not be needed at that time, but that the blood work and skeletal survey would still be done. Based on her medical evaluation and her phone conversation with Cox, Petska concluded that the skin lesions on L.G.'s arms were not necessarily indicative of abuse.

Having reached this conclusion, Petska told Dobrozsi that if Dr. Pomeranz had not already called CPS to report possible abuse, Dr. Pomeranz could wait to do so. Dobrozsi communicated this by text to Dr. Pomeranz, but Dr. Pomeranz had already initiated the referral to CPS.

Petska continued with the medical evaluation, coordinating to complete shoulder and clavicle x-rays, blood work, and a skeletal survey. She thereafter permitted Dobrozsi to return home with L.G. The results of this evaluation did not reveal any "definitive evidence" of child abuse, nor did they necessarily indicate that Cox had intentionally harmed L.G. Petska communicated this to Cox over the phone.

Thereafter, it was determined that Petska would recuse herself from the care and treatment of L.G. based on a supposed conflict of interest. This determination was reached because Petska and Plaintiffs worked for the same hospital system. Accordingly, Petska and Sheets concluded that L.G.

should be evaluated by a different medical provider. According to Plaintiffs, Petska retained obligations to ensure that L.G. would be seen by a provider who could provide the same or a higher level of care and to continue to care for L.G. until L.G. could be seen by a different provider.

Petska transferred care of L.G. from herself to nurse practitioner Ventura, an employee of CHHS and/or CHW.[4] Ventura was affiliated with the Milwaukee Child Advocacy Center[5] but was not herself a board-certified child advocacy pediatrician. Following this referral to Ventura, Petska called Plaintiffs to give them the results of the lab work that had been ordered for L.G. Petska informed Plaintiffs that the results of the lab work were "normal," which was apparently an erroneous statement. Petska instructed Plaintiffs to go to an outpatient clinic run and operated by CHW and CHHS the following day. Petska did not, however, disclose to Plaintiffs the identity of the medical provider to whom she had referred L.G. Petska assured Plaintiffs that they would be able to have all their questions answered at that clinic, including review of the lab work that had been performed.

On May 9, 2019 (the day of the incident, and the day before the medical evaluation by Ventura), CPS sent a social worker to Plaintiffs' home to interview them and assess the home and L.G. The social worker found no reason to intervene at that time.

On May 10, 2019, L.G. was scheduled to be seen by Ventura, as instructed by Petska. That same morning, Barber, an employee of CPS,

---

[4]As noted *supra* at n. 3, CHW is owned and operated by CHHW, and the amended complaint does not make clear by which entity Ventura is employed.

[5]The Milwaukee Child Advocacy Center is owned and operated by CHW. ECF No. 37 at 5.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 5 of 116   Document 67

informed Plaintiffs that officials at CPS and CHW had determined that Plaintiffs would not be allowed to attend that appointment. Plaintiffs did not, at this time, know the identity of the medical professional into whose care L.G. had been transferred, and Barber refused to provide Plaintiffs with that information. According to Plaintiffs, their exclusion from L.G.'s appointment at the outpatient clinic violated standard medical practice and deviated from MCW and CPS's policies and procedures. Plaintiffs allege that they were disallowed from attending the appointment because of their professions as physicians. Plaintiffs also allege that they were not afforded the protections and rights they were entitled to as pre-adoptive parents because Defendants considered that status as being less worthy of protection.

Barber took L.G. to the appointment. Plaintiffs allowed Barber to take L.G. without them because they believed they would be allowed to participate in the appointment via telephone. Plaintiffs claim they were fully authorized to participate in L.G.'s medical care by virtue of signed consents from L.G.'s birth parents and Catholic Charities.

Plaintiffs requested to speak to the individual performing the medical examination of L.G. at that appointment. Their request was denied, and Ventura did not speak with them. Barber informed Plaintiffs that the then-undisclosed medical provider had recommended a follow-up head CT scan (commonly utilized in evaluations for possible child abuse) to be completed that same day, but Barber provided no other details.

Ventura, unlike the physicians who evaluated L.G., concluded that L.G.'s injuries resulted from abuse. According to Plaintiffs, Ventura, unlike the evaluating physicians, did not conduct her examination pursuant to standard medical procedures for evaluation of potential child abuse.

Ventura's evaluation, according to Plaintiffs, was inappropriate, incomplete, and flawed. Plaintiffs allege that Ventura's examination of L.G. violated the standard of care applicable to Ventura as a nurse practitioner, clinical practice guidelines developed by Petska, the established standards of care for evaluation of child maltreatment by the American Academy of Pediatrics, and CHW's own policies and procedures. She failed to document a "complete and accurate patient history" and improperly labeled marks on L.G.'s body. She took improper photographs which were insufficient to document the alleged injuries. She misinterpreted bloodwork, resulting in her ruling out "any possibility that L.G. suffered from a bleeding disorder that would make her more susceptible to bruising." She also allegedly misinterpreted x-rays. Collectively, these errors resulted in Ventura's conclusion that all the marks on L.G.'s body were bruises, all of which were intentionally caused, indicating abuse. Ventura told Barber that L.G. was "covered in bruises from head to toe."

In her documentation of her evaluation of L.G., Ventura wrote that L.G.'s past medical and family history was limited because L.G. was brought to the clinic by a CPS worker who did not have complete information. She did not therein note that Defendants had prohibited Plaintiffs from attending the appointment, nor did she document her refusal to speak with Plaintiffs. According to Plaintiffs, her documentation also utilized inflammatory and incorrect statements that went beyond the scope of the evaluation she had performed. Ventura wrote that "[i]nfants with unexplained bruising are at risk for more serious injury and/or death. Failure to place this child in a safe environment increases the risk of further harm." Plaintiffs allege that this inappropriately implied that their home

was not a safe environment for L.G. CPS relied on Ventura's documentation in concluding that L.G. should be removed from Plaintiffs' home.

According to Plaintiffs, MCW, CHW, and CHHS[6] had policies requiring that Ventura be supervised by a physician in certain situations, including upon request of the parent or guardian. Sheets was Ventura's supervising physician, but Ventura was not supervised by Sheets or any other physician during the appointment at issue. Ventura presented herself to CPS personnel and police as "Dr. Ventura," improperly suggesting that she was a medical doctor within the context of the child abuse evaluation. By failing to ensure that Ventura's evaluation and conclusions were supervised and corrected as necessary, Gutzeit (CHW's Chief Medical Officer and Vice President of Quality and Safety) and Sheets allegedly violated the standards of care applicable to them.

Sometime after the appointment, Ventura concluded that L.G.'s clavicle fracture could not have happened as a result of the accident asserted by Cox. She made this conclusion without consulting an orthopedic specialist and without consulting Cox about the incident in which L.G. acquired the injuries.

Plaintiffs informed Dr. Pomeranz about the evaluation by Ventura. Dr. Pomeranz expressed concern over the discrepancies between his own examination of L.G.'s skin, the examination by Petska, and that of Ventura. Dr. Pomeranz instructed Plaintiffs to consult a dermatologist.

At some point following Ventura's evaluation, Ventura "called or ordered someone to call" the police to investigate possible abuse. On the

---

[6] The Court may hereafter refer to this group of Defendants as the "Entity Defendants."

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 8 of 116   Document 67

afternoon of May 10, 2019, Dobrozsi was allowed to attend the follow-up CT scan ordered by Ventura. The scan confirmed that L.G. had no bleeding in her head. Police then arrived at that appointment and spoke with Dobrozsi. An officer requested that Dobrozsi undress L.G. to show him the bruises Ventura had identified. Dobrozsi did so and showed the officer "three small bruises." The officer noted that he had been informed that L.G. was covered with bruises from "head to toe," but that this did not appear to be the case. The police found no evidence of abuse at that time. Nevertheless, Barber informed Dobrozsi that, moving forward indefinitely, Plaintiffs could not be around any of their children—including both L.G. and Plaintiffs' other two adopted children—without direct supervision. Plaintiffs were made to submit to a "protection plan" pursuant to which Dobrozsi's parents were required to supervise Plaintiffs' interactions with the children.

The next day, May 11, 2019, Catholic Charities and L.G.'s birth parents were informed of the incident and the subsequent events. On May 12, 2019, two social workers from Catholic Charities and L.G.'s birth parents went to Plaintiffs' home. At that time, they expressed continuing support for Plaintiffs' planned adoption of L.G.

Over the following months, Ventura's evaluation of L.G. and her diagnosis of abuse were reviewed by other, non-party medical professionals. One, a child advocacy physician, concluded that Ventura's "initial impression of 'contusions' on L.G.'s body . . . was an inaccurate, nonspecific, and inflammatory characterization . . . ." That physician concluded that the available information, taken in the aggregate, did not indicate that L.G. suffered child abuse. Additionally, an expert in pediatric dermatology specializing in child abuse stated that none of the bruises

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 9 of 116   Document 67

present on L.G. appeared typical of abuse and instead appeared consistent with the accident asserted by Cox. The pediatric dermatologist concluded that the remaining marks on L.G. were birthmarks. Moreover, four pediatric hematologists concluded that Petska and Ventura failed to appropriately interpret L.G.'s bloodwork and drew incorrect conclusions about the nature of the bruising as a result.

Similarly, Dr. Pomeranz concluded that the clavicle fracture was consistent with the mechanism of injury described by Cox. Two orthopedic surgeons similarly validated that conclusion, as did two biomechanics experts who created "independent recreations of the accident."

On May 14, 2019, Plaintiffs went to CHW's patient relations department to file a grievance with CHW and CHHS. A CHW social worker called the Milwaukee Child Advocacy Center at that time to "advocate for" Ventura to take a medical and event history directly from Plaintiffs, but Ventura again refused to speak directly with Plaintiffs. Ventura instead instructed Cox to provide a written statement to CPS and the police for her review. Cox did so within an hour, but Ventura completed her documentation concluding L.G. had suffered abuse without considering the additional history provided by Cox.

On May 15, 2019, Plaintiffs' grievances were communicated to Gutzeit by hospital personnel. On at least six separate occasions, Plaintiffs expressed their concerns to one or more Defendants through formal mechanisms, including in-person meetings on May 13, May 17, May 27, and August 12; a written grievance filed on May 28; and a written grievance appeal on July 2. In addressing the grievances, Sheets, Ventura, and Gutzeit insisted that Plaintiffs' status as physicians had no impact on the decisions made regarding them.

On May 21, 2019, Plaintiffs met with Scherbarth, Jewell, Hartmann and Miller at the offices of CPS. During this meeting, those Defendants asked Plaintiffs about a bruise on L.G.'s foot. Miller refused to allow Plaintiffs to see the photographs taken by Ventura at the medical examination and refused to provide information about the evaluation. These photographs were also withheld from L.G.'s medical record and were made available only to providers affiliated with the Milwaukee Child Advocacy Center and CPS.

On May 24, 2019, Scherbarth, at the direction of other Defendants, went to Plaintiffs' home and removed L.G. Scherbarth did so without a court order and without the "consent of Plaintiffs or of L.G.'s birth parents." Scherbarth, and CPS generally, did so without having performed an investigation into Plaintiffs' history as parents. At the time of L.G.'s removal from the home, Catholic Charities and L.G.'s birth parents maintained their support of Plaintiffs' planned adoption of L.G.

Dr. Pomeranz continued to express concern about discrepancies in conclusions reached regarding L.G.'s injuries. Dr. Pomeranz informed CPS of these concerns and opined that suspicions of child abuse were reached in error. Pomeranz communicated this to CPS medical director Urban, who told Dr. Pomeranz that she was "staying out of the case."

Despite Dr. Pomeranz's protestations, Plaintiffs were not able to finalize their planned adoption of L.G. L.G. was permanently removed from Plaintiffs' home and Plaintiffs never became L.G.'s formal adoptive parents. Plaintiffs allege that had the incident occurred mere months later, following their formal adoption of L.G., the removal of L.G. from their home could not have occurred without judicial oversight.

At some point after the removal of L.G. from Plaintiffs' home, Plaintiffs allege that Defendants came to realize that their conclusion of abuse was reached in error. But rather than correct this erroneous conclusion, they conspired to cover up the wrongdoing, to smear Plaintiffs' reputations with continued insistence of child abuse, to influence the outcome of the CPS investigation, and to convince law enforcement to bring criminal child abuse charges against Cox. Dr. Pomeranz was told by MCW that he was forbidden from continuing to advocate for L.G., and Sheets spoke to the Chair of Dermatology to admonish the provision of a medical opinion in the case that was favorable to Plaintiffs. Sheets also prevented CPS from accessing Petska's medical documentation because it did not align with a conclusion of child abuse, and wrongly told investigators that Cox had previously abused a different child.

In July 2019, Plaintiffs met with MCW legal counsel Jon Wertz ("Wertz"). Wertz agreed with Plaintiffs that the withholding of the photographs taken at Ventura's appointment with L.G. was not appropriate and deviated from hospital policy. He confirmed that the photos were improperly omitted from L.G.'s medical record.

Later that month, Plaintiffs requested an ethics consult through CHW's standard process. A physician from the ethics committee initially concluded that a review of the case was appropriate. However, two days later, after having consulted with lawyers, that same physician concluded that the ethics committee would not perform a review of the case because there was an open CPS case against Plaintiffs. Plaintiffs did not believe this to be a valid reason to refuse an ethics consult and were familiar with situations where the ethics committee reviewed a case notwithstanding CPS involvement.

Following the ethics committee's refusal to perform an ethics consult, several physicians from the ethics committee expressed to Gutzeit that a full review should be undertaken. Nevertheless, Gutzeit insisted that the ethics committee could not, and would not, perform a review.

Plaintiffs thereafter met with Dr. Margolis, Vice Chair of the Department of Pediatrics. At this meeting, Dr. Margolis stated that the unsupervised care provided by Ventura was inappropriate and that the case needed a review. Dr. Margolis urged Plaintiffs to again advocate for a review of the case by the ethics committee.

In August of 2019, Gutzeit offered Plaintiffs a meeting with CHW leaders. At the meeting, Plaintiffs raised many issues including the withholding of the photographs from Plaintiffs; the lack of transparency as to whether Ventura had been supervised by a physician during the medical examination of L.G. and if so, by whom; the use of note templates for medical documentation which include inflammatory language; and the treatment of Plaintiffs as pre-adoptive parents generally. CHW dismissed the concerns and reiterated that no review would be undertaken. Gutzeit maintained that Plaintiffs' status as pre-adoptive parents justified their exclusion from the medical evaluation of L.G.

In November of 2019, Cox provided twelve physician reports to CPS pursuant to a formal review procedure established by state law to "further support the treating physician assessments that L.G. had not been abused." According to Plaintiffs, state law required Chagall and other members of the review panel to perform an independent evaluation of the evidence provided to them. In violation of that requirement, Miller and Chagall sent the reports provided by Cox to an outside consultant to attempt to discredit the physicians supporting Cox's position. This attempt to discredit Cox

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 13 of 116    Document 67

apparently backfired, as the outside expert solicited by CPS confirmed that Ventura had misinterpreted L.G.'s bloodwork.

As part of this review process, Plaintiffs claim that CPS was required to provide their final determination within 10 days of the hearing held and that CPS failed to do so. CPS in the meantime attempted to convince Cox to drop his appeal of CPS's findings, stating that he could "avoid criminal prosecution" if he did so. Cox declined.

Also in November of 2019, Plaintiffs submitted a confidential, internal report for peer review of the medical care provided by the Milwaukee Child Advocacy Center, including by Sheets, Ventura, and Petska. In retaliation for submitting this report, CHW retained outside counsel to represent it against Plaintiffs.

Plaintiffs maintain that the Child Advocacy Program implemented and maintained by MCW, CHW, and CHHS was designed to confirm suspicions of child abuse rather than to accurately evaluate whether abuse had occurred. Plaintiffs had raised issues about the Entity Defendants' provision of medical care to foster children in the past, prior to L.G.'s birth. Their advocacy as to those issues resulted in the Entity Defendants announcing that they would perform a transparent review of the Child Advocacy Program. An external review of the Child Advocacy Program was performed in 2020. The external review identified systematic failures in the program and confirmed a need for "improvement to meet the standards applicable to child maltreatment medical evaluations." To respond to the program deficiencies identified in the external review, MCW, CHW, and CHHS created a Child Maltreatment System Improvement Team Charter composed of approximately 30 individuals "charged with correcting" the deficient system.

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 14 of 116    Document 67

In January of 2020, the CPS review committee finally concluded its review process after having held a hearing in November. At that time, the committee unanimously decided to clear the allegation of abuse against Cox. However, it did not notify Cox of that decision at that time, and on January 23, 2020, Cox was criminally charged for felony child abuse in Milwaukee County. Shortly after the electronic filing of the criminal complaint against Cox, Gutzeit notified hundreds of hospital personnel of it by email. Cox did not receive notice of his successful appeal of CPS's findings until February 27, 2020. As a result of these circumstances spanning several years, Plaintiffs suffered intense emotional distress. L.G. never returned to the care of Plaintiffs and they never formally adopted her.

### 3.    MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Cherry v. Husz*, No. 14-CV-1539-JPS, 2015 U.S. Dist. LEXIS 97504, at *6 (E.D. Wis. July 27, 2015) (internal citations omitted). A plausible claim is one with "enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "[C]ourts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

On a motion to dismiss, the district court accepts as true the plaintiff's factual allegations. *Harris v. Honey*, No. 90-3037, 1991 U.S. App. LEXIS 27193, at *5 (7th Cir. 1991) (internal citation omitted). "[A]ll such

facts, as well as the reasonable inferences that follow, are viewed in the light most favorable to the plaintiff." *Teague v. United States Postal Serv.*, No. 94-C-2152, 1997 U.S. Dist. LEXIS 20864, at *6 (N.D. Ill. Dec. 23, 1997) (internal citation omitted). At the motion to dismiss stage, the Court does not ask "did these things happen"; instead, "the proper question to ask is . . . '*could* these things have happened.'" *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (internal citations omitted). "[T]he court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Hartman v. Gilead Scis., Inc.*, 536 F.3d 1049, 1057 (9th Cir. 2008). That said, courts need not accept as true legal conclusions or threadbare recitals of the elements of a cause of action, unsupported by mere conclusory statements. *Cherry*, 2015 U.S. Dist. LEXIS 97504, at *7 (internal citation omitted).

### 4.  STATE CRIMINAL CASE

Various Defendants also move the Court to take judicial notice of facts relating to the underlying state case against Cox. ECF No. 47 at 11. Typically, when considering a motion to dismiss, the Court may consider only the facts alleged in the complaint. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). However, "a court may under some circumstances take judicial notice of certain matters of public record not contained within the complaint." *Stietz v. Frost*, No. 19-cv-43-wmc, 2020 U.S. Dist. LEXIS 120491, at *3 (W.D. Wis. July 9, 2020) (internal citation omitted). In particular, "a court may take judicial notice of an adjudicative fact that is both not subject to reasonable dispute and either 1) generally known within the territorial jurisdiction of the trial court or 2) capable of accurate and ready determination by resort to sources whose accuracy

cannot reasonably be questioned." *Id.* (cleaned up) (citing *GE Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997) (quoting Fed. R. Evid. 201(b)). "Because judicial notice 'substitutes the acceptance of a universal truth for the conventional method of introducing evidence,' however, the Seventh Circuit understandably advises courts to exercise caution in employing this adjudicative device." *Stietz*, 2020 U.S. Dist. LEXIS 120491, at *3 (internal citation omitted).

The fact that Cox had a Milwaukee County criminal case instituted against him in 2020 arising out of the incident with L.G. is not subject to reasonable dispute and is capable of accurate determination by resort to the Wisconsin Circuit Court Access site. *See State v. Cox*, Milwaukee Cnty. Circuit Court Case No. 2020CF000344, available at https://wcca.wicourts.gov/caseDetail.html?caseNo=2020CF000344&county No=40&index=0&mode=details (last visited Jan. 4, 2023). The items appearing on that docket are official judicial notations, the accuracy of which cannot be questioned. *See Stietz*, 2020 U.S. Dist. LEXIS 120491, at *3 ("Here, the existence of the previous case, its procedural history, and the fact that [Plaintiff] pled no contest . . . are all facts that are not reasonably disputed and ascertainable from a source whose accuracy cannot be reasonably questioned.").

Accordingly, the Court is "at liberty to take judicial notice of the Plaintiff's underlying state court criminal proceedings." *Wesley v. Swearington*, No. 19-1236, 2019 U.S. Dist. LEXIS 117912, at *3 (C.D. Ill. July 16, 2019) (internal citation omitted). The Court will take judicial notice of the following, all of which is drawn from the Milwaukee County Circuit Court docket cited previously. However, since at the motion to dismiss stage the Court is obligated to draw all reasonable inferences in favor of

Plaintiffs, the judicial notice of Cox's state criminal case will hold little, if any, weight in the Court's rulings. Only if the existence of the state criminal case were to render Plaintiffs' allegations implausible would it be material at the motion to dismiss stage, and the Court does not believe that it does. But for purposes of providing a complete background, and since the state criminal case may prove relevant at a future stage in the proceedings, the Court recounts the following:

In January of 2020, the Milwaukee County Circuit Court reviewed a criminal complaint filed against Cox and "found probable cause to hold [him] for further proceedings." Cox was originally charged with "Physical Abuse of a Child (Intentional Causation of Bodily Harm)" in violation of Wis. Stat. § 948.03(2)(b).[7] As part of the state case, Cox was ordered to have no contact with L.G. The case was on track to proceed to trial, with a final pretrial hearing scheduled for summer of 2021 and a *Daubert* hearing scheduled for that fall. However, the parties reached a resolution in advance of trial in the way of a Deferred Prosecution Agreement ("DPA") involving a reduced charge—negligent failure to provide necessary care to a child under Wis. Stat. § 948.21(2). For clarity, the Court will also take judicial notice of the definition of a DPA as codified at Wis. Stat. § 971.39. "A deferred prosecution agreement . . . includes, but is not limited to," certain enumerated conditions, including the defendant's admittance "in writing, all of the elements of the crime charged" and the district attorney's ability to "resume prosecution upon the defendant's failure to meet or comply with" the DPA's enumerated conditions.

---

[7] This is conceded in Plaintiffs' response. ECF No. 61 at 8.

A plea hearing was held on November 8, 2021, at which time Cox entered a plea of no contest to the reduced charge. The Milwaukee County Circuit Court found Cox guilty but withheld entry of judgment of conviction. As part of the DPA, Cox participated in community service and parenting class. On May 6, 2022, the Milwaukee County Circuit Court held that Cox had complied with the DPA and dismissed the case with prejudice.[8]

## 5. ANALYSIS

### 5.1 42 U.S.C. § 1983

#### 5.1.1 Requisite of State Action

Plaintiffs allege eight separate counts under 42 U.S.C. § 1983. ECF No. 37 at 56–63 (Counts I—VIII). Plaintiffs allege that since their amended complaint "plainly and repeatedly alleges a 'meeting of the minds' between the state and non-state employee Defendants . . . they are all subject to

---

[8]Defendants do not argue, and the Court does not find, that the hearing of this case in federal court is barred by the *Rooker-Feldman* doctrine. "The *Rooker-Feldman* doctrine prevents lower federal courts from exercising jurisdiction over cases brought by state court losers challenging state court judgments rendered before the district court proceedings commenced." *Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 741 (7th Cir. 2016). Plaintiffs do not seek to challenge the Milwaukee County case described herein. They do not contest the DPA to which Cox was subject, nor do they contest the general facts upon which the reduced charge of child neglect was based. ECF No. 61 at 5 ("[F]rom day 1, Plaintiffs' [sic] acknowledged that Dr. Cox made a mistake when he fell asleep with L.G., and that she suffered minor accidental injuries as a result."). To the contrary, Plaintiffs describe Milwaukee County Circuit Court's "disposition of the criminal charges" as a "complete vindication of Plaintiffs' position." *Id*. at 5.

Cox's participation in the DPA required Cox to agree to the elements of child neglect having been met. *See* Wis. Stat. § 971.39. He does not now argue that those elements were not, in fact, met. Moreover, no judgment of conviction was ever entered in Cox's Milwaukee County case and the case was dismissed with prejudice. Accordingly, the *Rooker-Feldman* doctrine does not preclude this Court from hearing this case.

liability under § 1983." ECF No. 61 at 21 (internal citation omitted). The CPS Defendants do not dispute that they are state actors subject to suit under § 1983. The MCW Defendants and Children's Defendants, in contrast, argue that they cannot be held liable under § 1983 because they are not "state actors" who acted under color of state law. ECF Nos. 47 at 12–15, 42 at 2. The Court addresses this dispute first before discussing the individual counts brought under § 1983.

MCW itself is a non-stock, not-for-profit corporation. ECF No. 32 at 2. Petska and Sheets are physicians employed thereby. ECF No. 37 at 5–6. Similarly, CHW is a subsidiary corporation of CHHS. ECF No. 30 at 2. Ventura and Gutzeit are employed thereby. ECF No. 37 at 5–6. None of these parties are clearly state actors. The Court will therefore discuss whether the individual MCW Defendants and Children's Defendants (Sheets, Petska, Gutzeit, and Ventura) are properly considered state actors for purposes of § 1983 at the pleading stage, *infra* Section 5.1.1.1, and same for the Entity Defendants (MCW, CHHS, and CHW), *infra* Section 5.1.1.2.

### 5.1.1.1 The Individual MCW and Children's Defendants

Private actors may be liable under § 1983 in some circumstances. "[I]f a private citizen conspires with a state actor," for example, "then the private citizen is subject to Section 1983 liability." *Brokaw v. Mercer County*, 235 F.3d 1000, 1016 (7th Cir. 2000). Private action can become state action when "private actors conspire or are jointly engaged with state actors to deprive a person of conditional rights." *Hallinan v. FOP*, 570 F.3d 811, 815 (7th Cir. 2009) (internal citation omitted).

"Plaintiffs allege that [Sheets, Petska, Gutzeit, and Ventura] conspired with the CPS Defendants (who are indisputably state actors) to

perpetuate the false allegations of abuse." ECF No. 61 at 21. "To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (internal citation omitted). However, "a bare allegation of a conspiracy between private and state entities is insufficient to bring the private entity within the scope of § 1983." *Xiong v. Fisher*, 787 F.3d 389, 398 (7th Cir. 2015). "Vague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden; a complaint must contain factual allegations suggesting that the defendants reached a meeting of the minds" with respect to violating the plaintiff's constitutional rights. *Mirbeau of Geneva Lake, LLC v. City of Lake Geneva,* 746 F. Supp. 2d 1000, 1008 (E.D. Wis. 2010) (quoting *Evers v. Reak*, 21 Fed. App'x 447, 450 (7th Cir. 2001)).

The amended complaint is replete with allegations of conspiracy among the individual MCW and Children's Defendants and CPS, and the Court is satisfied that at least some of those allegations are not "bare." *See Xiong*, 787 F.3d at 398. Plaintiffs allege that Sheets, Ventura, Gutzeit, and Petska conspired with various of the CPS Defendants—state actors—to ensure that Cox faced criminal child abuse charges, that L.G. was removed from Plaintiffs' home, that the "truth" of Ventura's medical examination was never acknowledged, and that Plaintiffs suffered for having expressed criticism of the treatment to which they had been subject. ECF No. 37 at 36. Plaintiffs allege that Defendants "acted in coordination" to oppose, ignore, and discredit those with positions favorable to Plaintiffs, such as Dr. Pomeranz. *See id*. They allege that Defendants collectively covered up

evidence that Ventura's medical examination of L.G. was inappropriately unsupervised such as by refusing to inform Plaintiffs of the nature of the medical appointment and the name of who, if anyone, would be supervising it. *Id*. at 14 and 31. They claim that Defendants further conspired to cover up the fact that Ventura's conclusions of child abuse were not only unsupported by, but were in contradiction to, the medical evidence. *Id*. at 31 ("CPS Defendants Perform an Incomplete and Biased Investigation, Disregarding Overwhelming Evidence that the Abuse Allegations Were False."), 33–34, and 42. In order to keep these errors under wraps, Plaintiffs allege that Defendants conspired to withhold information from Plaintiffs and from L.G.'s record, such as the photos taken at L.G.'s appointment. These photos were withheld from Plaintiffs but were made available to CPS. *Id.* at 36–37.

Plaintiffs speak to the coordination between the non-state actor Defendants and the CPS Defendants regarding disallowing Plaintiffs from attending Ventura's examination of L.G. Plaintiffs allege that this enabled Ventura to misleadingly document that L.G.'s medical history was "limited" because she was brought to the Child Advocacy Center merely by a CPS worker. Plaintiffs allege that a CPS employee, Barber, stood by the MCW Defendants by refusing to provide Ventura's identity. Similarly, Plaintiffs allege that Sheets, Ventura, and Gutzeit repeatedly declined to identify which, if any, physician was charged with supervising Ventura's examination of L.G., instead giving vague responses. Plaintiffs allege that Barber communicated with them on behalf of both CPS and the other Defendants, and that in so doing she misled them about the medical appointment. They allege that Barber, "acting at the direction of other

Defendants," removed L.G. from the home.[9] *Id*. at 23. Plaintiffs allege that "one or more of the Defendants" contacted police to encourage an investigation of Cox. Plaintiffs further allege that Miller and other Defendants withheld the photographs of L.G. from Plaintiffs and from L.G.'s medical folder to continue to obscure the flawed medical examination. These are just some of the various facts relating to the conspiracy alleged by Plaintiffs and indicating that the "alignment of the child advocacy medical providers lies with the agencies investigating abuse . . . ." *Id.* at 37.

The Court cannot conclude at this juncture that such allegations are implausible. The Court is highly skeptical of the magnitude and depth of such a conspiracy, but the Court is required at this stage to accept Plaintiffs' well-pleaded factual allegations as true, and the Court cannot at this stage conclude that they are utterly implausible. It is conceivable, as Plaintiffs allege, that the medical professionals involved in the allegedly substandard medical procedures and the CPS Defendants involved in the subsequent investigation and removal of L.G. may have been motivated to "cover up" their actions to protect their jobs and their reputations. *See id*. at 36. It is similarly conceivable that, upon allegedly discovering that their actions were not undertaken pursuant to their own policies and accepted standards of the field, these Defendants may have essentially doubled down to take the actions necessary to make Plaintiffs appear uncredible and to maintain the erroneously-reached conclusion of abuse.

---

[9]Elsewhere in the amended complaint, however, Plaintiffs allege that it was Scherbarth, not Barber, who removed L.G. from the home at the direction of other Defendants. ECF No. 37 at 32.

For purposes of the motion to dismiss stage, Plaintiffs have alleged sufficient facts to support the conclusion that there was a "conspiracy, an agreement on a joint course of action in which the private party and the state have a common goal." *Hughes v. Meyer*, 880 F.2d 967, 972 (7th Cir. 1989). Accordingly, the Court is satisfied that Sheets, Gutzeit, and Ventura may be subject to § 1983 liability.

As to Petska, however, the Court cannot so conclude. The amended complaint does not allow for the reasonable inference that Petska participated in an alleged conspiracy to deprive Plaintiffs of their constitutional rights. To the contrary, Plaintiffs allege that it was Petska who concluded that L.G.'s injuries were not necessarily indicative of abuse and indicated to Cox that she thought everything would turn out okay for his family, and Plaintiffs themselves allege that their exclusion from L.G.'s appointment was contrary to Petska's plan of care. Plaintiffs allege that Petska wrongfully transferred care of L.G. to Ventura, but they do not suggest that she did so intentionally—rather, Plaintiffs' allegations suggest that she did so negligently. However, merely because Plaintiffs have not pleaded such factual allegations at to Petska does not necessarily mean that "there are no [such] facts" in existence to support their claim. 3 MOORE'S FEDERAL PRACTICE—CIVIL § 15.15. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to address the deficiency noted here.

"The issue [at the pleading stage] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), abrogated on other grounds by *Harlow v. Fitzgerald*, 459 U.S. 800 (1982). If Plaintiffs have no evidence in support of this alleged conspiracy, that will become

abundantly clear, and any § 1983 claims asserted against the MCW Defendants and the Children's Defendants will be appropriately dismissed. But for the time being, Plaintiffs have alleged that Sheets, Gutzeit, and Ventura worked collectively to smear Plaintiffs' reputations, to cover up Ventura's flawed medical examination, to ensure that criminal charges were brought against Cox, and to remove L.G. permanently from Plaintiffs' home. Plaintiffs allege various facts to support these allegations, the reasonable inferences of which also support them. The Court is satisfied at this stage that these factual allegations, and the reasonable inferences drawn from them, sufficiently allege a conspiracy between the CPS Defendants and Sheets, Gutzeit, and Ventura.

### 5.1.1.2 The Entity Defendants

An additional discussion is necessary as to the Entity Defendants. Can they, as private corporations, be held liable under § 1983? The Seventh Circuit has held, albeit warily, that the answer is yes. "For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity." *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). "The Supreme Court has not applied the *Monell* standard to private corporations that act under color of state law, like prison and jail health-care providers." *Hildreth v. Butler*, 960 F.3d 420, 436 (7th Cir. 2020). Nevertheless, "[o]ur precedents have applied *Monell* to such private corporations, though that doctrine has been questioned within the court and the academy." *Id.* (citing *Shields v. Ill. Dep't of Corr.*, 756 F.3d 782, 789–90 (7th Cir. 2014)).

In sum, private entities such as MCW, CHHS, and CHW may be subject to liability under § 1983 pursuant to the *Monell* standard.

Accordingly, in order to state a claim, as a general matter, against MCW, CHHS, and CHW under § 1983, Plaintiffs must plead that those entities' "polic[ies], practice[s], or custom[s], caused a constitutional violation." *Maya v. Wexford Health Sources Inc.*, 17-cv-546-NJR, 2020 U.S. Dist. LEXIS 167073, at *44 (S.D. Ill. Sep. 14, 2020). Moreover, it will not suffice to allege merely a theory of respondeat superior. *Thomas v. U.S. Airways*, No. 13-6121, 2014 U.S. Dist. LEXIS 65455, at *14 (E.D. Penn. May 13, 2014) (noting that a private corporation cannot be held vicariously liable under § 1983 merely by the actions of its employees); *see also Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1340 (N.D. Okla. Mar. 25, 2014) ("[P]rivate corporations may not be held liable under § 1983 based upon *respondeat superior*, but may only be held liable where their policies caused a constitutional violation.") (internal citation omitted). Again, this requires Plaintiffs to "allege facts to show the existence of a [CHW, CHHS, and MCW] policy or custom by which [Plaintiffs were] denied a constitutional right and that there is a direct causal link between the policy or custom and the injury alleged." *Revilla*, 8 F. Supp. 3d at 1341 (internal citation omitted).

At times, Plaintiffs allege that it is the entity Defendants' *refusal to adhere* to their own policies and practices that caused the alleged constitutional violations. For example, they state that the "Entity Defendants' policies and procedures" prohibit intimidation or retaliation against those who make a report and that Defendant CHW intimidated and retaliated against Plaintiffs in "direct violation of these policies and procedures." *See* ECF No. 37 at 44 ("In spite of these efforts and in violation of the Entity Defendants' policies and procedures, Defendants' repeatedly refused to take these concerns seriously, and repeatedly provided false information to Plaintiffs . . . ."). Those allegations, even accepted as true,

would not appear to support *Monell* liability against the Entity Defendants since they do not allege that it is the policies and procedures themselves that caused the alleged constitutional violations. *See Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 698–99 (7th Cir. 2020) (noting that § 1983 makes constitutional violations, but not violations of departmental regulations or policies, actionable).

In contrast, however, Plaintiffs also repeatedly allege that these Defendants' policies and procedures were themselves flawed and constitutionally violative. *See, e.g.*, ECF No. 37 at 45 ("[W]hat happened to L.G. and to Plaintiffs was a direct result of a broken system and of deeply flawed, policies, practices and procedures maintained by the Entity Defendants and which were known by them to taint their Child Advocacy Program."); *id*. at 46 ("The Entity Defendants maintained a deeply flawed and biased system, the primary purpose of which is to confirm abuse, rather than to investigate to determine the truth."); *id*. at 47 ("Despite being placed on notice of this and other important findings about gaps and flaws in the Entity Defendants' policies and procedures regarding the treatment of children in out-of-home placement, the Entity Defendants' [sic] failed to improve those policies and procedures, resulting in the numerous failures and errors with [sic] pervaded their treatment of L.G."). The Court is satisfied that these allegations sufficiently allege that the constitutional violations alleged against MCW, CHHS, and CHW were caused by the policies, procedures, and/or customs of those Defendants, as required to invoke § 1983 liability against them pursuant to *Monell*.

And finally, the Court addresses the MCW Defendants' scant contention that application of the intracorporate immunity doctrine bars this conclusion, at least as to them. The MCW Defendants write that "the

MCW Defendants' discussions with each other would be protected under the intracorporate immunity defense." ECF No. 42 at 27. In support of this contention, they cite only *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). There, the Supreme Court had granted certiorari on the question of "whether a parent corporation and its wholly owned subsidiary are legally capable of conspiring with each other under § 1 of the Sherman Act." *Copperweld*, 467 U.S. at 755. The MCW Defendants do not explain how the Supreme Court's resolution of that question extends to the distinct circumstances here, outside of the antitrust context. In response, Plaintiffs assert simply that there is no "validity to the arguments brought relating to the intracorporate conspiracy doctrine, since Plaintiffs expressly allege that the conspiracy encompassed employees of at least three different corporations or agencies." ECF No. 61 at 31.

The MCW Defendants' single-sentence reference to this doctrine is insufficient to raise the issue, and they have accordingly forfeited it. *See Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived."); *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 842 (7th Cir. 2010) ("We will not fill this void by crafting arguments and performing the necessary legal research.").

Having established that Plaintiffs' second amended complaint sufficiently invokes § 1983 liability against the MCW Defendants and the Children's Defendants, including both the named individuals and the entities, the Court now proceeds to evaluating the specific claims pleaded under § 1983.

### 5.1.2   Count I – Due Process

Plaintiffs allege Count I (§ 1983 Due Process claim) against all Defendants. ECF No. 37 at 56. Plaintiffs write that "[a]s a result of their status as L.G.'s pre-adoptive parents . . . , Plaintiffs had a liberty interest in their existing and anticipated future familial relationship with L.G." *Id*. at 57. As described in greater detail earlier in the amended complaint, "the Individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, acted to deprive Plaintiffs of their liberty interest in their existing and anticipated future familial relationship with L.G." *Id*. "As a result of [this misconduct,] Plaintiffs were permanently deprived of their familial relationship with L.G., and suffered great mental and emotional anguish . . . ." *Id*.

To state a Fourteenth Amendment due process claim under § 1983, Plaintiffs must allege (1) that they had a cognizable liberty interest under the Fourteenth Amendment; (2) that they were deprived of that liberty interest; and (3) that the deprivation was without due process. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (internal citation omitted).

First, the Court must determine whether Plaintiffs have identified a protected interest. Plaintiffs cite to the liberty interest in their "existing and anticipated future familial relationship with L.G." ECF No. 37 at 57. Defendants argue that Plaintiffs cannot make out a viable due process claim because L.G. was merely Plaintiffs' foster child, and they her pre-adoptive parents, rather than having completed a formal adoption. ECF No. 61 at 24.

The assertion of rights of association and companionship with one's children as liberty interests for purposes of due process is not novel. *See, e.g., Russ v. Watts*, 190 F. Supp. 2d 1094, 1099 (N.D. Ill. 2002). The question

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 29 of 116   Document 67

is whether recognition of such rights extends to those relationships that are not only non-biological, but have also not yet reached the point of adoption. The Seventh Circuit has recognized that a parent-child relationship need not necessarily be biological to invoke a protectable liberty interest. *See Procopio v. Johnson*, 994 F.2d 325, 328 (7th Cir. 1993). Indeed, the Supreme Court in *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 844 (1977) wrote that it could not "dismiss the foster family as a mere collection of unrelated individuals" and acknowledged that the "basic foundation of the family in our society . . . is of course not a matter of blood relation."[10] But whether the recognition of that interest extends to the context of foster relationships, and specifically to that of pre-adoptive relationships, where the child has not yet been formally adopted by the plaintiff-parents, remains unclear.

The question arose in this district in *Thelen v. Catholic Social Services* several decades ago. 691 F. Supp. 1179 (E.D. Wis. 1988). Plaintiffs rely heavily on this case. There, the plaintiffs sought adoption of a baby through a private adoption agency. *Id*. at 1180. They welcomed a baby into their home as pre-adoptive parents, until the private adoption agency became aware of allegations of infidelity in the family. *Id*. Roughly three to four

---

[10]Notwithstanding this acknowledgment, the Supreme Court did not, and has not since, explicitly held that a foster family relationship creates a protected liberty interest. The Court in *Smith* assumed only arguendo that it constituted a protected liberty interest, but decided the case on other grounds. 431 U.S. at 847 ("[E]ven on the assumption that appellees have a protected 'liberty interest,' the District Court erred in holding that the preremoval procedures presently employed by the State are constitutionally defective."). *See also Thelen v. Catholic Soc. Servs.*, 691 F. Supp. 1179, 1183–84 (E.D. Wis. 1988) ("In the Supreme Court case of [*Smith*], the court discussed, but did not resolve, the issue of whether foster parents had a constitutionally protected liberty interest in their relationship with a foster child.").

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 30 of 116   Document 67

months into the 6-month waiting period, the adoption agency removed the child from plaintiffs' care. *Id*. at 1180–81. The pre-adoptive parents brought suit after the state declined to administratively review the private adoption agency's removal decision. *Id*. at 1181. The plaintiffs' due process claim alleged that they were "deprived of their 'fundamental and/or property interest' in the pre-adoptive family unit without due process of law." *Id*. at 1182 (internal citation omitted).

In beginning its analysis, the court wrote that "the initial hurdle which must be overcome by the [plaintiffs] is establishing that they have been deprived of a constitutionally protected liberty or property interest." *Id*. at 1183. In analyzing whether plaintiffs had done so, the court noted that "it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Id*. at 1184; *see also Lindley v. Sullivan*, 889 F.2d 124, 130 (7th Cir. 1989) (noting that both foster parents' rights and adoptive parents' rights are creatures of state law, historically governed by legislative enactment).

Under Wisconsin law, proposed adoptive parents must satisfy conditions of pre-adoption before they can petition for formal adoption. Wis Stat. § 48.90 provides that "no petition for adoption may be filed unless the child has been in the home of the petitioners for 6 months or more[,]" unless certain circumstances are applicable. Following completion of the six month pre-adoptive period, the pre-adoptive parents may file their petition for adoption. *Thelen*, 691 F. Supp. at 1184. An investigation, recommendation by the adoption agency, and hearing on the petition follow. *Id*.

The court in *Thelen* distinguished the reasonable expectations and entitlements of typical foster parents with those of pre-adoptive parents.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 31 of 116   Document 67

"Unlike the foster parents, the prospective adoptive parents cannot be said to expect that their relationship with the child will be ended." *Id*. "To the contrary, the very motive of the prospective adoptive parents, as well as the State, is to secure a life-long relationship between the adoptive parents and the child." *Id*. "[W]hile the State ultimately will decide whether the prospective adoptive parents do gain legal custody of the child, it cannot be said that the parents with whom the child has been placed have a reasonable expectation under Wisconsin law that the relationship will eventually be terminated." *Id*. at 1185. Accordingly, the Court in *Thelen* ultimately concluded that "the prospective adoptive couple has a limited, but not wholly insignificant, constitutionally protected liberty interest in their family unit during the initial six-month period that a child is placed in their home." *Id*.

Things do not end there, however. The question again arose in *Procopio* several years later, albeit under Illinois law. There, the plaintiffs were foster parents to a child for five years. *Procopio,* 994 F.2d at 326. The foster parents intended to eventually adopt the child and had been led to believe that "almost no significant barriers would prevent their adoption" of the child. *Id*. at 326–27. The child's birth parents, however, sought to regain custody after the child had resided with plaintiffs all those years. They successfully did so—the juvenile court returned the custody of the child to her birth parents *Id*. The plaintiffs, as foster parents, sued, including for violations of the Fourteenth Amendment Due Process Clause, just as the plaintiffs had in *Thelen*. *Id*. Unlike in *Thelen*, however, the district court dismissed the case, accepting the defendants' contentions that the plaintiffs failed to allege a cognizable liberty interest for purposes of due process protection. *Procopio v. Johnson*, 785 F. Supp. 1317, 1319 (N.D. Ill. 1992).

The Seventh Circuit affirmed, acknowledging that while the "Supreme Court has recognized that biological relationships are not the 'exclusive determination of the existence of a family' and that emotional attachments play a role as well[,]" it has "stopped short of deciding that foster family arrangements achieve the status of a liberty interest that states cannot disrupt without due process." *Procopio*, 994 F.2d at 328. The proper means of determining the "scope of the liberty interest at stake," the district court wrote, and the Seventh Circuit confirmed, "is appropriately ascertained from the parties' expectations and entitlements as they are set out in state law." *Id*. The critical question is whether the applicable statutory language "supports an expectancy of a permanent relationship" with the foster child. *Id*. at 329. This analysis does not differ from that utilized in *Thelen*, but it led the district court to a different outcome.

In *Procopio*, the applicable statutory language—from the Illinois Juvenile Court Act of 1987, Ill. Rev. Stat. ch. 37, § 801-1 *et seq*.—provided that where possible, a minor removed from his or her family should be placed "in a family home so that he or she may become a member of the family by legal adoption or otherwise." Additionally, the plaintiffs proffered, the Illinois Adoption Act indicated that foster parents were to be "preferred above all others as the foster child's permanent family." *Id*. The relevant provision provided that "the child's legal guardian 'shall give preference and first consideration to [the foster parents'] application over all applications for adoption of the child . . . ." *Id*. (internal citation omitted).

Despite this express statutory preference in the adoption process for the foster parents who intended to permanently adopt the child, the Seventh Circuit agreed with the district court that the statutory language was insufficient to "create a liberty interest" in the relationship between

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 33 of 116   Document 67

plaintiffs and the foster child. *Id.* at 328–29 ("Notwithstanding the preference state law grants to foster families seeking to adopt their foster children, this priority does not rise to the level of an entitlement or expectancy.").

The question arose again more recently, in 2014, again under Illinois law. *See Van Dyke v. Ill. Dep't of Children & Fam. Servs.*, No. 13-C-5971, 2014 U.S. Dist. LEXIS 70222 (N.D. Ill. May 22, 2014). The facts of that case bear some resemblance to those presently before the Court. *Van Dyke* involved a child, K.C., who had been placed for fostering with the plaintiff, his grandmother. *Id.* at *1. A defendant, Illinois Department of Children and Family Services, removed K.C. from the plaintiff's home based on allegations of abuse. *Id.* The plaintiff had previously reported suspicions of sexual abuse against K.C. by K.C.'s biological father, seeking an order from the juvenile court terminating visitation between K.C. and his biological father. *Id.* at *4. This defendant later removed K.C. from the plaintiff's home, in what the plaintiff alleged was retaliation for her report of sexual abuse. *Id.* at *5. The defendant alleged that plaintiff had abused K.C. and accordingly removed K.C. from the home. *Id.*

The plaintiff there alleged, inter alia, violation of her substantive due process rights. *Id.* at *1. The defendants brought a motion to dismiss, claiming that "Plaintiff has no impairment of a substantive due process interest as K.C.'s former foster parent." *Id.* at *9. The court agreed, following *Procopio*, and granted the motion to dismiss. "Foster parents do not have constitutional rights to a continued relationship with a foster child placed in their home," the court wrote. *Id.* at *10 (internal citation omitted). "[T]he foster family's existence is subject to the state's determination that it should continue, and Illinois law can create no expectancy of a constitutionally

protected liberty interest." *Id.* at *9–10 (quoting *Procopio*, 994 F.2d at 330); *see also Dupuy v. Samuels*, 397 F.3d 493, 513 (7th Cir. 2005) ("[F]oster parents do not have a constitutionally protected interest in maintaining a relationship with a specific foster child . . . . Illinois law confers no liberty interest on foster parents to a relationship with a foster child or the continued placement of certain children in their home, *because the foster family relationship is subject to the State's determination that it should continue*.") (citing *Procopio*, 994 F.2d at 330) (emphasis added)).

The plaintiff in *Van Dyke* argued that not only was she a foster parent, she also was K.C.'s maternal grandmother, and that by virtue of that additional relationship, she possessed "a liberty interest in a close familial relationship with her grandson." *Id*. at *10. The court didn't bite, writing that the plaintiff was still merely a "foster parent and a grandparent *without permanent custody rights* . . . ." *Id*. at *11 (emphasis added). This suggests that the addition of supporting factors (for example, a biological relationship such as grandparent, or a particularly prolonged period of care in the foster parents' home) might not suffice to push a foster parent into territory involving a protected liberty interest.

Plaintiffs do not address how *Procopio* implicates the validity of *Thelen* and, accordingly, their reliance thereon. *Procopio*'s conclusion, and *Van Dyke*'s following, call into question the continued validity of this district's decision in *Thelen* in 1988. Since *Procopio* was not decided pursuant to Wisconsin law, the critical question is whether there are differences between the statutory texts and factual contexts at issue in *Thelen* versus in *Procopio* (and subsequently, *Van Dyke*) sufficient to support different conclusions. Does an individual's status as a pre-adoptive parent under Wisconsin law, rather than as merely a temporary foster parent with no

Page 35 of 116

intention of adoption, create a protectable liberty interest where one otherwise does not exist? Because the applicable Wisconsin statutory language similarly fails to support an entitlement to a permanent relationship with the foster child, the Court concludes that it does not. Accordingly, the Court holds that this district's decision in *Thelen* has been invalidated by the Seventh Circuit's decision in *Procopio*.[11] Therefore, *Thelen* does not mandate the outcome in the present case.

As noted previously, under Wisconsin law, proposed adoptive parents must satisfy various conditions of preadoption before they can petition for formal adoption. Wis Stat. § 48.90 provides that "no petition for adoption may be filed unless the child has been in the home of the petitioners for 6 months or more[,]" unless certain circumstances are applicable.[12] But even where the child resides with the pre-adoptive parents for that period, they still cannot file a petition for adoption "unless the petitioners have complied with all applicable provisions of this chapter relating to adoptive placements." Wis. Stat. § 48.90(3). In other words,

---

[11]The Tenth Circuit in *Elwell v. Byers* held that "while the typical foster care arrangement generally does not create a liberty interest in familial association . . . the [plaintiffs], who had cared for [the child] nearly his entire life and were on the verge of adopting him, fall closer to the status of adoptive parents than in the ordinary, temporary foster arrangement." 699 F.3d 1208, 1217 (10th Cir. 2012). Even if *Elwell* were mandatory authority, it would be clearly distinguishable here. Where there the situation warranted recognition of a protected liberty interest in part because the plaintiffs had cared for the child nearly his entire life (there, over a year) and were "on the verge of adopting him," *id*. at 1211–12, 1208, here Plaintiffs had L.G. in their care for less than a month and were less than a month into the required six-month waiting period before they could even file a petition for adoption. ECF No. 37 at 9; Wis. Stat. § 48.90.

[12]The parties do not argue that any of those enumerated circumstances, *see* Wis. Stat. § 48.90(1), are applicable.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 36 of 116   Document 67

having begun the pre-adoptive waiting period is merely one step in a road that continues for some time and which may be spotted with hurdles.

For example, § 48.84 provides that "[b]efore a child may be placed" for adoption by a proposed adoptive parent, "the proposed adoptive parent shall complete the preadoption preparation required under this section." Wis. Stat. § 48.84.[13] Once the preadoption period is completed and the petitioner files the adoption petition, "an investigation and recommendation is made by the agency involved and a hearing is required." *Thelen*, 691 F. Supp. at 1184 (citing Wis. Stat. §§ 48.81–48.91). At that hearing, "the determination of adoption is made based on the best interest of the child." *Id*. (citing Wis. Stat. § 48.91(3)). If the adoption agency is the legal guardian of the child, its recommendation is "presumed to be in the best interest of the child unless the fair preponderance of the credible evidence is to the contrary." Wis. Stat. § 48.85. If the petition is denied, "the child remains in the legal custody of the agency." *Thelen*, 691 F. Supp. at 1184 (citing Wis. Stat. § 48.95).

These provisions all indicate that while the pre-adoptive parents subject to them may legitimately hope and aspire to adopt the foster child formally and permanently, and may expect based on their successful completion of the 6-month waiting period that they will be successful in achieving that outcome, they are far from having an entitlement to that outcome. Plaintiffs acknowledge this. ECF No. 61 at 26 ("[Plaintiffs] were not entitled to adopt L.G."). Mere expectations unsupported by state law are insufficient to give rise to a state-created liberty interest protected by

---

[13]This section applies only to those proposed adoptive parents who have not "previously adopted a child," however—a group of which Plaintiffs are not a part. *See* ECF No. 37 at 2 (noting that Plaintiffs have two adopted sons).

the Due Process Clause. *Rodriguez v. McLoughlin*, 214 F.3d 328, 338 (2d Cir. 2000).

Plaintiffs seem to argue that, as pre-adoptive parents, they have some sort of statutorily elevated status in the adoption process. *See id*. at 35 ("L.G. was not a foster child, but a child as part of pre-adoptive status."). But the status of preadoption is not akin to a rubber stamp on a subsequent adoption petition. It is instead a prerequisite to even filing a petition for adoption in the first instance. Affixing the label of "pre-adoptive parents" onto the situation does not change the fact that they remain under the umbrella of fostering, an arrangement to which "the State is a party." *See id*.; *see also generally Pierce County v. C.S.*, 877 N.W.2d 651, 2016 Wisc. App. LEXIS 115 (Wis. Ct. App. 2016) (referring to pre-adoptive parents as foster parents throughout); *see also* Katherine S. Wilson, *Comment: Not Quite a Family: the Second Circuit Decides Against Recognizing Procedural Due Process Rights for a Pre-Adoptive Foster Family in* Rodriguez v. McLoughlin, 67 Brooklyn L. Rev. 899, 909 (2002) ("The Kyees decision, however, emphasized more strongly the Supreme Court's statement that the foster family is an 'arrangement' to which the State is a party.") (citing *Kyees v. Cnty. Dep't of Public Welfare*, 600 F.2d 693, 698 (7th Cir. 1979)). Plaintiffs emphasize a distinction between foster parents and pre-adoptive parents, but the effect they attribute to it does not appear to be supported by law. *Procopio*, 994 F.2d at 330 ("Despite the differing emphases on the possible permanence of foster families, the state's ultimate power to terminate those arrangements—a power that both Illinois and Indiana have—is *dispositive.*") (emphasis added). Wisconsin, too, retains that power, irrespective of a foster parent's status as a pre-adoptive parent.

Even assuming arguendo that Plaintiffs' argument as to an alleged heightened position as pre-adoptive parents is true, that argument cannot carry the day. That same argument was made by the foster parents and accepted by the Seventh Circuit in *Procopio*, and it was still insufficient to create a protectable liberty interest. *Procopio*, 994 F.2d at 328–29 (acknowledging express statutory preference for adoption placement with foster parent, but nevertheless holding that this was insufficient to create a liberty interest in the foster relationship). As under Illinois law in *Procopio*, Wisconsin retains the ultimate say in whether the child may be adopted. *See* Wis. Stat. § 48.95 (relating to denial of adoption petition). The pre-adoptive family relationship, like the foster family relationship, is subject to the State's determination that it should continue. This factor is expressly identified as "dispositive" in authority that is mandatory to this Court. *Procopio*, 994 F.2d at 330.

Plaintiffs argue that absent Defendants' conduct, "Plaintiffs would have completed the 6 month period of waiting and would have been fit parents for adoption, as they were already the adoptive parents of two children and there was no reason not to complete the adoption." ECF No. 61 at 35. But the Court is not persuaded that such a statement can be made with such certainty where the state retains the ultimate discretion to grant the adoption petition and thereby complete the adoption, and is constrained by the best interest of the child irrespective of the completion of the preadoption period. *See* Wis. Stats. §§ 48.91(3), 48.85. Plaintiffs also argue that they were deprived of the "state law process, pursuant to which if they followed the procedural requirements . . . they would obtain, as a matter of right ("shall make an order") an adoption order making L.G. part of their family." ECF No. 61 at 26 (quoting Wis. Stat. § 48.91). But "the fact

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 39 of 116   Document 67

that a state has established procedures to be followed does not mean that it has created a protectable liberty interest." *Rodriguez*, 214 F.3d at 339.

Furthermore, Wisconsin law expressly states that the "rights" associated with the "natural relation of child and parent" do not exist until "[a]fter the order of adoption is entered." Wis. Stat. § 48.92(1). *See also Van Dyke*, 2014 U.S. Dist. LEXIS 70222, at *10–11 (noting explicitly, in holding that foster relationship created no protected liberty interest, that plaintiff there was a "foster parent and a grandparent without permanent custody rights"). No reference is made in Wisconsin law to pre-adoptive parents having any such rights, even in limited form, during the pre-adoptive period.

The Court is obligated to follow the Seventh Circuit's reasoning and holding in *Procopio*. And because the Court finds that the status of a temporary foster parent versus a pre-adoptive parent, and the respective statutory language related to them, do not differ significantly enough to warrant departure from *Procopio*'s reasoning and holding, the Court must depart from this district's previous holding in *Thelen*. The Court concludes that the pre-adoptive parent's relationship with the child under Wisconsin law does not constitute a protectable liberty interest for purposes of Fourteenth Amendment due process. Even accepting all of Plaintiffs' factual allegations as true, the Court must dismiss their due process claim for failure to state a claim. Furthermore, granting leave to amend to address this issue would be futile because no further factual elaboration can remedy the conclusion that Wisconsin law does not support an entitlement or expectancy of a permanent relationship for foster and pre-adoptive parents. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 310 (7th Cir. 2018) (district court need not allow amendment if doing so would be futile).

Accordingly, the Court will grant Defendants' motions to dismiss to the extent that they seek dismissal of Count I for failure to state a claim.

### 5.1.3   Counts II & III – Equal Protection Based on Class Membership

Plaintiffs separately allege equal protection violations by all Defendants on the basis of two classes: (1) their status as pre-adoptive parents, and (2) their status as physicians. ECF No. 37 at 57–58. Having already established state action via the alleged conspiracy for purposes of rendering Sheets, Gutzeit, Ventura, MCW, CHW, and CHHS vulnerable to liability under § 1983, the Court addresses each equal protection claim in turn.

#### 5.1.3.1          Status as Pre-adoptive Parents

Plaintiffs first allege violations by all Defendants of the Equal Protection Clause based on their status as "pre-adoptive parents." *Id*. at 57. They allege that Defendants treated Plaintiffs "less favorably, afforded them fewer rights, privileges, and procedural protections, and acted in a manner violative of Plaintiffs' dignity and basic human and civil rights on account of Plaintiffs' employment status as pre-adoptive parents." *Id*. at 57–58. In so doing, Plaintiffs allege that Defendants acted with "discriminatory animus towards Plaintiffs" because Defendants did not view their status as pre-adoptive parents as "worthy of their care, attention or respect." *Id*. at 58. Further, Plaintiffs allege, this discriminatory treatment was unsupported by any "rational basis." *Id*.

"The Equal Protection Clause of the Fourteenth Amendment prohibits intentional and arbitrary discrimination." *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 696 (7th Cir. 2015) (internal citation omitted), cert. denied by *Dunnet Bay Constr. Co. v. Blankenhorn*, 2016 U.S. LEXIS 4864 (Oct.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 41 of 116   Document 67

3, 2016). "For an equal-protection claim based on class membership to survive a motion to dismiss, a plaintiff must sufficiently allege that they were treated differently by the government based on membership in a protected class, and that the defendant acted with discriminatory intent." *Doe v. Bd. of Educ.*, No. 19-C-00263, 2020 U.S. Dist. LEXIS 52156, at *18–19 (N.D. Ill. Mar. 24, 2020). Further, "[o]nly when the plaintiff in an equal protection case is complaining of a form of discrimination that is suspect because historically it was irrational or invidious is there a heavier burden of justifying a difference in treatment than merely showing that it is rational." *Irizarry v. Bd. of Educ.*, 251 F.3d 604, 610 (7th Cir. 2001). To put it more simply, unless the alleged discriminatory treatment is based on a suspect classification, that treatment need withstand only rational basis review. *Little Arm, Inc. v. Prosecutors: Adams*, 13 F. Supp. 3d 893, 911 (S.D. Ind. 2014).

Plaintiffs concede that no heightened review is warranted here and that rational basis is the applicable standard. ECF No. 61 at 28. But they characterize the issue not as

> whether there could be a rational basis for some level of disparate treatment between the class(es) to which Plaintiffs belonged and other classes of people—that is to say, Plaintiffs do not and need not allege that Defendants would lack a rational basis for treating pre-adoptive parents differently in *any* fashion from parents with full parental rights . . . . The issue is, was there any rational basis for excluding Plaintiffs completely from any participation in L.G.'s care, based on [Plaintiffs'] status as pre-adoptive parents . . . .

*Id*. at 28–29.

Plaintiffs have sufficiently alleged that some Defendants intentionally discriminated against them based on their status as pre-

adoptive parents. The gist of Plaintiffs' equal protection claim based on their status as pre-adoptive parents is that they were treated differently than non-pre-adoptive parents (i.e., formal adoptive parents or biological parents) because of discriminatory animus. The reasonable inferences of their factual allegations are that if they had been formal adoptive parents, rather than pre-adoptive parents, they would have been afforded more respect and attention and would have been allowed to participate in L.G.'s medical care, which would have allowed them to provide L.G.'s patient history. *See* ECF No. 37 at 58 ("[T]he Individual Defendants acted with discriminatory animus towards Plaintiffs on account of their status as pre-adoptive parents, a status which the Individual Defendants did not view as worthy of their care, attention or respect.") and at 41 ("Defendants' attempt to use Plaintiffs' status as pre-adoptive foster parents as a legitimate justification for excluding them from L.G.'s care was incorrect and malicious, highlighting the persistent willingness of Defendants to incorrectly, unethically, and illegally treat pre-adoptive foster parents with less respect and consideration than they are entitled to by law.") ("Defendant Gutzeit stated that Plaintiffs' status as foster parents justified their exclusion from L.G.'s medical evaluation.").

The Children's Defendants argue that Plaintiffs have failed to state an equal protection violation because "[a]ll it takes to defeat [an equal protection] claim is a *conceivable* rational basis for the difference in treatment." ECF No. 47 at 21–22 (internal citation omitted). They argue that on a motion to dismiss, a plaintiff must "allege facts sufficient to overcome the presumption of rationality that applies to government classifications" and that Plaintiffs have failed to do so. *Id*. at 22.

It is true that under rational basis review, a law is presumed constitutional, and "a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). Application of this standard, however, is somewhat counterintuitive at the motion to dismiss stage. In *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992), the Seventh Circuit wrote that "[a] perplexing situation is presented when the rational basis standard meets the standard applied to a dismissal under Fed. R. Civ. P. 12(b)(6)." "The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification; the Rule 12(b)(6) standard requires the plaintiff to prevail if 'relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Id.* (internal citation omitted). In other words, the rational basis standard, which is deferential to the defendant, intersects with the motion to dismiss standard, which is deferential to the plaintiff. *See Akbar v. Daley*, No. 09-CV-1289, 2019 U.S. Dist. LEXIS 85897, at *14–15 (N.D. Ill. Sep. 18, 2009). What is the outcome of such an intersection?

"The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard," the court in *Wroblewski* wrote. 965 F.2d at 459. If it could, allegations of equal protection violations would rarely, if ever, make it past the pleading stage. The way to proceed, the court explained, was to "take as true all of the complaint's allegations and reasonable inferences that follow," and apply the resulting "facts" in light of the deferential rational basis standard. *Id.* at 460. "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government

classifications." *Id*. In *Wroblewski*, the Seventh Circuit affirmed dismissal of the plaintiff's equal protection claim because "[a] rational basis for the City's policy toward Wroblewski [was] not only conceivable and plausible; it [was] directly supported by the allegations in the complaint." *Id*. That being the case, "[t]he complaint's conclusionary assertion that the policy [was] 'without rational basis' [was] insufficient to overcome the presumption of rationality coupled with the readily apparent justification for the policy." *Id*.

While it is true that Plaintiffs have made the "conclusionary assertion" that Defendants' actions lacked a rational basis, *see* ECF No. 37 at 58 ("There was no rational basis for the manner in which the Individual Defendants treated Plaintiffs less favorably on account of their status as pre-adoptive parents"), that is not the full extent of their allegations on the issue. For example, Plaintiffs argue that "it is not rational to have excluded Plaintiffs from any involvement in L.G.'s care, because that deprived L.G.'s caregivers from gathering any meaningful patient history." ECF No. 61 at 29; *see also* ECF No. 37 at 40 (noting Plaintiffs' concern regarding Ventura's refusal to speak with them to gain L.G.'s patient history and asserting a national standard requiring gathering a child's patient history from the child's caregivers) and at 17 (asserting that Ventura's documentation in L.G.'s medical record that L.G.'s medical history was limited because she was brought in by a CPS worker was misleading due to Ventura's exclusion of Plaintiffs from the appointment). Indeed, since L.G. was taken to the medical appointment at the Milwaukee Child Advocacy Center by a CPS employee, and since Plaintiffs were disallowed from attending or participating in any fashion, this enabled Ventura to record the arguably misleading conclusion that no patient history for L.G. was available.

Plaintiffs additionally allege that Defendants' decision to exclude them from participating in L.G.'s medical care "violated standard medical practice, and contravened the Entity Defendants' policies and procedures." ECF No. 37 at 23. In light of all of this, Plaintiffs have alleged "facts sufficient to overcome the presumption of rationality." *Wroblewski,* 965 F.2d at 460.

Furthermore, this situation is distinct because a rational basis is not "directly supported by the allegations in the [amended] complaint." *See Wroblewski,* 965 F.2d at 460. Nothing in Plaintiffs' amended complaint, taking its factual allegations as true and making all reasonable inferences in Plaintiffs' favor, lends itself to a rational basis for excluding Plaintiffs from the appointment based on their being pre-adoptive parents rather than adoptive or biological parents. *See Doe,* 2020 U.S. Dist. LEXIS 52156, at *22 ("[E]ven with the applicable presumption of rationality, at this stage the Court must still draw any plausible inferences in Plaintiffs' favor . . . ."). And "taking the Plaintiffs' allegations as true, the Amended Complaint does not reveal any conceivable rational basis" for the differential treatment. *Id.* at *23.[14]

---

[14]The Children's Defendants write that "[o]ne can easily conceive of rational reasons for treating" pre-adoptive parents differently from adoptive or biological parents, and physician parents differently from parents of other professions. ECF No. 47 at 22. They write that pre-adoptive parents have a "more limited interest in their relationship" with the child and that it would accordingly be rational for health care providers to grant them less information and access to proceedings involving the child. *Id.* But the question is whether such alleged rational reasons are conceivable and plausible in light of the Plaintiffs' allegations. *See Wroblewski,* 965 F.2d at 460. And here, where Plaintiffs allege that their exclusion resulted in Defendants making medical conclusions without the benefit of any patient history, they have rebutted the presumption of rationality, at least for purposes of the pleading stage.

Accordingly, the Court is satisfied that Plaintiffs have satisfied their burden at this stage, at least as to some Defendants. However, Plaintiffs have asserted these equal protection claims against all named Defendants, and the Court must address the fact that not all named Defendants participated in any capacity in Plaintiffs' exclusion from L.G.'s medical care and the alleged differential treatment of Plaintiffs generally. For example, the extent of Urban's involvement in the case, according to Plaintiffs' own allegations, was to be informed by Dr. Pomeranz in August of 2019 of his concerns regarding the medical treatment provided to L.G., at which time Urban allegedly responded that she was staying out of the case. That allegation does not indicate that Urban afforded differential treatment to Plaintiffs based on discriminatory animus. Plaintiffs have therefore failed to state equal protection claims against Urban.

Similarly, Plaintiffs assert equal protection claims against Petska, but there are no allegations in the amended complaint suggesting that Petska afforded differential treatment to Plaintiffs based on discriminatory animus. To the contrary, it was Petska who concluded that L.G.'s injuries were not necessarily indicative of abuse and indicated to Cox that she thought everything would turn out okay for his family, and Plaintiffs themselves allege that their exclusion from L.G.'s appointment was contrary to Petska's plan of care. Plaintiffs allege that Petska wrongfully transferred care of L.G. to Ventura, but they do not suggest that she did so out of discriminatory animus. Rather, the amended complaint seems to suggest that Petska did so negligently. Therefore, even if Plaintiffs had succeeded in alleging that Petska was vulnerable to suit under § 1983, which the Court has concluded is not the case, *see supra* Section 5.1.1.1, their equal protection claims against her would still fail.

The equal protection claims are also brought against Chagall, but the extent of Chagall's alleged participation was her presence at a meeting held on November 14, 2019, at which time Chagall was "responsible for overseeing the formal review process." ECF No. 37 at 52. This was months after Plaintiffs were excluded from L.G.'s appointment and were withheld information relating thereto and the photos taken therein. The amended complaint alleges that Chagall, in violation of requirements applicable to her, sent medical reports provided by Cox to an outside consultant "in an attempt to further discredit" the physicians who supported Plaintiffs. *Id*. Plaintiffs allege that this was a "blatant and desperate abuse of the process with the intent to perpetuate the false statement that Dr. Cox had abused L.G. and further prevent the adoption of L.G." *Id.* These allegations do not suggest that Chagall undertook this alleged conduct with discriminatory animus based on Plaintiffs' membership in any particular class.

However, such deficiencies in pleading may be redressable by amendment. "Courts should not dismiss the complaint unless it is beyond a doubt that there are no facts to support relief." 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15. Merely because Plaintiffs have not pleaded such factual allegations as to Urban, Petska, and Chagall does not necessarily mean that "there are no [such] facts" in existence to support their claim. *Id*. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to address the deficiencies noted here.[15]

---

[15]Failure to properly submit a second amended complaint addressing these deficiencies will result in dismissal without prejudice of Count II and III against Urban, Petska, and Chagall for failure to state a claim. The same will be true for any other deficient claim addressed in this Order for which the Court has granted leave to amend.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 48 of 116   Document 67

A separate discussion is also needed as to the Entity Defendants. As noted previously, in order to state a claim against them under § 1983, Plaintiffs must plead that those entities' "polic[ies], practice[s], or custom[s], caused a constitutional violation." *Maya,* 2020 U.S. Dist. LEXIS 167073, at *44. As noted previously, Plaintiffs at times plead the opposite of what that standard requires. "This decision to bar Plaintiffs from attending L.G.'s medical visit . . . deviated from the Entity Defendants' policies and procedures." ECF No. 37 at 14; *see also id*. at 23 ("The decision to exclude Plaintiffs from participating in L.G.'s medical care . . . contravened the Entity Defendants' policies and procedures."). Plaintiffs have in those instances pleaded that it was not the Entity Defendants' policies, procedures, or customs that caused the alleged equal protection violations against them, but rather the Entity Defendants' employees' failure to follow them. This is insufficient to establish § 1983 liability against the Entity Defendants. *See Thomas,* 2014 U.S. Dist. LEXIS 65455, at *14 (a private corporation cannot be held vicariously liable under § 1983 merely by the actions of its employees).

At the same time, however, Plaintiffs have also pleaded that the policies and procedures of the Entity Defendants were themselves constitutionally violative and contributed to Plaintiffs' injuries. ECF No. 37 at 45 ("[W]hat happened to L.G. and to Plaintiffs was a direct result of a broken system and of deeply flawed, policies, practices and procedures maintained by the Entity Defendants and which were known by them to taint their Child Advocacy Program."); *id*. at 47 ("Despite being placed on notice of this and other important findings about gaps and flaws in the Entity Defendants' policies and procedures regarding the treatment of children in out-of-home placement, the Entity Defendants' [sic] failed to

improve those policies and procedures, resulting in the numerous failures and errors with [sic] pervaded their treatment of L.G."). Through these latter allegations, Plaintiffs have sufficiently alleged that the Entity Defendants' "polic[ies], practice[s], or custom[s], caused" the equal protection violations. *Maya,* 2020 U.S. Dist. LEXIS 167073, at *44.[16]

### 5.1.3.2    Status as Physicians

Plaintiffs additionally allege violations of their equal protection rights by all Defendants based on Plaintiffs' status as physicians. ECF No. 37 at 58. They allege that Defendants treated Plaintiffs "less favorably, afforded them fewer rights, privileges, and procedural protections, and acted in a manner violative of Plaintiffs' dignity and basic human and civil rights on account of Plaintiffs' employment status as physicians." *Id.*

The Court has already laid the foundation for discussion of this claim. And as above, Plaintiffs have sufficiently alleged that at least some Defendants intentionally discriminated against them based on their status as physicians. *See* ECF No. 37 at 23 ("Without Plaintiffs [sic] knowledge, Defendants, including Defendant Parr-Nelson, determined that Plaintiffs would not be allowed to attend or participate in L.G.'s medical visit . . . because Plaintiffs were physicians"); *id.* ("Defendant Parr-[N]elson wrote an email to identify a social worker to bring the child to the visit, stating that '[t]he adoptive parent is a children's medical doctor and because of the sensitive nature of this relationship/circumstance CAC requested that an IAS bring the infant this morning without the foster parents.'"); *id.* at 25

---

[16]This analysis and conclusion are equally applicable to Plaintiffs' remaining § 1983 equal protection claims against the Entity Defendants—Count III and IV. Accordingly, the Court will deny the motions to dismiss the equal protection claims (Counts II, III, and IV) to the extent they are asserted against the Entity Defendants.

("Barber told Dr. Dobrozsi that she believed Plaintiffs had not been allowed to participate in the examination because Plaintiffs were both physicians, who would be able to ask informed questions and who had the knowledge to be able to question the assessment made by the Child Advocacy Center provider."); *id.* at 30 ("Plaintiffs repeatedly questioned why they were not allowed to participate in L.G.'s medical visit on May 10, 2019 due to their status as physicians.").

But again, the next question is whether Plaintiffs have "allege[d] facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski*, 965 F.2d at 460. The Court concludes that they have.

Plaintiffs acknowledge the reasoning proffered by several Defendants for the exclusion. The justification provided by Parr-Nelson for excluding Plaintiffs from the appointment based on their status as physicians was the "sensitive nature of the relationship/circumstance." ECF No. 37 at 23. According to Barber, it was because they would, as physicians, be "able to question the assessment made." *Id*. at 25. In other words, Plaintiffs acknowledge that the disallowance of their attendance and participation was made, at least ostensibly, for some articulable reason, rather than arbitrarily. Even assuming arguendo that these justifications constitute a rational basis "directly supported by the allegations in the [amended] complaint," *see Wroblewski,* 965 F.2d at 460, the Court is satisfied that Plaintiffs have made sufficient allegations to rebut any presumption of rationality for purposes of this stage.

Plaintiffs allege that the "decision to exclude Plaintiffs from participating in L.G.'s medical care violated standard medical practice, and contravened the Entity Defendants' policies and procedures." ECF No. 37

at 23. They allege that Sheets, Gutzeit, and Ventura erroneously insisted that Plaintiffs' employment as "pediatricians at MCW" and their "membership on the CHW medical staff" had no impact on decisions regarding their exclusion from L.G.'s appointment, and Plaintiffs emphasize that these assertions contradict those made by Barber and Parr-Nelson. *Id*. at 30–31. Plaintiffs additionally allege that Gutzeit responded to Plaintiffs' concerns about Ventura's refusal to allow their participation in L.G.'s appointment by "falsely stating that this approach was required by the national standards governing Child Advocacy Clinics," when in fact "the national standards state the exact opposite . . . ." *Id*. at 40. The Court is satisfied for purposes of the motion to dismiss stage that these allegations sufficiently rebut the presumption of rationality afforded to the alleged classification. However, for the same reasons as noted regarding Plaintiffs' status as pre-adoptive parents, Plaintiffs have failed to state equal protection claims against Urban, Petska, and Chagall. Again, the Court is obliged to grant leave to amend to attempt to address the deficiencies as to those three Defendants.[17]

### 5.1.4   Count IV – Equal Protection – Class-of-One

Plaintiffs allege a class-of-one equal protection violation against Sheets, Gutzeit, Scherbarth, Miller, Chagall, MCW, CHHS, and CHW. Plaintiffs write that these Defendants "treated Plaintiffs less favorably and afforded them fewer rights, privileges, and procedural protections than similarly situated individuals were treated." ECF No. 37 at 59.

The Equal Protection Clause protects persons "against purely arbitrary government classifications, even when a classification consists of

---

[17] *See supra* n. 15 and accompanying text.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 52 of 116   Document 67

singling out just one person for different treatment for arbitrary and irrational purposes." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). However, plaintiffs alleging class-of-one claims carry a heavy burden. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 588 (7th Cir. 2021). "[A] class-of-one claim requires the plaintiff to allege that (1) a state actor intentionally treated them 'differently than others similarly situated, and (2) there is no rational basis for the difference in treatment.'" *Doe*, 2020 U.S. Dist. LEXIS 52156, at *19. "A class-of-one claim need not allege discrimination based on a suspect classification, but must allege that the plaintiff was singled out arbitrarily, without rational basis, for unfair treatment." *Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010).

"Normally, a class-of-one plaintiff will show an absence of rational basis by identifying some comparator—that is, some similarly situated person who was treated differently." *Fares Pawn, LLC v. Ind. Dep't of Fin. Inst*s., 755 F.3d 839, 845 (7th Cir. 2014). "To be similarly situated, a comparator must be 'identical or directly comparable' to the plaintiff 'in all material respects.'" *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (internal citation omitted); *see also FKFJ,* 11 F.4th at 588 ("To satisfy the 'similarly situated' element, [Plaintiffs and their] comparators must be '*prima facie* identical in all relevant respects or directly comparable . . . in all material respects.'") (internal citation omitted).

However, the Seventh Circuit has "confirmed that plaintiffs alleging class-of-one equal protection claims do not need to identify specific examples of similarly situated persons in their complaints." *Doe*, 2020 U.S. Dist. LEXIS 52156, at *21 (quoting *Miller,* 784 F.3d at 1120). In other words, the "lack of a comparator" will not doom a Plaintiff's claim at the motion to dismiss stage. *Miller*, 784 F.3d at 1120; *see also Geinosky,* 675 F.3d at 748 n.3

("Even in a case where a plaintiff would need to identify a similarly situated person to prove his case, . . . we see no basis for requiring the plaintiff to identify the person *in the complaint.*").[18]

Plaintiffs have satisfied these requirements. They allege that these Defendants acted with illegitimate animus towards Plaintiffs in preventing them from attending L.G.'s appointment and participating in her care. ECF No. 37 at 59–60. They allege that these Defendants, in conflict with their employers' policies and with standard practice, precluded Plaintiffs from accessing the photos of L.G. taken by Ventura, *id*. at 37, from allowing Plaintiffs to provide L.G.'s patient history, *id*., and from benefiting from an ethics committee review, *id*. at 38. Plaintiffs allege that their request for an ethics consult was initially denied "because there was an open CPS case against Plaintiffs." *Id*. at 38. But Plaintiffs allege further that they knew the existence of an open CPS case was not a valid reason to refuse an ethics consult and "Dobrozsi had personally been involved as an attending physician in cases reviewed by the ethics committee where CPS was involved with the family." *Id*. "Additionally, a physician from the ethics committee had been involved in a case where a family was reported to CPS by CHW for abuse or neglect, and the ethics review found that CHW had overstated concerns and was inappropriately targeting the child for removal from their family." *Id*. Accordingly, the MCW Defendants'

_____

[18] The Children's Defendants cite *FKFJ,* 11 F.4th 574, in support of the assertion that Plaintiffs' class-of-one claim must be dismissed because Plaintiffs have failed to identify a comparator that is "prima facie identical in all relevant respects or directly comparable . . . in all material respects." ECF No. 47 at 23 (quoting *FKFJ,* 11 F.4th at 588). But FKFJ was decided on at the summary judgment stage and does not stand for the proposition that Plaintiffs must identify this comparator in their complaint to survive dismissal.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 54 of 116   Document 67

assertion that Plaintiffs' class-of-one claim should be dismissed because "there is no allegation they were treated differently than others suspected of abusing a child," ECF No. 42 at 17, is incorrect.

Plaintiffs allege that they were irrationally and arbitrarily denied the procedure to which they were entitled and which similarly situated families were provided. They allege that they were intentionally treated differently from other families being investigated by CPS on suspicion of child abuse or neglect because of animus against them. This is sufficient at this stage in the proceedings since Plaintiffs did "not need to identify specific examples of similarly situated persons in their [amended complaint.]" *Miller*, 784 F.3d at 1120 (quoting *Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705, 717 (7th Cir. 2013)).

Again, however, this claim is subject to the rational-basis requirement, which "sets the legal bar low and simply requires 'a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *D.B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (internal citation omitted). "[E]ven at the pleadings stage, all it takes to defeat a class-of-one claim is a *conceivable* rational basis for the difference in treatment." *Doe*, 2020 U.S. Dist. LEXIS 52156, at *22 (internal citation omitted). As is the case for equal protection claims based on class membership, to survive a Rule 12(b)(6) motion to dismiss on a class-of-one claim, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications," *Wroblewski*, 965 F.2d at 460, and "allegations of animus" alone do not overcome this presumption. *Flying J, Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008). *See also Miller*, 784 F.3d at 1121 (internal citation omitted) ("Even under what we have referred to as 'the least demanding standard' . . .

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 55 of 116    Document 67

plaintiffs must allege that state actors lacked a rational basis for singling them out for intentionally discriminatory treatment."). The Court is satisfied at this stage that Plaintiffs have done so.

Plaintiffs argue that they "were prevented from participating in L.G.'s care due to an illegitimate animus against them, and since they were the best (if not only) source for an accurate patient history, there was no rational basis to exclude them (at least not without reasonable efforts to obtain the necessary information in some other fashion)." ECF No. 61 at 29. As noted previously, Defendants' exclusion of Plaintiffs from L.G.'s medical care allowed Ventura to misleadingly document that L.G.'s available medical history was limited because she was brought in by a CPS worker rather than by her foster parents. ECF No. 37 at 17. In reality, the availability of L.G.'s medical history was limited at the time of the appointment because those with access to that history (and who were ready and able to provide it) were excluded from the appointment.

Plaintiffs also alleged that the denial of their request for an ethics review was irrational because it was done in contravention of not only the Entity Defendants' standard practice of performing an ethics consult notwithstanding CPS's involvement in the case, but also of the positions taken by "three different physicians from the ethics committee . . . [who stated] that the case and care provided needed a full review by physicians and that the review needed to include Plaintiffs." *Id*. at 38. And as noted previously, Plaintiffs allege that their exclusion from L.G.'s care was not consistent with national practice standards. *Id*. at 40. These allegations sufficiently rebut the presumption of rationality applicable to the differential treatment. Accordingly, to the extent the Defendants' motions sought dismissal of Count IV for failure to state a claim against Sheets,

Gutzeit, Scherbarth, Miller, and the Entity Defendants, the Court will deny them.

### 5.1.5 Count V—Retaliation

Plaintiffs further assert liability against Sheets, Gutzeit, Scherbarth, Miller, Chagall, MCW, CHW, and CHHS for retaliation pursuant to § 1983. The Court has already concluded that, for purposes of the pleading stage, Plaintiffs have sufficiently alleged that the non-state Defendants against whom claims are brought pursuant to § 1983 constitute state-actors by virtue of participation in a conspiracy with the CPS Defendants.

"[F]or retaliation of First Amendment right claims under [§ 1983], a plaintiff must show that (1) she engaged in constitutionally protected speech; (2) the defendants, as [state actors], engaged in adverse conduct against her; and (3) the defendants were motivated, at least in part, by her protected speech." *Bach v. Milwaukee Cnty. Cir. Ct.*, No. 13-CV-370, 2013 U.S. Dist. LEXIS 129700, at *14 (E.D. Wis. Sep. 11, 2013) (citing *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010)). "'[A] campaign of petty harassment' and 'even minor forms of retaliation,' 'diminished responsibility, or false accusations' can be actionable under the First Amendment." *Power v. Summers*, 226 F.3d 815, 821 (7th Cir. 2000) (internal citation omitted).

Plaintiffs' retaliation claim fails on the first element. Plaintiffs allege that they engaged in constitutionally protected speech when they advocated and petitioned "for the redress of their grievances" related to Defendants' alleged misconduct. ECF No. 37 at 60; *see also id*. at 36 ("Plaintiffs engaged in advocacy protected by the First Amendment to rebut the spurious allegations of abuse . . . .") and at 37 ("Plaintiffs requested an ethics consult through the standard hospital process available to all caregivers.").

Specifically, Plaintiffs allege that they "brought their concerns about the substandard medical care to one or more of the Defendants through various formal mechanisms" on at least six occasions. *Id*. at 30. These petitions for redress included various in-person meetings as well as written petitions. *Id*. at 30 ("Several of the in-person meetings were attended by hospital leadership, including Defendant Gutzeit, and resulted in written responses from Defendants Sheets, Ventura, and Gutzeit."), at 39 ("At this meeting [in August 2019], Plaintiffs outlined a variety of issues with the care L.G/ [sic] and their family had received."), and at 43 ("In November 2019, Plaintiffs submitted a confidential, internal report for peer review of troubling and substandard medical care provided by Members of the Child Advocacy Department, including Defendants Sheets, Ventura and Petska."). Throughout their advocacy, Plaintiffs expressed a substantial amount of criticism towards Defendants. *Id*. at 30. *See also id*. at 29 ("On May 14, 2019, Plaintiffs went to the hospital patient relations department to file a grievance with Defendant CHW and CHHS complaining of the medical examination performed by Defendant Ventura, including for her failure to take a medical history and mechanism of injury from Dr. Cox.").

Plaintiffs also demanded that they be provided information to which they believed they were entitled. *Id*. at 29–30 ("Plaintiffs sought to find out who performed any medical examination, what physician (if any) was responsible for that examination, and what physician (if any) reviewed Defendant Ventura's findings.") ("Plaintiffs repeatedly questioned why they were not allowed to participate in L.G.'s medical visit on May 10, 2019 due to their status as physicians.").

The MCW Defendants assert that the amended complaint presents "no plausible allegation of activity protected under by [sic] the First

Amendment." *See* ECF No. 63 at 8. However, they make no actual argument as to why the activity described by Plaintiffs is not constitutionally protected. Nor do Plaintiffs substantively address this contention. *See* ECF No. 61 at 29 (asserting that the only challenge raised against the retaliation claim involves causation and stating that "Defendants do not dispute that Plaintiffs allege they engaged in First Amendment protected advocacy"). While the Court at this stage must accept as true Plaintiffs' well-pleaded factual allegations, it need not accept as true their bare legal assertions, such as that the above-described activity was "protected by the First Amendment." ECF No. 37 at 37.

In the Court's view, the issue is that the amended complaint suggests that Plaintiffs directed their grievances to the Entity Defendants and some of their employees rather than to any government agency, and purely private speech is not protected by the First Amendment. *See Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016) (nonfrivolous grievances addressed to government agency are protected by First Amendment); *McCrary v. Knox County*, 200 F. Supp. 3d 782, 797 (S.D. Ind. 2016) ("A grievance filed to further a purely private interest does not constitute protected speech, even if the topic is potentially of interest to the public."). The grievances described appear to have been made pursuant to hospital procedures regarding the Child Advocacy Department and those hospital staff working within it. They were not made about or directed towards CPS.

Grievances relating to matters of public concern rather than to purely private matters may receive First Amendment protection in some circumstances, even where directed to private parties. *See Connick v. Meyers*, 461 U.S. 138, 145 (1983) (speech on public issues or matters of public concern occupies the highest rung on the hierarchy of First Amendment values and

is entitled to special protection). "To involve a matter of public concern, [Plaintiffs'] speech must 'relate to any matter of political, social, or other concern to the community." *Kreilkamp v. City of Watertown*, No. 99-C-0586-C, 2000 U.S. Dist. LEXIS 22578, at *26–27 (W.D. Wis. Nov. 27, 2000) (quoting *Connick*, 461 U.S. at 146).

But it is not clear that Plaintiffs' grievances (based on which they were allegedly subject to retaliation) go beyond the sphere of their own personal concerns as a matter of law. Their allegations indicate that their grievances were expressed regarding the medical treatment their foster child personally received "on behalf of L.G. and on behalf of themselves," ECF No. 37 at 44. Merely because an issue may be of interest to the public does not make it one entitled to First Amendment protection. *See Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010); *Marshall v. Porter Cnty. Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) (if speech concerns a matter of public interest but the expression of it addresses only the personal effect on the plaintiff, then the speech is not on a matter of public concern as a matter of law). In *Bivens*, the Seventh Circuit noted that while "the public may have been interested in Bivens's grievance and may have benefitted from the resolution he requested," that was not sufficient to "raise the speech here to the level of public concern." 591 F.3d at 561. The same is true here.

Plaintiffs allege that three years prior to the incident with L.G., they had advocated on behalf of "all children in out-of-home placement" regarding the systematic failure "to understand medical consent outside of the context of biological parenthood." ECF No. 37 at 47. It could be argued that Plaintiffs' expression at that time was not limited to the issue's "personal effect" on Plaintiffs and therefore could be considered a matter of public concern entitled to First Amendment protection. But Plaintiffs do

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 60 of 116    Document 67

not allege that they were retaliated against starting in 2019 for that previous advocacy. They allege that they were retaliated against because of the grievances and criticism they expressed specifically relating to L.G.'s treatment following her medical examination in May of 2019. Because the expression they engaged in and for which they allege they were subject to retaliation addressed "only the personal effect" of Defendants' conduct on Plaintiffs, it was not a matter of public concern as a matter of law. Plaintiffs have accordingly failed to state a § 1983 retaliation claim.[19]

### 5.1.6 Count VI—Failure to Intervene

Plaintiffs additionally assert a § 1983 failure to intervene claim against all Defendants. ECF No. 37 at 61. "[A plaintiff's] § 1983 claim for failure to intervene requires that she show that one or more of the Defendants had a realistic opportunity to prevent another state actor from committing a constitutional violation but failed to do so." *Scott v. Buncich*, No. 2:16-CV-114, 2016 U.S. Dist. LEXIS 130122, at *40 (N.D. Ind. Sept. 23, 2016) (citing *Leaf v. Shelnutt*, 400 F.3d 1070, 1093 (7th Cir. 2005)). This requires alleging that the Defendants (1) knew, or had reason to know, that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it. *Gill v. City of Milwaukee*, 850 F.3d 355, 342 (7th Cir. 2017); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Additionally, "a claim of failure to intervene requires plaintiff to show an underlying constitutional violation." *Casciaro v. Allmen*, No. 17-CV-50094, 2018 U.S.

---

[19]The Court need not grant Plaintiffs leave to amend as to this Count because no factual elaboration can remedy the fact that the advocacy engaged in by Plaintiffs cannot support a claim of retaliation as a matter of law. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 310 (7th Cir. 2018) (district court need not allow amendment if doing so would be futile).

Dist. LEXIS 143366, at *29 (N.D. Ill. Aug. 23, 2018) (citing *Gill*, 850 F.3d at 342). While failure to intervene claims arise most commonly in the context of police officers, such claims may still be viable against non-police officers. *See Miller v. City of Chicago*, No. 19-CV-4096, 2019 U.S. Dist. LEXIS 201381, at *7 (N.D. Ill. Nov. 20, 2019) (citing *Yang v. Hardin*, 27 F.3d 282 (7th Cir. 1994)).

Plaintiffs have successfully stated a claim for an underlying constitutional violation against at least some Defendants. *See supra* Sections 5.1.3.1, 5.1.3.2, and 5.1.4 (equal protection violations). The next question is whether Defendants knew, or had reason to know, that such constitutional violations were being committed.

Again, the equal protection violations are alleged to stem from Plaintiffs' exclusion from L.G.'s medical appointment and care generally. Plaintiffs also allege generally as to their class-of-one claim that they were treated "less favorably" and were "afforded . . . fewer rights, privileges, and procedural protections" compared to similarly situated individuals. ECF No. 37 at 57. Plaintiffs must allege, therefore, that each Defendant knew of these alleged violations specifically and failed to intervene to prevent them.

Ventura knew, or had reason to know, that this allegedly unconstitutional conduct was occurring because she was among those who personally participated in excluding Plaintiffs from L.G.'s medical care. *Id.* at 14 ("Ventura . . . refused to speak with Plaintiffs."); ("Barber . . . told [Plaintiffs] that they would not be able to participate at all in the medical visit . . . ."). Ventura had a realistic opportunity to prevent the violations from occurring because she could have kept Barber from excluding Plaintiffs from L.G.'s care. And vice versa, Barber knew that Plaintiffs were being excluded from L.G.'s care by Ventura and could have intervened.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 62 of 116   Document 67

Accordingly, Plaintiffs successfully stated failure to intervene claims against Barber and Ventura.

Next, Chagall is personally mentioned in the amended complaint only to the extent that she "was present at" and "was responsible for" overseeing a formal review process meeting in November of 2019. *Id*. at 52. There, Chagall and Miller are alleged to have "sent the medical reports provided by Dr. Cox to an outside consultant in an attempt to further discredit the now 15 physicians supporting Dr. Cox's position that he had an accident with L.G. . . . ." *Id*. Plaintiffs allege that this was done in violation of both state law and CPS processes and that it was an abuse of process with "the intent to perpetuate the false statement that Dr. Cox had abused L.G. and further prevent the adoption of L.G." *Id*. Since Chagall is alleged to have participated along with other CPS employees in depriving Plaintiffs of procedures afforded to others in their position pursuant to "CPS processes and state law," and since Chagall had a realistic opportunity to prevent Miller from doing so, Plaintiffs have stated a claim of failure to intervene against her.

Next, the amended complaint alleges that Hartmann and Jewell had "supervisory authority over one or more of Defendants Barber and Scherbarth." *Id*. at 7. There is no indication, however, that either Hartmann or Jewell—by virtue of possibly having supervisory authority over Barber—were aware of Barber's participation in Plaintiffs' exclusion from L.G.'s medical care. Plaintiffs make no allegation that Barber excluded Plaintiffs from L.G.'s appointment at the behest of, or at least at the knowledge of, Hartmann or Jewell.

Hartmann and Jewell are specifically implicated in the amended complaint only in reference to their alleged participation in a meeting at the

offices of CPS on May 21, 2019. *Id*. at 31. At that meeting, Miller is alleged to have withheld from Plaintiffs photos of L.G. taken by Ventura as well as information about the medical examination generally. *Id*. This withholding of information and of the photos taken of L.G. at her medical appointment falls within Plaintiffs' general claim of exclusion from L.G.'s medical care, which forms the basis of their equal protection claims. It can therefore be said that Hartmann and Jewell, by attending and participating in the meeting at which the photos and information were withheld, knew that this allegedly unconstitutional differential treatment was occurring and had an opportunity to intervene to prevent their CPS colleagues from engaging in such differential treatment. Plaintiffs have therefore successfully stated failure to intervene claims against Hartmann and Jewell.

Next, the Court evaluates the claim as to Parr-Nelson. She is also alleged to have supervisory authority over Barber and/or Scherbarth. *Id*. at 7. As was the case regarding Hartmann and Jewell, the amended complaint makes no indication that Parr-Nelson, by virtue of possibly having supervisory authority over Barber, was aware of Barber's actions in excluding Plaintiffs from L.G.'s medical care. However, unlike Hartmann and Jewell, Parr-Nelson is specifically alleged to have been personally involved in the determination that "Plaintiffs would not be allowed to attend or participate in L.G.'s medical visit with the Child Advocacy Center provider because Plaintiffs were physicians." *Id*. at 23. Accordingly, Parr-Nelson was aware that the allegedly unconstitutional differential treatment was occurring and could have intervened to prevent Barber or Ventura from participating in it. Plaintiffs have succeeded in stating a claim for failure to intervene against Parr-Nelson.

Next, the Court evaluates the claim as to Miller and Scherbarth. Both are CPS employees but are not alleged to have had any supervisory authority over any subordinates. Like Jewell and Hartmann, Miller and Scherbarth are alleged to have participated in the May 21, 2019 meeting at the offices of CPS. *Id.* at 31. Again, at that meeting Miller allegedly refused to allow Plaintiffs to see the photos taken by Ventura, and also withheld from Plaintiffs information about the medical evaluation. *Id.* By attending and participating in the meeting at which the photos and information were withheld, Plaintiffs have sufficiently alleged for purposes of this stage that Miller and Scherbarth knew that this allegedly unconstitutional differential treatment was occurring and had an opportunity to intervene to prevent their CPS colleagues from engaging in such differential treatment. Plaintiffs have stated a claim for failure to intervene against Miller and Scherbarth.

The amended complaint implicates Urban only to the extent that Urban allegedly was notified by Dr. Pomeranz in August of 2019 of the "serious issues with medical care provided to L.G., and with the erroneous conclusions drawn in L.G.'s case." *Id.* at 51. This was several months after the appointment with Ventura from which Plaintiffs were excluded. Dr. Pomeranz notified Urban of these issues because "as CPS medical director, Urban had an obligation to provide review and oversight to the CPS processes as they pertained to and interacted with medical care and evaluations." *Id.* The amended complaint further alleges that despite Urban's obligation to "provide review and oversight to the CPS processes," "Urban told Dr. Pomeranz that she was staying out of the case." *Id.*

According to Plaintiffs' own allegations, by the time Urban was made aware of the issues surrounding L.G.'s medical care, it had been several months since Plaintiffs were excluded from the appointment.

Similarly, the meeting at which various CPS employees continued to deprive Plaintiffs of information relating to the appointment and of the photos taken there, allegedly in violation of Plaintiffs' constitutional rights, occurred several months before the matter was brought to Urban's attention by Dr. Pomeranz. However, Urban was made aware of the issues prior to November 14, 2019, at which time CPS undertook a "formal review process dictated by state statute." At that meeting, several CPS employees are alleged to have continued to unconstitutionally deprive Plaintiffs of the procedures to which they were entitled. *See id*. at 52 ("In direct violation of [CPS processes and state law], Defendants Miller and Chagall sent the medical report provided by Dr. Cox to an outside consultant in an attempt to further discredit the now 15 physicians supporting Dr. Cox's position . . . ."). Since the amended complaint reasonably allows for the inference that Urban had reason to know of the allegedly unconstitutional conduct (by Dr. Pomeranz's communication to her) at a time at which Urban could realistically intervene to prevent its continuation, Plaintiffs have stated a failure to intervene claim against her.

Next, the Court analyzes the claim as it is asserted against Sheets. Sheets is alleged to have "directed one or more of her subordinates to coordinate with CPS, to ensure that CPS employees would deny Plaintiffs the right to be present for L.G.'s medical examination." *Id*. at 22. Plaintiffs allege that that exclusion violated their equal protection rights. They have successfully alleged that Sheets knew of the allegedly unconstitutional conduct and had a realistic opportunity to intervene to prevent it.

As to Gutzeit, the amended complaint alleges that "[d]espite the overwhelming information available to" him about L.G.'s care, he "continued to fail to provide truthful information to Plaintiffs," and despite

the negative evaluation of the Child Advocacy Program managed in part by Gutzeit, he and others failed to provide information of this negative evaluation to "CPS, to police investigators, or to the office of the District Attorney despite knowing that these offices rely heavily" on information from the Child Advocacy Program. ECF No. 37 at 50. In spite of his alleged knowledge of the flaws in the Child Advocacy Program which worked to effect an alleged deprivation of Plaintiffs' constitutional rights, Gutzeit continued to affirmatively "express[] support for the Child Advocacy Program" following the criminal prosecution of Cox. *Id*. at 54. The Court is satisfied for purposes of this stage that Plaintiffs have sufficiently alleged that Gutzeit knew or had reason to know of allegedly unconstitutional differential treatment being afforded to pre-adoptive parents such as themselves and had a realistic opportunity to intervene to prevent such differential treatment.

As to Petska, the amended complaint alleges that she evaluated L.G. on May 9, 2019 and concluded that her injuries were not necessarily indicative of abuse. *Id*. at 11. Shortly thereafter, Petska recused herself from the treatment of L.G. and transferred care of L.G. to Ventura. *Id*. at 12–13.

As a threshold matter, the Court has already concluded that Petska, a private actor, may not be sued under § 1983. *See supra* Section 5.1.1.1. Moreover, the amended complaint does not indicate that Petska had any role in or awareness of Plaintiffs' exclusion from L.G.'s appointment and care. To the contrary, the amended complaint states that the "decision to bar Plaintiffs from attending L.G.'s medical visit with Defendant Ventura contradicted Defendant Petska's plan of care . . . ." *Id*. at 14. It is not alleged that Petska knew or had any reason to know that Plaintiffs were being excluded from L.G.'s appointment with Ventura on May 10, 2019. Nor is it

alleged that Petska knew or had any reason to know that medical information and photos from the appointment were subsequently withheld from Plaintiffs. The amended complaint makes no indication that Petska knew or had reason to know of the allegedly differential treatment being afforded to Plaintiffs. Plaintiffs have failed to state a failure to intervene claim against Petska. However, such a deficiency in pleading may be redressable by amendment. "Courts should not dismiss the complaint unless it is beyond a doubt that there are no facts to support relief." 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15. Merely because Plaintiffs have not pleaded such factual allegations does not necessarily mean that "there are no [such] facts" in existence to support their claim. *Id*. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to address the deficiency as to Petska.

Next, the Court evaluates the failure to intervene claim as asserted against MCW, CHW, and CHHS. "Although unlikely in practice, it is not categorically impossible for a corporation to be responsible for a constitutional tort under a failure-to-intervene theory." *See Miller*, 2019 U.S. Dist. LEXIS 201381, at *7.

As to the Entity Defendants, Plaintiffs allege that three years prior to L.G. sustaining injuries, they put the Entity Defendants on notice of their "failure to understand medical consent outside of the context of biological parenthood." ECF No. 37 at 47. This advocacy by Plaintiffs resulted in the Entity Defendants creating a "50-person hospital committee tasked with fixing this systematic failure." *Id*. Plaintiffs allege that this served to put the Entity Defendants on notice of "this and other important findings about gaps and flaws in the Entity Defendants' policies and procedures regarding the treatment of children in out-of-home placement." *Id*. Since Plaintiffs

allege that the Entity Defendants were put on notice of the differential treatment of which they now complain, it can be said that those Defendants knew, or at least had reason to know, that such allegedly unconstitutional conduct was occurring within their facilities.

The Court is satisfied, at least for purposes of the pleading stage, that Plaintiffs have sufficiently alleged that the Entity Defendants knew, or had reason to know, that equal protection violations were being committed within their facilities against non-biological families and failed to take advantage of their opportunity to prevent them. *See id.* (alleging that despite being on notice of these flaws in policies and procedures regarding medical consent in the context of non-biological parenthood, the Entity Defendants failed to improve those policies and procedures to prevent the issues from occurring again). *See also McCollough v. Hanley*, No. 17-C-50116, 2018 U.S. Dist. LEXIS 121456, at *38–39 (N.D. Ill. July 20, 2018) ("While the Court understands that [defendants'] position is that no such [unconstitutional conduct] existed or that they had no knowledge of such [unconstitutional conduct], those arguments will have to wait for summary judgment proceedings or trial.").

### 5.1.7    Count VII—Conspiracy

Plaintiffs further allege a § 1983 conspiracy claim against all Defendants. "A § 1983 conspiracy claim requires both (1) an underlying constitutional violation and (2) an agreement among the defendants to inflict the unconstitutional harm." *Green v. Howser*, 942 F.3d 772, 778 (7th Cir. 2019); *see also Gaylor v. Thompson*, 939 F. Supp. 1363, 1375 (W.D. Wis. 1996) (noting that a § 1983 conspiracy claim ultimately requires proof of a conspiracy by state actors to deprive a petitioner of a constitutional right) (internal citation omitted). Without deprivation of an underlying

constitutional right, there can be no successful § 1983 conspiracy claim. *Gaylor*, 939 F. Supp. at 1376. Moreover, "[t]o state a conspiracy claim, plaintiffs must 'allege the parties, the general purpose, and the approximate date of the conspiracy.'" *Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103, 1110 (N.D. Ill. 2019) (quoting *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 1006)).

The Court has already concluded that Plaintiffs have successfully stated claims for equal protection violations, so the first element is met. The second element, "an agreement among the defendants to inflict the unconstitutional harm," *Green*, 942 F.3d at 778, is also met for purposes of the pleading stage. The Court has already discussed these allegations. The parties against whom these allegations are made are all named Defendants. The general purpose of the alleged conspiracy was to ensure that Defendants' wrongful conduct surrounding L.G.'s medical care and Defendants' wrongful allegations of child abuse were kept under wraps— by discrediting Plaintiffs, intimidating Plaintiffs and those who agreed with them, depriving Plaintiffs of appropriate administrative review, ensuring criminal prosecution of Cox, and more. The approximate date of the conspiracy, as alleged, is around May 10/11, 2019 through February of 2020. Accordingly, Plaintiffs have successfully stated a § 1983 conspiracy claim.

### 5.1.8   Count VIII—Supervisory Liability

Supervisory liability under § 1983 is asserted against Sheets, Gutzeit, Parr-Nelson, Urban, Miller, Chagall, Jewell, and Hartmann. ECF No. 37 at 63. Plaintiffs write that "[t]he constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Individual Defendants who acted in a supervisory capacity, such that these [] Defendants personally knew about, facilitated, approved, and condoned

this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act." *Id*.

"The United States Supreme Court [has] expressly rejected *respondeat superior* as a basis to attach supervisory liability under a § 1983 action." *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 634 (N.D. Ind. 2006) (citing *Monell v. Dep't of Social Servs*., 436 U.S. 658, 691–92 (1978)). "Thus, basing a claim of supervisory liability merely on a supervisor's right to control employees is insufficient." *Id*. Rather, "§ 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation." *Id*. (quoting *Galdikas v. Fagan*, 342 F.3d 684, 693 (7th Cir. 2003)).

"Proof that a supervisor was negligent or even grossly negligent in failing to detect or prevent constitutional violations is insufficient: 'The supervisor must know about the conduct and facilitate it, condone it, or turn a blind eye for fear of what they might see. They must act either knowingly or with deliberate, reckless indifference.'" *Id*. (internal citation omitted). "When a supervisor is on notice of a possible unconstitutional policy or custom and fails to take corrective measures, for example, by . . . affirmatively commanding employees to continue unconstitutional acts, liability may attach." *Id*. at 635. "However, isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." *Id*. "A failure to supervise does not hinge on actual notice of prior violations by subordinates but supervisory liability may arise under § 1983 when the supervisor disregards known or 'obvious' risks of

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 71 of 116   Document 67

constitutional violations that would flow from a lack of supervision." *Id.* Plaintiffs must allege that their injuries occurred at these named Defendants' "direction or with their knowledge and consent" and that these Defendants acted "either knowingly or with deliberate, reckless indifference." *Stockton v. Milwaukee County*, 44 F.4th 605, 619 (7th Cir. 2022).

Plaintiffs must first allege that Sheets, Gutzeit, Parr-Nelson, Urban, Miller, Chagall, Jewell, and Hartmann are supervisors or had supervisory authority at the time of the alleged violations. As to some of these Defendants, Plaintiffs have clearly done so. ECF No. 37 at 6 ("Sheets served as Defendant Ventura's supervising physician.") ("Gutzeit served as Chief Medical Officer of CHW and as its Vice President of Quality and Safety, and accordingly was the physician responsible for ensuring the quality of the care that was provided at Defendant CHW."), at 6–7 ("Parr-Nelson, Jewell and Hartmann had supervisory authority over one or more of Defendants Barber and Scherbarth."), and at 51 ("Urban, the CPS medical director . . . violated her obligation to supervise and review the use of medical evidence in CPS decision-making . . . .").

As to Miller, however, there is no allegation that Miller was a supervisor or had any supervisory authority at the time of the alleged events. And as to Chagall, there are allegations that Chagall enjoyed oversight responsibility, but not necessarily over subordinates. *See id.* at 52 ("Chagall . . . was responsible for overseeing the formal review process."). Accordingly, Plaintiffs have failed to state supervisory liability claims against Miller and Chagall.

Plaintiffs must next show that the remaining Defendants—Sheets, Gutzeit, Parr-Nelson, Jewell, Hartmann, and Urban—knew about the allegedly constitutionally violative conduct, and "facilitate[d] it,

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 72 of 116    Document 67

condone[d] it, or turn[ed] a blind eye for fear of what they might see . . . . either knowingly or with deliberate, reckless indifference." *Mayes*, 442 F. Supp. 2d at 634.

As to Urban, Plaintiffs allege that "Dr. Pomeranz raised these issues with Defendant Urban" in August of 2019 and that despite Urban's obligation to "provide review and oversight to the CPS processes," "Urban told Dr. Pomeranz that she was staying out of the case." ECF No. 37 at 51. Those are the extent of Plaintiffs' specifical factual allegations as to Urban.[20]

These allegations suggest that Urban "turn[ed] a blind eye for fear of what [she] might see." *Mayes*, 442 F. Supp. 2d at 634. Plaintiffs have alleged that Urban was put on notice of issues in the conduct of her subordinates and simply chose to ignore them and not inquire further as to their seriousness and extent. This goes beyond mere "dereliction of duty," which does not itself "constitute deliberate indifference" for purposes of supervisory liability. *Id*. at 651. The Court is satisfied for purposes of this stage that Plaintiffs have stated a supervisory liability claim against Urban.

---

[20]Plaintiffs allege that three years prior to the incident with L.G., they had advocated for CHW, MCW, and CHHS to create a hospital committee tasked with fixing the "systematic failure" to "understand medical consent outside of the context of biological parenthood." ECF No. 37 at 47. "Despite being placed on notice of this and other important findings about gaps and flaws in the Entity Defendants' policies and procedures regarding the treatment of children in out-of-home placement, the Entity Defendants' [sic] failed to improve those policies and procedures, resulting in the numerous failures and errors with [sic] pervaded their treatment of L.G." *Id*. It is not suggested that CPS generally, nor Urban specifically, were part of this committee process three years prior to the incident with L.G. Accordingly, these allegations regarding Plaintiffs' putting the Entity Defendants on notice of systematic flaws in their policies cannot transform Urban's alleged knowledge of an "isolated instance[]" of unconstitutional conduct into something more. *See Mayes*, 442 F. Supp. 2d at 935.

Next, Parr-Nelson, Jewell, and Hartmann are alleged to have "supervisory authority over one or more of Defendants Barber and Scherbarth." ECF No. 37 at 7. The question is whether Plaintiffs sufficiently allege that those three Defendants were aware of Barber and/or Scherbarth's allegedly constitutionally violative conduct and "facilitate[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see . . . . either knowingly or with deliberate, reckless indifference." *Mayes*, 442 F. Supp. 2d at 634.

Plaintiffs allege that Parr-Nelson "determined that Plaintiffs would not be allowed to attend or participate in L.G.'s medical visit" and "wrote an email to identify a social worker to bring the child to the visit, stating that '[t]he adoptive parent is a children's medical doctor and because of the sensitive nature of this relationship/circumstance CAC requested that an IAS bring the infant this morning without the foster parents.'" ECF No. 37 at 23. They allege that Parr-Nelson participated generally in the overall conspiracy to deprive Plaintiffs of their rights and of L.G., but they do not allege that Parr-Nelson facilitated, condoned, or turned a blind eye towards the allegedly unconstitutional conduct of Barber and/or Scherbarth.[21]

---

[21]Plaintiffs allege that on May 21, 2019, they met with various of the CPS Defendants—Scherbarth, Jewell, Hartmann, and Miller—at the offices of CPS, but there is no allegation that Parr-Nelson was involved with that meeting in any capacity or even knew of it. ECF No. 37 at 31. Plaintiffs also allege that "Scherbarth and additional CPS defendants took repeated actions to specifically prevent Plaintiffs from completing their planned adoption of L.G." *Id*. at 52. Again, it is not clear that this allegation involved Parr-Nelson. The Court cannot assume, without additional allegations, that merely because Parr-Nelson allegedly participated in this overall conspiracy, she knew of unconstitutionally violative conduct specifically undertaken by Barber and/or Scherbarth and allowed it to continue.

Accordingly, Plaintiffs have failed to state a supervisory liability claim against Parr-Nelson.

As to Jewell and Hartmann, the amended complaint states that Plaintiffs met them, along with Miller and Scherbarth, at the offices of CPS on May 21, 2019. *Id*. at 31. During this meeting, "Defendants repeatedly rebuffed Plaintiffs' efforts to provide truthful information about the circumstances of L.G.'s injury . . . ." *Id*. It is also alleged that at that time, Miller withheld information and photos of L.G. from Plaintiffs, but it is not alleged that Jewell or Hartmann had any supervisory authority over Miller. Again, apart from general allegations about participation in the overall conspiracy to deprive Plaintiffs of their rights, there are no further factual allegations as to Jewell and Hartmann.

However, by alleging that Jewell and Hartmann participated along with Scherbarth, their subordinate, at the May 21, 2019 meeting in which they collectively continued to deprive Plaintiffs of information relating to L.G.'s medical care and disregarded contrary medical evidence so as to maintain Defendants' wrongful reliance on Ventura's medical conclusions, Plaintiffs have sufficiently alleged that Jewell and Hartmann "facilitate[d]" Scherbarth's allegedly constitutionally violative conduct. *See Mayes*, 442 F. Supp. 2d at 634. Accordingly, they have successfully stated a claim for § 1983 supervisory liability against those two Defendants.

Next, the Court evaluates Plaintiffs' supervisory liability claim against Sheets. Plaintiffs allege that Sheets was Ventura's supervising physician, ECF No. 37 at 19, but that Sheets did not actually supervise Ventura during the medical exam of L.G., *id*. at 25. Plaintiffs have sufficiently alleged that Sheets knew about Ventura's allegedly

unconstitutional conduct, and "facilitate[d] it . . . . either knowingly or with deliberate, reckless indifference." *Mayes*, 442 F. Supp. 2d at 634.

Specifically, Plaintiffs allege the following. Sheets, following the unsupervised medical examination of L.G., continued to deny Plaintiffs appropriate administrative review and to deny that Plaintiffs' status as physicians had anything to do with their exclusion from the appointment. ECF No. 37 at 30. Sheets "declined to name a physician responsible for the" supervision of Ventura on May 10, 2019, further obscuring the wrongful conduct that allegedly occurred at the appointment that day. *Id.* at 31. Sheets further condoned Ventura's wrongful conduct and facilitated the narrative Ventura established by attempting to "silence any provider who disagreed with Defendant Ventura's medical evaluation, to tarnish Dr. Cox's reputation, and to attempt to influence the outcome of the ongoing CPS investigation." *Id*. at 41. To cover up Defendants' conduct and ensure that the erroneous conclusions Ventura reached would remain unimpeached, Sheets attempted to have a dermatologist who reached a differing conclusion punished, spread Ventura's conclusion that Cox had abused L.G. to other hospital employees, told investigators that this was not the first time Cox had abused a child, and kept CPS from accessing Petska's medical documentation (since Plaintiffs allege Petska agreed with them that L.G. was not a victim of abuse). *Id*. at 41–42. Sheets engaged in all of this behavior despite knowing that Ventura's conclusions of abuse were contrary to the medical evidence. *Id*. at 42. Plaintiffs have successfully stated a claim for supervisory liability against Sheets.

The final Defendant against whom supervisory liability is asserted is Gutzeit. The CHW Defendants argue that Gutzeit cannot be liable for failure to supervise under § 1983 because Gutzeit did not become aware of

any of the allegedly unconstitutional activity until after it had concluded, and "after the conduct at issue is completed, there is nothing the official can do to stop it, so []he cannot be held liable." ECF No. 47 at 26–27 (quoting *Phillips v. Mega Concrete Constr., LLC*, No. 20-CV-658-JDP, 2022 U.S. Dist. LEXIS 14808, at *21–22 (W.D. Wis. Jan. 27, 2022)). Plaintiffs' contention that Gutzeit "ratified, adopted, and endorsed [Ventura's] false conclusions and diagnosis of abuse" is, according to the CHW Defendants, insufficient to establish supervisory liability. *Id*. at 26 (quoting ECF No. 37 at 25).

The allegations as to Gutzeit are that "[d]espite the overwhelming information available to" him about L.G.'s care, he "continued to fail to provide truthful information to Plaintiffs," and despite the negative evaluation of the Child Advocacy Program managed in part by Gutzeit, he and others failed to provide information of this negative evaluation to "CPS, to police investigators, or to the office of the District Attorney despite knowing that these offices rely heavily" on information from the Child Advocacy Program. ECF No. 37 at 50.  In spite of his alleged knowledge of the flaws in the Child Advocacy Program which worked to effect an alleged deprivation of Plaintiffs' constitutional rights, Gutzeit continued to affirmatively "express[] support for the Child Advocacy Program" following the criminal prosecution of Cox. *Id*. at 54. The Court is satisfied that Plaintiffs have alleged that Gutzeit condoned the allegedly unconstitutional conduct of his subordinates and facilitated its continuation. Accordingly, they have successfully stated a claim for supervisory liability against Gutzeit.

As to Parr-Nelson, Miller, and Chagall, although the Court has concluded that Plaintiffs' amended complaint fails to state supervisory claims against them, the Court is obliged to afford Plaintiffs leave to amend

their complaint to address these deficiencies. "Courts should not dismiss the complaint unless it is beyond a doubt that there are no facts to support relief." 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15. Merely because Plaintiffs have not pleaded such factual allegations does not necessarily mean that "there are no [such] facts" in existence to support their claim. *Id*.

### 5.2 COUNT X—CIVIL CONSPIRACY

Plaintiffs also attempt to plead a state law claim of civil conspiracy against Defendants Ventura, Petska, Sheets, Gutzeit, CHW, MCW, and CHHS.[22] ECF No. 37 at 65.

As a threshold matter, Defendants argue that Plaintiffs' state-law claims are barred by the application of Wisconsin's Worker's Compensation Act ("WCA"). ECF No. 42 at 21. This argument is applicable to Plaintiffs' claims for civil conspiracy, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious interference. Defendants write that the WCA provides the "exclusive remedy for an employee who makes a claim against his or her employer, and any other employee of the same employer." *Id*. (citing Wis. Stat. § 102.03(2)). In response, Plaintiffs argue that their state law claims are not barred by the WCA because that act applies only where the plaintiff was "performing services 'growing out of and incidental to . . . [his] employment at the time of injury.'" ECF No. 61 at 33 (quoting *Jenson v.*

---

[22]Although Plaintiffs failed to assert constitutional claims against CHW, MCW, and CHHS, the Court is satisfied that it may exercise supplemental jurisdiction over the related state-law claims asserted against these Defendants. The Court must expressly acknowledge this because, while Plaintiffs assert federal subject matter jurisdiction pursuant to both § 1331 and § 1332, it is not entirely clear at this juncture that Plaintiffs actually have diversity jurisdiction. Their amended complaint does not indicate the domiciles of the Individual Defendants, and so the Court has no way of discerning if there is complete diversity.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 78 of 116   Document 67

*Employers Mut. Cas. Co.*, 468 N.W.2d 1, 8 (Wis. 1991)). For the WCA's exclusive remedy provision to apply, Plaintiffs write, "only the injured employee, and not the injuring coemployee need have been acting within the scope of his or her employment at the time of the injury," and "Plaintiff was NOT acting within the scope of his employment at the time of his injury related to any of his State law claims." *Id.* at 33–34 (internal citation omitted).

If Plaintiffs' state-law claims are those for which "there is the right to recovery under the WCA," then Plaintiffs are constrained by the WCA's exclusivity and mandated procedures. *See Jenson*, 468 N.W.2d at 4.[23] In order for a plaintiff to have a right to recovery under the WCA, Wis. Stat. § 102.03(1)(c) of that act requires that "at the time of the injury, the employee is performing service growing out of and incidental to his or her employment." Indeed, as Plaintiffs assert, "only the injured employee, and not the injuring coemployee need have been acting within the scope of his or her employment at the time of the injury" in order for the WCA to provide the exclusive remedy. *Jenson*, 468 N.W.2d at 8 (quoting *Rivera v. Safford*, 377 N.W.2d 187, 190 (Wis. 1985)).

In *Jenson*, the Wisconsin Supreme Court concluded that the plaintiff's state common law claims were, indeed, barred by the WCA's exclusive remedy provision because she incurred the alleged injuries while "performing services 'growing out of and incidental to . . . her employment.'" *Id.* The plaintiff there was the "clerk-treasurer" of the Village of Solon Springs. *Id.* at 2. The court noted that the "attacks upon her

---

[23]The significance is that "recovery under the WCA is only in a scheduled amount while the common law claim permits whatever recovery a jury may award that is supported by the evidence." *Jenson*, 468 N.W.2d at 5.

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 79 of 116   Document 67

took place at village board meetings and in the confines of the village hall, where both [plaintiff and defendant] worked." *Id.* at 8. They occurred immediately before, during, and immediately after the board meeting. *Id.* "It would appear from a common sense point of view," the court wrote, "these were times when Jenson, by virtue of her duty to be at the board meetings, was performing services growing out of and incidental to her employment." *Id*. Plaintiff was attacked "at work and in respect to her work performance." *Id. See also Bostwick v. Watertown Unified Sch. Dist.*, No. 13-C-1036, 2013 U.S. Dist. LEXIS 170827, at *6–7 (E.D. Wis. Dec. 4, 2013) ("[§ 102.03's] language—growing out of and incidental to employment—is used interchangeably with the phrase 'course of employment.' . . . An injury arises in the course of employment when it takes place within the period of the employment at a place where the employee reasonably may be, and while he or she is fulfilling his or her duties or engaged in doing something thereto.") (internal citation omitted).

The same is not true here, and the Court concurs with Plaintiffs' assertion that at the time of the alleged injuries, Plaintiffs were not "performing service growing out of and incidental to [their] employment." Wis. Stat. § 102.03(1)(c). Plaintiffs' state common law claims—civil conspiracy, intentional and negligent infliction of emotional distress, defamation, and tortious interference—relate to their treatment as foster parents of a child who was subject to Defendants' care. Plaintiffs were not acting within the scope of their employment as physicians at the time of these injuries. While the injuries occurred in their place of work, Plaintiffs were not there in their capacity as physicians, nor do the pleadings suggest that they were on the clock. Unlike in *Jenson*, Plaintiffs had no "duty" to be

at the hospital at that time and were not performing any work-related services. *See Jenson*, 468 N.W.2d at 8.

The MCW Defendants cite *Becker v. Automatic Garage Door Co.*, 456 N.W.2d 888 (Wis. Ct. App. 1990) in support of their argument that WCA is the exclusive remedy for Plaintiffs' state law claims. There, the court held that the plaintiff's claim that she was defamed was barred by the exclusivity provision of the WCA. *Becker*, 456 N.W.2d 891. The plaintiff claimed that defendants stated that she was calling off sick from work "in order to stay home" and cheat on her husband. *Id*. at 891–92. The court there did not, however, analyze whether she incurred the alleged injury while performing services growing out of and incidental to her employment as required for the WCA to be the plaintiff's exclusive remedy. The court stated simply that her defamation claim was barred by the WCA's "exclusivity provisions . . . as recently interpreted by this court in *Jenson* . . . ." *Id*. at 892. The court did not provide any further analysis on that issue. Because that case did not evaluate whether the plaintiff's injuries were incurred while the plaintiff was performing service growing out of or incidental to her employment, an express requisite for the WCA's exclusivity provision to apply, it provides little guidance to the Court.

The MCW Defendants also cite *Wolf v. F&M Banks*, 534 N.W.2d 877 (Wis. Ct. App. 1995). ECF No. 42 at 22. The court there wrote that "In *Becker*, the court of appeals held that defamation claims by an employee against an employer and its employees are preempted by the WCA." *Wolf*, 534 N.W.2d at 883. Again, the court did not there analyze whether the plaintiff's injury was incurred while the plaintiff was performing service growing out of or incidental to her employment.

*Wolf* relied on *Becker*, and *Becker* ostensibly relied on *Jenson*. The Wisconsin Supreme Court's interpretation of the WCA's exclusivity provision in *Jenson* is what is controlling to this Court. *Jenson* explicitly acknowledged the requirement that "[w]here, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment" as required for "[l]iability under this chapter" to exist. *Jenson*, 468 N.W.2d at 8 (citing Wis. Stat. § 102.03(1)). *Becker* and *Wolf* made no mention of that requirement. The Court concludes that *Jenson* and its analysis of § 102.03(1) is controlling. And as noted above, it is the Court's opinion at this time that the present circumstances are materially distinguishable from *Jenson.* Accordingly, the WCA does not bar Plaintiffs' state common law claims.

Defendants similarly argue that Wis. Stat. Ch. 655 is the "exclusive remedy for all medical malpractice claims" and that Plaintiffs do not have standing thereunder. ECF No. 42 at 19–20; *see also* ECF No. 47 at 36 ("[T]o the extent those [state-law claims] are founded in medical malpractice, they fail because (1) Plaintiffs did not follow Wisconsin Statute Chapter 655's 'exclusive procedure and remedy for medical malpractice in Wisconsin,' . . . and (2) Plaintiffs lack standing to assert medical malpractice under Chapter 655 as pre-adoptive parents, *see* Wis. Stat. § 655.007"). Plaintiffs do not address this contention.

"When applicable, 'Chapter 655 constitutes the exclusive procedure and remedy for medical malpractice in Wisconsin.'" *Andruss v. Divine Savior Healthcare Inc.*, 973 N.W.2d 435, ¶ 26 (Wis. 2022) (internal citation omitted). Section 655.007 provides that "any patient or the patient's representative having a claim . . .[or] a derivative claim for injury or death on account of malpractice is subject to this chapter." No death is alleged

here, nor do Plaintiffs seek relief against Defendants for any physical injury suffered by L.G., so the Court must analyze the scope of Chapter 655's applicability.

"While 'malpractice' is not defined within the statute, the term is traditionally defined as 'professional misconduct or unreasonable lack of skill,' or 'failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession.'" *McEvoy v. Grp. Health Coop.*, 507 N.W.2d 397, 406 (Wis. 1997) (internal citation omitted). The court there held that "[C]h. 655 applies only to *negligent* medical acts or decisions made in the course of rendering professional medical care." *Id.* (emphasis added). "To hold otherwise would exceed the bounds of the chapter and would grant seeming immunity from non-chp. 655 suits to those with a medical degree." *Id.* Therefore, "claims not based on malpractice, such as a bad faith tort action, survive application of that chapter." *Id.*

Most of Plaintiffs' state law claims require intentional, rather than merely negligent, conduct. Chapter 655 is therefore inapplicable to those claims because they are not based on allegedly "negligent medical acts." *Id.* Plaintiffs' negligent infliction of emotional distress ("NIED") claim, however, is grounded in allegations of negligent medical acts, and therefore does require discussion within the context of Chapter 655.[24]

---

[24]Ch. 655 usually encompasses claims for loss of consortium. *See Phelps v. Physicians Ins. Co. of Wis., Inc.*, 768 N.W.2d 615, ¶¶ 62–63. However, Plaintiffs' loss of consortium claim, Count XVI, arises out of their claim of defamation of Cox, not out of their allegations of negligent medical acts, and therefore does not fall within the umbrella of medical malpractice for purposes of Ch. 655 applicability. *See McEvoy*, 507 N.W.2d at 406 ("[C]h. 655 applies only to negligent medical acts or

In *Phelps v. Physicians Ins. Co. of Wis., Inc.*, 768 N.W.2d 615, ¶ 61 (Wis. 2009), the Wisconsin Supreme Court addressed "whether Wis. Stat. ch. 655 bars claims brought by a bystander who claims that an employee of a health care provider, or the health care provider itself, negligently provided health care services to a relative of the bystander that caused emotional distress to the bystander." The court noted that Chapter 655 refers to the "claims of patients and the *derivative* claims of specified relatives." *Id*. at ¶ 62 (internal citation omitted) (emphasis added). Therefore, "a relative's claim must be derivative to fall within the scope of allowable medical malpractice recovery . . . ." *Id*. (internal citation omitted).

The court explained that a bystander NIED claim is a "direct, not a derivative, claim," because such a claim "does not depend on the primary tort victim's ability to make the claim." *Id*. at ¶ 63 (internal citation omitted). Stated otherwise, "a derivative claim arises from the tort injury to another; it does not have its own elements of proof that are distinct from the negligence claim to which it attaches . . . . By contrast, a claim of bystander emotional distress has elements that, while arising from the underlying negligence, are distinct and subject to separate proof." *Id*. The court ultimately confirmed that "[b]ecause Chapter 655 exclusively governs all claims arising out of medical malpractice [against health care providers and their employees], and because the legislature did not include [bystander] claims in Wis. Stat. §§ 655.005(1) or 655.007, . . . negligent infliction of emotional distress claims arising out of medical malpractice are not actionable under Wisconsin law." *Id*. at ¶ 65 (internal citation omitted).

---

decisions made in the course of rendering professional medical care."). For the Court's discussion of Plaintiffs' loss of consortium claim, *see* Section 5.6.

Plaintiffs, however, assert a direct NIED claim, not a bystander one. But this difference, at least in the context of Ch. 655's applicability, is immaterial. Although *Phelps* specifically made reference to "the negligent infliction of emotional distress to a bystander," *id*. at ¶ 67, its reasoning extends to direct NIED claims as well. Direct NIED claims, like bystander NIED claims, have "elements that, while arising from the underlying negligence, are distinct and subject to separate proof." *Id*. at ¶ 63. Like bystander NIED claims, then, direct NIED claims are not derivative and do not "fall within the scope of allowable medical malpractice recovery" under Chapter 655. *Id*. at ¶ 62 (internal citation omitted). Because Plaintiffs' direct NIED claim arises out of medical malpractice and is brought against a hospital and hospital employees, it is "exclusively govern[ed]" by Chapter 655. *See id*. at ¶ 65. And since, like bystander NIED claims, Chapter 655 "does not permit such claims," Plaintiffs' direct NIED claim is not recognized by Wisconsin law. *See id*. at ¶ 66. The Court must therefore grant Defendants' motions to dismiss to the extent they seek to dismiss Plaintiffs' NIED claim for failure to state a claim.[25]

Having addressed Defendants' argument regarding the WCA and Chapter 655, the Court now proceeds to the merits of the civil conspiracy claim. Under Wisconsin law, "[a] civil conspiracy is 'a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself

---

[25]Since the Court has concluded that this claim is not actionable under Wisconsin law, the Court need not address Defendants' contention that Plaintiffs do not have standing under Chapter 655 to bring it. Furthermore, the Court need not grant leave to amend as to this Count as doing so would be futile. *See NewSpin Sports, LLC*, 910 F.3d at 310 (district court need not allow amendment if doing so would be futile).

unlawful.'" *Fabick, Inc. v. FABCO Equip., Inc.*, No. 16-CV-172-WMC, 2017 U.S. Dist. LEXIS 87028, at *13 (W.D. Wis. June 7, 2017) (internal citation omitted). "To state a cause of action for civil conspiracy, the complaint must allege: (1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts." *Id*. (quoting *Onderdonk v. Lamb*, 255 N.W.2d 507, 510 (Wis. 1977)). "The complaint must state what was done in the execution of the conspiracy and that the purpose of the combination was accomplished." *Onderdonk*, 255 N.W.2d at 510 (internal citation omitted). The Court concludes that these elements are met for purposes of the pleading stage.

As to the first element, the Court has already discussed Plaintiffs' allegations regarding Defendants' conspiracy to discredit Plaintiffs, foil the planned adoption of L.G., and see to it that criminal child abuse charges were brought against Cox—all based on an allegedly erroneous medical examination and an extensive subsequent coverup. *See supra* Sections 5.1.1.1 and 5.1.1.2. Plaintiffs' amended complaint sufficiently alleges the scope and operation of the alleged conspiracy.

Similarly, the Court has already acknowledged the "wrongful act or acts done pursuant" to the alleged conspiracy. *Id*.; *Fabick*, 2017 U.S. Dist. LEXIS 87028, at *13. The amended complaint is replete with such alleged acts. They include spreading the baseless claim that L.G. was covered in bruises from head to toe, refusing to allow Plaintiffs into L.G.'s appointment, refusing to disclose the photos of L.G. taken at the appointment, attempting to intimidate Plaintiffs for expressing their grievances, attempting to intimidate and punish those medical professionals whose conclusions aligned with those of Plaintiffs, wrongfully informing others that Cox had abused another child, denying

Plaintiffs administrative review, extensively covering up Defendants' errors upon discovering them, and more.

The Court must note, however, that the amended complaint does not appear to implicate Petska in any of the above-listed alleged acts. To the contrary, it was Petska who concluded that L.G.'s injuries were not necessarily indicative of abuse and indicated to Cox that she thought everything would turn out okay for his family, and Plaintiffs themselves allege that their exclusion from L.G.'s appointment was contrary to Petska's plan of care. Plaintiffs allege that Petska wrongfully transferred care of L.G. to Ventura, but they do not suggest that she did so intentionally—rather, Plaintiffs' allegations suggest that she did so negligently. The amended complaint does not allege, not can the Court reasonably infer, that Petska was involved in any conspiracy to injure Plaintiffs. However, merely because Plaintiffs have not pleaded such factual allegations at to Petska does not necessarily mean that "there are no [such] facts" in existence to support their claim. 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to address the deficiency noted here.

The Court continues to the third element as to the remaining Defendants: that the amended complaint sufficiently alleges the "damage resulting from such act or acts." *Fabick*, 2017 U.S. Dist. LEXIS 87028, at *13. In other words, that Plaintiffs have alleged that the conspiracy's "purpose . . . was accomplished." *Onderdonk*, 255 N.W.2d at 510 (internal citation omitted). Plaintiffs allege that as a result of these wrongful acts orchestrated pursuant to Defendants' conspiracy, they were unable to complete their planned adoption of L.G., their reputations were tarnished,

Cox was subject to felony child abuse charges based on allegedly erroneous medical conclusions, and they were humiliated.

The analysis does not end there, however. "Under Wisconsin law, a claim for civil conspiracy also requires an underlying tort to be actionable." *Fabick,* 2017 U.S. Dist. LEXIS 87028, at *13. This is because in Wisconsin, "there is no such thing as a civil action for conspiracy. There is an action for damages caused by acts pursuant to a conspiracy but none for the conspiracy alone." *Onderdonk,* 255 N.W.2d at 509. "[I]t is not the conspiracy, as such, that constitutes the cause of action, but the overt acts that result from it. Thus, any concomitant damage to the plaintiffs stems from the acts done in furtherance of the conspiracy, not from the conspiracy itself." *Id.* at 510 (internal citation omitted). The question is therefore whether Plaintiffs have sufficiently stated a claim (or claims) for an underlying tort. As the Court will discuss further below, Plaintiffs have done so. Accordingly, Plaintiffs have stated a claim for civil conspiracy against all those Defendants against whom this claim was brought, except Petska.

### 5.3 COUNT XIII—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs additionally seek to recover for intentional infliction of emotional distress ("IIED") against Ventura, Sheets, Gutzeit, MCW, CHHS, and CHW. ECF No. 37 at 69. To raise a claim for IIED under Wisconsin law, a plaintiff must allege "(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct." *Lenczner v. Fargo,*

No. 14-cv-691-wmc, 2017 U.S. Dist. LEXIS 82713, at *7 (W.D. Wis. May 31, 2017).

The MCW Defendants allege that this claim fails because the amended complaint fails to sufficiently allege that Defendants' behavior was "extreme and outrageous." ECF No. 42 at 30. They cite *Kennedy v. Children's Service Society*, 17 F.3d 980 (7th Cir. 1994). There, the plaintiffs sought to adopt a child but were hindered in doing so after Children's Services Society of Wisconsin ("CSS") backed out because it believed the plaintiffs were members of a cult. *Kennedy*, 17 F.3d at 982. That case provides that "[e]xtreme or outrageous behavior means that 'the average member of the community must regard the defendant's conduct in relation to the plaintiff as being a complete denial of the plaintiff's dignity as a person." *Id.* at 986–87 (internal citation omitted). It further provides that "[t]his is a high standard, and Wisconsin courts have been reluctant to find conduct sufficiently extreme to meet this test." *Id.* at 987.

The MCW Defendants' argument regarding whether Defendants' conduct is truly "extreme or outrageous" is better suited for summary judgment. Indeed, *Kennedy*—the case the MCW Defendants cite—was at the summary judgment stage. Taking Plaintiffs' well-pleaded factual allegations as true, and drawing all reasonable inferences in their favor, Plaintiffs have sufficiently alleged that the behaviors to which they were subject were "extreme and outrageous."

*Kennedy* did not stand for the proposition that IIED claims are incognizable in the adoption context as a matter of law. Nor are the facts of *Kennedy* so analogous as to be controlling here. In *Kennedy*, the Seventh Circuit wrote that "CSS's withdrawal from the adoption" or the statements made about the suspected cult could not be considered extreme or

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 89 of 116   Document 67

outrageous or "a complete denial of the plaintiff's dignity." *Id.* at 987. Plaintiffs' allegations, in contrast, go well beyond the mere failure of a planned adoption and a few adverse comments. In addition to being prevented from fulfilling an adoption as planned, Plaintiffs allege that Defendants targeted them with a campaign of harassment, wrongfully excluded them from L.G.'s care, tarnished their reputations (both personal and professional), erroneously portrayed them as child abusers, ensured that Cox was criminally charged based on a flawed medical examination, wrongfully denied them timely administrative review, and more. While the burden for showing extreme and outrageous conduct is a difficult one, the Court cannot say at this time that Plaintiffs have failed to plead it.

There is a problem with this claim, however. Plaintiffs do not allege that these Defendants' conduct was "intentioned to cause emotional distress." *Id*. This element requires the plaintiff to show that "the purpose of the conduct was to cause emotional distress." *Woltring v. Specialized Loan Servicing LLC*, 56 F. Supp. 3d 947, 952 (E.D. Wis. 2014) (internal citation omitted). Plaintiffs allege that these Defendants' actions "caus[ed] them intense emotional distress," but they do not allege that Defendants' actions were motivated by that purpose. Plaintiffs allege that Defendants used Ventura's erroneous conclusion of abuse to "begin an unprecedented campaign of targeted harassment against Plaintiffs, tarnishing Plaintiffs' personal reputations as loving parents and their professional reputations as skilled and reliable medical caregivers," ECF No. 37 at 3, but nowhere does the amended complaint allege that Ventura, Sheets, Gutzeit, MCW, CHHS, and CHW instituted such a campaign of harassment for the *purpose* of inflicting emotional distress upon Plaintiffs. To the contrary, Plaintiffs' amended complaint suggests that these Defendants participated in this

alleged conduct for the purpose of covering-up their own errors and protecting their own professional reputations. *See id*. at 36 ("Rather than admit the truth, in order to cover up and obscure the evidence of their wrongdoing and of these violations, and in retaliation for Plaintiffs' advocacy and criticism, Defendants conspired with one another to take whatever steps were necessary to smear Plaintiffs' reputations, to generate false substantiation for the allegations of abuse, and to support the decision to remove L.G. from Plaintiffs' care . . . ."). Because they have not properly alleged that Ventura, Sheets, Gutzeit, MCW, CHHS, and CHW engaged in the alleged conduct for the purpose of inflicting emotional distress on Plaintiffs, this claim fails.

However, such a deficiency in pleading may be redressable by amendment. "Courts should not dismiss the complaint unless it is beyond a doubt that there are no facts to support relief." 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15. Merely because Plaintiffs have not pleaded such factual allegations does not necessarily mean that "there are no [such] facts" in existence to support their claim. *Id*. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to address the deficiency noted here.

### 5.4    COUNT XIV—TORTIOUS INTERFERENCE

Plaintiffs also attempt to raise a claim of tortious interference against Ventura, Sheets, Gutzeit, MCW, CHHS, and CHW. ECF No. 37 at 70. They allege that they had a "reasonable expectancy of entering into a valid adoption with Catholic Charities and L.G.'s birth parents," that the above-mentioned Defendants were aware of that, and that those Defendants' conduct "resulted in Plaintiffs [sic] inability to adopt L.G." *Id*.

The elements of tortious interference under Wisconsin law are: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Henson v. Stroede*, 868 N.W.2d 198, ¶ 6 (Wis. Ct. App. 2015) (quoting *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 724 N.W.2d 879, ¶ 37 n.9 (Wis. 2006).

The Children's Defendants argue that this claim must fail because "a claim for tortious interference requires interference with an existing or prospective *contractual* relationship" and "[a]n adoption is not a contractual relationship; it is a process governed by statute and subject to court oversight and approval." ECF No. 47 at 36; *see also* ECF No. 42 at 24. In response, Plaintiffs do not dispute that "an adoption is ultimately determined by a Wisconsin Family Court after a 6-month waiting period . . . ." ECF No. 61 at 35. But, they argue, Defendants fail to acknowledge that "Plaintiffs did have an agreement with Catholic Charities and the birth parents to have custody of L.G." *Id*. "[L.G.'s] birth mother still had full legal rights as this was a private adoption, and there was an agreement between the birth mother, Catholic Charities, and Plaintiffs to take custody of her and maintain custody during the statutory waiting period of 6 months." *Id*. Indeed, the amended complaint provides that they "entered into an agreement with L.G.'s birth parents and with the agency supervising L.G.'s adoption for Plaintiffs to begin serving as pre-adoptive foster parents to L.G. immediately following her birth . . . ." ECF No. 37 at 8.

The MCW Defendants write that "[t]here is no Wisconsin case that acknowledges a claim for alleged interference with a couple's hope to adopt a child." ECF No. 42 at 24. Indeed, the Court has found no case factually analogous evaluated under Wisconsin law upon which it could determine that such a claim is cognizable. Nor have Plaintiffs cited such a case. But the lack of an analogous case is not necessarily dispositive. The elements of tortious interference do not indicate that their application is limited strictly to the "business contract" context. *See* ECF No. 42 at 24.

Wisconsin's recognition of the tort of tortious interference is based on its adoption of the Restatement (Second) of Torts § 766. *Roeming v. Peterson Builders*, 545 N.W.2d 521, 1995 Wisc. App. LEXIS 1571, at *11 (Wis. Ct. App. Dec. 27, 1995). Accordingly, the Court looks to that provision of the Restatement (Second) of Torts to determine the scope of the tort. Section 766 of the Restatement (Second) of Torts provides that "[o]ne who intentionally and improperly interferes with the performance of a contract (*except a contract to marry*) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (emphasis added).

The language there explicitly excludes one context from the tort's applicability—that of marriage. The canon of construction *expressio unius est exclusion alterius* provides that "to express or include one thing implies the exclusion of the other." *United States v. Peralta-Espinoza*, 413 F. Supp. 2d 972, 977 (E.D. Wis. 2006) (citing *Dersch Energies v. Shell Oil Co.*, 314 F.3d 846, 861 n.15 (7th Cir. 2002)). In other words, if the drafters of the Restatement (Second) of Torts intended to exclude from the tort's applicability that which arises from the adoption context—or even from the context of

domestic relations generally—the Court would assume that context would be listed along with that of marriage. But since only "contract[s] to marry" are listed as excluded in the Restatement's language, the Court assumes that that is the only context in which the tort cannot, as a matter of law, apply. Indeed, the comments to § 766 confirm this conclusion. *See* Restatement (Second) of Torts § 766, cmt. d ("[T]he rule stated in this Section is applied to *any type of contract*, except a contract to marry.") (emphasis added). In sum, the Court has no reason before it to conclude that tortious interference with a contract cannot be raised in the adoption context as a matter of law.

The Court must also address the MCW Defendants' argument that Plaintiffs have failed to raise a tortious interference claim because "[t]here is no causal connection between the MCW Defendants' alleged conduct and the state's decision to remove L.G. from Plaintiffs' home." ECF No. 42 at 3, 25. The MCW Defendants state simply that the amended complaint indicates that "the decision to remove L.G. from [Plaintiffs'] home was not based on anything the MCW Defendants did." *Id*. at 25. In response, Plaintiffs argue that

> [Defendants'] conduct must only be "a cause" of Plaintiff's inability to remain L.G.'s custodian during the adoption process . . . . *Ehlinger v. Sipes*, 148 Wis. 2d 260, 265 (Ct. App. 1988) ("The causation inquiry is shaped by the substantial factor test. Causation may be established if a party's action substantially causes the resulting harm; a party's action need not be the sole or primary factor before liability attaches."). It can be nothing more than disingenuous for MCW Defendants to argue that their ongoing and continued support for an inappropriate and incomplete evaluation by an unqualified practitioner plus Dr. Sheets' ongoing lies about Plaintiff Dr. Cox having previously abused another child [] and her repeated claims that Dr. Sheets knew Dr. Cox abused L.G. []

Case 2:22-cv-00553-JPS   Filed 01/17/23   Page 94 of 116   Document 67

played *no* role in L.G. being removed from their custody and their inability to pursue adoption upon completion of the 6 month waiting period.

ECF No. 61 at 36. The Court agrees that, taking Plaintiffs' well-pleaded factual allegations as true, it is false to assert that L.G.'s removal was not based on "anything the MCW Defendants did." ECF No. 42 at 25.

Having addressed that argument and having found it to be without merit, the Court returns to the remaining elements of tortious interference. Plaintiffs' amended complaint must allege that "the plaintiff had a contract or prospective contractual relationship with a third party." *Henson*, 868 N.W.2d 198, ¶ 6.[26] The Court is satisfied for purposes of the pleading stage that Plaintiffs sufficiently allege that they had a contract with Catholic Charities and with L.G.'s birth parents. *See Stucchi USA, Inc. v. Hyquip, Inc.*, No. 09-CV-732, 2011 U.S. Dist. LEXIS 45600, at *23 (E.D. Wis. Apr. 20, 2011) (requirement of existence of actual or prospective contract was met where plaintiff had plausibly alleged that it had an "oral agreement"); ECF No. 37 at 8 (alleging that Plaintiffs entered into an "agreement" with Catholic Charities and L.G.'s birth parents).

---

[26]The MCW Defendants cite *Shank v. William R. Hague, Inc.*, 192 F.3d 675 (7th Cir. 1999) both for their recitation of the elements of tortious interference as well as for the definition of a contract. ECF No. 42 at 24–25. They rely on it in support of their assertion that there "was no contract" here because a "legally binding contract is one in which the parties manifested their intention to be bound to an agreement, the terms of which are sufficiently certain and definite." *Id*. at 25 (citing *Shank*, 192 F.3d at 685). Not for the first time in the briefing on these motions, the Court is provided with no acknowledgement of the cited case's negative subsequent history. The parties are reminded that it is advisable to acknowledge a case's negative subsequent history, even if not relevant to the point for which it is cited. *See* Bluebook Table 8 ("rev'd on other grounds").

Plaintiffs' amended complaint must further allege that the relevant Defendants interfered with the contractual relationship and that the interference was intentional. *See Henson*, 868 N.W.2d 198, ¶ 6. Moreover, a claim for tortious interference with a contractual relationship requires the plaintiff not merely to allege that the defendant intentionally undertook the conduct that had the result of interfering with the contractual relationship, but rather that the defendant "act[ed] with a purpose to interfere with the . . . contract." *Foseid v. State Bank of Cross Plains,* 541 N.W.2d 203, 209 (Wis. Ct. App. 1995). "If an actor lacks 'the purpose to interfere' then his or her 'conduct does not subject [him or her] to liability even if it has the unintended effect of deterring [a third party] from dealing with the [plaintiff]." *Id*. Necessarily, "[t]o be subject to liability [for tortious interference with a contract], the actor must have knowledge of the contract with which he is interfering and the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts, § 766, cmt. i. Interference with the contract need not be the defendant's sole motivation. Liability for tortious interference with a contract may attach "if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition." *Id*. at cmt. j.

The following portions of the amended complaint relate to these elements. ECF No. 37 at 70 ("Defendants' interfering acts were done willfully, or with a wanton disregard for the rights of Plaintiffs"), at 42 (alleging that Sheets made "repeated statements" to hospital employees that she was positive that Cox had abused L.G, while knowing such statements were false; alleging that Sheets prevented CPS from accessing Petska's medical documentation and from speaking with her; and alleging

that Sheets provided knowingly false information to government investigators to prejudice them against Cox), at 25 (alleging that Ventura deliberately conducted a flawed medical evaluation of L.G.), at 45 (alleging that the Child Advocacy Program built and maintained by the Entity Defendants was deliberately designed to confirm abuse).

These allegations demonstrate that the interference was intentional, but not necessarily that it was intentioned specifically towards interfering with Plaintiffs' agreement with L.G.'s birth parents and Catholic Charities. Even if the Court were to conclude that these interfering acts were intentioned at least in part towards interfering with the agreement, it is not at all clear from the amended complaint that the relevant Defendants "act[ed] for the *primary purpose* of interfering with the performance of the contract." Restatement (Second) of Torts, § 766, cmt. j (emphasis added). Plaintiffs claim that Defendants were aware of the agreement, but the amended complaint suggests that Defendants' interfering acts were premised, at least primarily, on other ends—such as protecting their own reputations and professions.

However, the Restatement (Second) of Torts goes on to state that liability for tortious interference

> applies also to intentional interference . . . in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

*Id.* Taking Plaintiffs' well-pleaded factual allegations as true and drawing reasonable inferences in their favor, Plaintiffs have satisfied this element of

tortious interference. Since Defendants were allegedly aware of the agreement between Plaintiffs, L.G.'s birth parents, and Catholic Charities, and since Defendants were motivated to ensure that CPS would investigate Plaintiffs for suspected child abuse, the Court can reasonably infer that those Defendants "kn[ew] that the interference [was] certain or substantially certain to occur as a result of [their] action." *Id.* That satisfies Plaintiffs' burden at the pleading stage as to this element of tortious interference.

However, Plaintiffs do not clearly allege that Gutzeit, specifically, interfered with the contractual relationship and that any such interference was intentional. Gutzeit, according to the amended complaint, was the "Chief Medical Officer of CHW and [] its Vice President of Quality and Safety." ECF No. 37 at 6. Plaintiffs' allegations against Gutzeit appear to revolve around his negligence in failing to ensure that L.G. received proper care and that those employees interacting with her complied with applicable procedures and policies. *See id.* at 21 (alleging that Gutzeit violated the standard of care applicable to him by failing to ensure that Ventura's examination of L.G. was supervised and that her erroneous conclusions were corrected), at 25 (alleging that Gutzeit failed to ensure that L.G. was transferred into the care of a qualified medical professional). These alleged failures do not suggest intentional behavior, and they accordingly cannot support a tortious interference claim against Gutzeit.

Plaintiffs further allege that Gutzeit became more personally involved when they brought their "grievance concerns" to him on "May 15, 2019." *Id.* at 30. Plaintiffs allege that around that time, Gutzeit refused to name the specific physician responsible for supervising Ventura during the appointment and that Gutzeit informed Plaintiffs, allegedly erroneously,

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 98 of 116    Document 67

that their status as physicians had no bearing on the treatment they'd received. *Id*. at 30–31. It is not clear, however, how any of this alleged conduct interfered with the agreement Plaintiffs had with L.G.'s birth parents and Catholic Charities, and it is even less clear that this conduct was intentioned towards that end. Plaintiffs later allege that Gutzeit refused to allow the ethics committee to perform a review of the situation, but at that point L.G. had already been removed from Plaintiffs' home, *id*. at 32, 38–39, and their agreement with L.G.'s birth parents and with Catholic Charities had already been interfered with. Accordingly, Plaintiffs have failed to state a tortious interference claim against Gutzeit.

However, "[c]ourts should not dismiss the complaint unless it is beyond a doubt that there are no facts to support relief." 3 MOORE'S FEDERAL PRACTICE—CIVIL § 15.15. Merely because Plaintiffs have failed to plead such factual allegations as to Gutzeit does not mean that there are no such facts in existence to support their claim. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to attempt to address the deficiency noted here.

Lastly, the Court must evaluate whether Plaintiffs have sufficiently alleged that Sheets, Ventura, CHW, MCW, and CHHS were "not justified or privileged to interfere." *Henson*, 868 N.W.2d 198, ¶ 6. "When the interference is with a contract, an interference is more likely to be treated as improper than in the case of interference with prospective dealings . . . ." Restatement (Second) of Torts, § 766, cmt. b. Furthermore,

> [i]f the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so

far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

*Id*. at cmt. j. "The presence or absence of ill will toward the person harmed may clarify the purposes of the actor's conduct and may be, accordingly, an important factor in determining whether the interference was improper." *Id*. at cmt. r.

Whether Defendants were not actually justified or privileged to interfere is not the question here. The question is whether Plaintiffs plausibly allege that those Defendants were not justified or privileged in interfering. Taking Plaintiffs' well-pleaded factual allegations as true and drawing all reasonable inferences in their favor, the Court is satisfied that Plaintiffs have so alleged. Plaintiffs allege that the relevant Defendants were acting not only to advance some interest of their own, but also wrongfully and with ill will against Plaintiffs. *See id*. at cmt. j. Plaintiffs have accordingly stated a claim for tortious interference against Ventura, Sheets, MCW, CHHS, and CHW.

### 5.5    COUNT XV—DEFAMATION AS TO COX

Plaintiffs additionally assert liability for defamation of Cox against Sheets, Gutzeit, Ventura, MCW, CHW, and CHHS. ECF No. 37 at 71. They allege that these Defendants "stated that Dr. Cox had abused his child," "published the statement that Dr. Cox had abused his child by conveying that statement to one or more people," and "adopted" that statement. *Id*.

To state a claim for defamation under Wisconsin law, "a plaintiff must allege: 1) a false statement; 2) communicated by speech, conduct or in writing to someone other than the person defamed; 3) that is unprivileged and is defamatory." *Jackson v. Slome*, No. 15-cv-771-pp, 2016 U.S. Dist. LEXIS 2399, at *12 (E.D. Wis. Jan. 7, 2016) (internal citation omitted). "Under

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 100 of 116    Document 67

Wisconsin law, a statement is defamatory 'if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* at *13 (internal citation omitted). Furthermore, "[o]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." *Hart v. Bennet*, 672 N.W.2d 306, ¶ 25 (Wis. Ct. App. 2003) (quoting Restatement (Second) of Torts § 578 (1977)).

The following allegations go to the first two elements—that the relevant Defendants made a false statement communicated by speech, conduct, or writing to someone other than Cox. *Jackson*, 2016 U.S. Dist. LEXIS 2399, at *12. *See* ECF No. 37 at 45 (alleging that L.G.'s medical record named Cox as L.G.'s abuser before L.G. was ever evaluated by Ventura), at 42 ("Sheets told investigators that Dr. Cox had previously abused a different child.") ("Sheets made repeated statements to different groups of hospital employees that she was positive Dr. Cox had abused L.G."), and at 19 ("Ventura falsely stated to Defendant Barber that L.G. was 'covered in bruises from head to toe.'") (alleging that false information was provided to CPS to convince CPS that Plaintiffs represented threats to L.G.'s safety). These alleged statements are clearly defamatory as they paint Cox as a repeat child abuser—a status that would no doubt "lower him in the estimation of the community." *Jackson*, 2016 U.S. Dist. LEXIS 2399, at *13.

The amended complaint contains no specific allegations regarding defamatory statements made by Gutzeit, however. Plaintiffs allege generally that the entire group of Defendants against whom the defamation claim is asserted made or adopted such statements, but this bare allegation is insufficient. Plaintiffs allege that Gutzeit "falsely stat[ed] that [their exclusion from L.G.'s medical care] was required by the national standards

governing Child Advocacy Clinics," but this and similar statements are not defamatory. ECF No. 37 at 40.

Plaintiffs acknowledge this deficiency as to Gutzeit in their response. There, they provide additional factual allegations as to Gutzeit discovered "upon further investigation." ECF No. 61 at 44. They argue that, in a response to a motion to dismiss, they may "allege additional facts to be considered when evaluating the sufficiency of the Complaint, so long as they are consistent with the allegations in the Complaint." *Id*. Those additional facts are that Gutzeit participated in conversations and meetings with Ventura and Sheets wherein they would "inform people in the hospital of their erroneous conclusions." *Id*.

Indeed, "facts alleged by a plaintiff in a brief in opposition to a motion to dismiss 'may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint.'" *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) (internal citation omitted). It is true that the plaintiff there was pro se, but the Seventh Circuit's enunciation of the rule does not appear to be limited in application to pro se plaintiffs. *See Stamer v. Seas & Assocs., LLC*, No. 15-CV-08277, 2017 U.S. Dist. LEXIS 5490, at *2 n.2 (N.D. Ill. Jan. 13, 2017) (applying this rule in non-pro se context). Accordingly, the Court will consider these additional factual allegations. In light of the supplemental facts—that Gutzeit, like Ventura and Sheets, conveyed false conclusions of abuse about Cox to other hospital staff—the Court is satisfied that Plaintiffs have sufficiently pleaded that Gutzeit made defamatory statements.

However, the MCW Defendants argue that even if any such defamatory statements were made by any of the Defendants against whom this claim is asserted, they were "privileged as they were made related to

assessment, investigation and reporting of suspected child abuse." ECF No. 42 at 3. "An otherwise defamatory statement is conditionally privileged if it is made in furtherance of a common property, business or professional interest." *Kennedy*, 17 F.3d at 985. "There will be no liability if the defendant 'correctly or reasonably . . . believes that there is information that another sharing the common interest is entitled to know." *Id*. (internal citation omitted). The MCW Defendants, therefore, argue that any such statement would have been privileged as it would have been made pursuant to "the common interest of trying to protect L.G. from suspected child abuse." ECF No. 42 at 27.

But again, *Kennedy* was decided in the posture of summary judgment. Importantly, at the motion to dismiss stage, the Court must take Plaintiffs' well-pleaded factual allegations as true, and Plaintiffs allege that these defamatory statements were made not pursuant to the interest of trying to protect L.G., but rather the interest of covering up Defendants' own wrongdoing. "In a defamation action, a conditional privilege is an affirmative defense . . . . The burden is on defendant[s], not plaintiffs, to prove the communication was protected by privilege." *Embiata v. Marten Transp. Ltd*., 574 F. Supp. 2d 912, 919 (W.D. Wis. 2007). "[E]ven if [the Court accept[s] defendant[s'] argument that the complaint alleges a conditional privilege, the complaint also alleges that defendant[s] abused and therefore forfeited its conditional privilege by reporting violations it knew to be false." *Id*. (quoting *Zinda v. La. Pac. Corp*., 440 N.W.2d 548, 553 (Wis. 1989) ("[C]onditional privilege is not absolute and may be forfeited if the privilege is abused . . . The privilege may be abused: (1) because of the defendant's knowledge or reckless disregard as to the falsity of the defamatory matter . . . .")). The Court is satisfied for purposes of the motion

to dismiss stage that Plaintiffs have alleged that the defamatory statements were unprivileged and have accordingly stated a claim for defamation against Cox by Sheets, Ventura, and Gutzeit.

And as to the Entity Defendants, they can only be found liable for defamation through the actions of their agents. *See Classon v. Shopko Stores, Inc.*, 435 F. Supp. 1186, 1187 (E.D. Wis. 1977) ("[A] corporation can act only through its employees and . . . the principles of agency must be utilized to some extent to find liability on the corporation."). Since Sheets, Ventura, and Gutzeit are alleged to be "employee[s], agent[s], or apparent agent[s] of MCW and/or or CHHS and/or CHW," ECF No. 37 at 5–6, and since the Court has concluded that Plaintiffs have successfully stated a claim for defamation against those three individuals, the Court will decline to dismiss this claim against the Entity Defendants for failure to state a claim.

### 5.6    COUNT XVI—DEFAMATION/LOSS OF CONSORTIUM

Plaintiffs further allege defamation / loss of consortium against Ventura, Sheets, Gutzeit, MCW, CHW, and CHHS. ECF No. 37 at 72. They allege that as a result of "the negligence suffered by Dr. Cox, Dr. Dobrozsi has suffered an injury to her relationship, companionship and support." *Id*.

"[T]he common-law right of spouses to bring an action for loss of consortium compensates injuries to a spouse during the period of the injured spouse's disability." *Kottka v. PPG Indus., Inc.*, 388 N.W.2d 160, 169 (Wis. 1986). The concept involves "a broad range of elements such as love, companionship, affection, society, sexual relations, and the right of support or the performance of marital services, any one of which is sufficient to constitute a cause of action." *Id*. (internal citation omitted) (emphasis omitted). "The claim for a loss of consortium is derivative, in the sense that it does not arise unless the other spouse has sustained a personal injury."

*Muwonge v. Eisenberg,* No. 07-C-0733, 2008 U.S. Dist. LEXIS 21880, at *6 (E.D. Wis. Mar. 19, 2008).

"[T]he plaintiff must prove '[a] wrongful invasion, impairment, or deprivation of any of these rights, resulting from a disabling injury to a spouse.'" *Id*. at *5 (internal citation omitted). And although a claim for loss of consortium is derivative, the plaintiff must still allege, "separately and independently, that she personally suffered a loss of consortium." *Id*. at *6.

The amended complaint is devoid of any specific allegation as to Dobrozsi's alleged loss of consortium, let alone loss of consortium specifically stemming from the alleged defamation of her spouse, Cox. The amended complaint provides only the bare allegations that Dobrozsi suffered an "injury to her relationship, companionship and support" and that as a result of the alleged defamation of Cox, Dobrozsi suffered "injury of a personal and pecuniary nature." ECF No. 37 at 72–73. The Court will not speculate as to what this means. Plaintiffs have failed to state a claim for loss of consortium.

However, such a deficiency in pleading may be redressable by amendment. "Courts should not dismiss the complaint unless it is beyond a doubt that there are no facts to support relief." 3 MOORE'S FEDERAL PRACTICE – CIVIL § 15.15. Merely because Plaintiffs have not pleaded such factual allegations does not necessarily mean that "there are no [such] facts" in existence to support their claim. *Id*. Accordingly, the Court is obliged to grant Plaintiffs leave to file a second amended complaint to address the deficiency noted here.

### 5.7    COUNT XVII—INDEMNIFICATION

Lastly, Plaintiffs attempt to plead a claim for indemnification against MCW, CHW, and CHHS. ECF No. 37 at 73. In their response in opposition,

Plaintiffs describe this claim as relating "to the obligation of Defendants' employers to indemnify them in the event of an eventual judgment in Plaintiffs' favor on these claims." ECF No. 61 at 45. Plaintiffs write further that they "acknowledge [that] there is, at the moment, no judgment to indemnify." *Id*. They plead this claim in their amended complaint for the purpose of "avoid[ing] any claims of surprise" on the part of Defendants and to "place each of Defendants' employers squarely on notice that Plaintiffs intend to pursue indemnification of any such judgment at the appropriate time." *Id*.

The MCW Defendants argue that this claim should be dismissed because "Wisconsin does not permit a claim for indemnification." ECF No. 42 at 30. "A claim for indemnification can be raised by contract or equitable principles, but is not a separate claim in Wisconsin." *Id*.

This characterization does not appear to be entirely accurate. Wisconsin courts recognize a "common law indemnification claim." *W. Leather Lofts Condo. Ass'n v. Busalacchi*, 788 N.W.2d 384, 2010 Wisc. App. LEXIS 441, at *17 (Wis. Ct. App. June 15, 2010) (internal citation omitted); *see also Foss v. Madison Twentieth Century Theaters*, 551 N.W.2d 862, 867 (Wis. Ct. App. 1996) ("A common law claim for indemnification requires proof that the plaintiff was compelled to pay damages for which the plaintiff had no liability.").

"A common law indemnification claim . . . requires proof [of] an injustice." *Busalacchi*, 2010 Wisc. App. LEXIS 441, at *17 (internal citation omitted). "Specifically, to prevail on a claim for common law indemnification, a plaintiff must prove that the relationship between the parties is such that, either in law or in equity, there is an obligation on one party to indemnify the other . . . ." *Id*. (internal citation omitted). Plaintiffs

allege that "[e]ach of the Entity Defendants are required by law, contract or other obligation to pay any tort judgment for compensatory damages for which their employees are liable within the scope of their employment activities." ECF No. 37 at 73. The Court is satisfied for purposes of the pleading stage that Plaintiffs have sufficiently stated a claim for indemnification against MCW, CHW, and CHHS.

### 5.8    IMMUNITY

Having determined that Plaintiffs have successfully stated claims against at least some of the Defendants against whom those claims were asserted, the Court now addresses many of the Defendants' heavy reliance on defenses of immunity. *See Berman v. Young,* 291 F.3d 976, 983 (7th Cir. 2002) ("The Supreme Court has counseled that the best framework for analyzing a qualified immunity defense is to first determine if there has been a constitutional violation and then to consider whether the constitutional right at issue was clearly established at the time of the violation."). The Court must determine whether it is appropriate in this case to substantively consider issues of immunity at the pleading stage.

Immunity, as a general matter, "typically depends on the facts of the case, and therefore dismissal is often inappropriate at the pleading stage." *Knowles v. Hudson,* 2019 U.S. Dist. LEXIS 154884, at *7 (N.D. Ind. Sep. 11, 2019). (internal citation omitted). But like qualified immunity, absolute immunity may be considered at the pleading stage in the limited circumstance where "a defendant [shows] that she has 'an airtight defense' on the face of the complaint." *Paciorek v. Moss*, 2021 U.S. Dist. LEXIS 150879, at *3 (N.D. Ill. Aug. 11, 2021) (internal citation omitted) (dismissing suit at pleading stage on basis of absolute immunity).

"[S]ocial workers are entitled to absolute prosecutorial immunity when they initiate and aid the adjudication of child protective proceedings." *Loertscher v. Anderson*, No. 14-cv-870-jdp, 2016 U.S. Dist. LEXIS 73548, at *12 (W.D. Wis. June 6, 2016) (citing *Millspaugh v. Cnty. Dep't of Pub. Welfare*, 937 F.2d 1172, 1175 (7th Cir. 1991)). "But absolute immunity does not extend to social workers when they function as investigators." *Id.* "When performing acts in connection with that function, social workers are akin to police officers, and they are protected in that capacity only by qualified immunity." *Id.*

"The 'dividing line' between absolute immunity and qualified immunity 'is whether the injury depends on the judicial decision.'" *Id.* at *12–13 (quoting *Millspaugh*, 937 F.2d at 1175). "In other words, if the alleged injury would not have occurred but for a judge's decision . . . then the prosecutor or other individual who induces the judge to act is entitled to absolute immunity with respect to the inducing conduct." *Id.* at *13. Absolute prosecutorial immunity should not be afforded to the CPS Defendants because the injuries Plaintiffs allege did not depend on a "judge's decision." *Id.* To the contrary, Plaintiffs emphasize that many of their injuries stem from actions taken without judicial oversight.

An issue of absolute immunity pursuant to statute is also raised. All three groups of Defendants assert immunity pursuant to Wis. Stat. § 48.981(4). ECF Nos. 44 at 4, 47 at 32–33, and 42 at 17. That provision provides immunity from suit against individuals who in good faith participate in certain enumerated activities, such as making a report of child abuse, performing or assisting with the medical examination of a child, or otherwise providing assistance or information in connection with a child abuse investigation. Wis. Stat. § 48.981(4). It provides further that "[f]or the

purpose of any proceeding, civil or criminal, the good faith of any person reporting under this section shall be presumed." *Id.* That presumption is, however, still subject to rebuttal.

The Court need not ultimately consider whether the CPS Defendants are immune from suit under Wisconsin law because Plaintiffs, in their response to the motions to dismiss, agree to dismiss "their state law claims for negligence (Count IX) or professional negligence (Count XI)." ECF No. 61 at 5, n.2.[27] They write further that since "Count XI was the only state law claim alleged against any of the CPS Defendants, their arguments under the notice of claim statute and state law immunity are moot." *Id*.

But other state-law claims are still alleged against non-CPS Defendants—specifically Ventura, Petska, Sheets, Gutzeit, MCW, CHHS, and CHW, and those Defendants assert statutory immunity under § 48.981(4) just as the CPS Defendants had. Accordingly, the Court must still determine whether it is appropriate to consider the applicability of statutory immunity as to those Defendants at this stage. The Court concludes that it is. However, the Court believes that based on their well-pleaded allegations, Plaintiffs are entitled to an opportunity to rebut the presumption of good faith imposed by § 48.981(4).

There is no question that § 48.981(4) is applicable to the non-CPS Defendants listed above, all of whom are alleged to have participated in

---

[27]The MCW Defendants also contend that Plaintiffs abandoned their claims against Petska for failure to supervise (Count VIII). ECF No. 63 at 2 (citing ECF No 61 at 27) (noting that Plaintiff alleges supervisory liability "only against Defendants Sheets, Gutzeit, Parr-Nelson, Urban, Miller, Chagall, Jewell, and Hartmann"); *see also* ECF No. 63 at 3. This claim could not have been abandoned because Plaintiffs do not assert Count VIII against Petska. ECF No. 37 at 63 ("Count VIII: 42 U.S.C. § 1983 –Supervisory Liability—Against Defendants Sheets, Gutzeit, Parr-Nelson, Urban, Miller, Chagall, Jewell, and Hartmann.").

some form or another with the reporting, investigating, consulting, and examining on suspicion of child abuse against L.G. The Court needs no further allegations nor discovery to reach that conclusion. They are all, therefore, entitled to a presumption of good faith. But the analysis does not end there.

In *Phillips v. Behnke*, the Wisconsin Court of Appeals addressed the plaintiffs' contention that the defendants were not "entitled to immunity under § 48.981(4) . . . because they . . . did not report the allegations in good faith." 531 N.W.2d 619, 622 (Wis. Ct. App. 1995). The court drew from Black's Law Dictionary for the definition of good faith: "An intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage . . . ." *Id.* at 624.

Similarly, in *Whetter v. Brown County*, on summary judgment, the court wrote that "[t]o rebut the presumption [of good faith] in Wis. Stat. § 48.981, a plaintiff must demonstrate conscious or intentional wrongdoing, such as a conscious violation of a statute." 727 N.W.2d 375, 2006 Wisc. App. LEXIS 1258, at *9 (Wis. Ct. App. Dec. 19, 2006). The court confirmed that "negligence is not sufficient to defeat the presumption of good faith found in Wis. Stat. § 48.981(4)." *Id*. at *11. "[A] showing of intentional or conscious wrongdoing is required in order to rebut the presumption." *Id*.

In *Phillips*, there were "no facts or allegations to suggest that the respondents reported the allegations against [plaintiff] out of malice." 531 N.W.2d at 624. The same is not true here, and accordingly, dismissing Plaintiffs' claims based on immunity under § 48.981(4) would be inappropriate at this stage. Plaintiffs here expressly allege that Defendants'

Case 2:22-cv-00553-JPS    Filed 01/17/23    Page 110 of 116    Document 67

actions related to reporting allegedly suspected child abuse were not undertaken in good faith, and not merely out of negligence, but with malice and with conscious disregard for Plaintiffs' rights. ECF No. 37 at 44 ("All of these steps taken by Defendants to frustrate Plaintiffs [sic] efforts to advocate for themselves and their pre-adoptive child L.G. were taken with malice against Plaintiffs, with the intention to protect the hospital child advocacy program from responsibility or liability . . . , to protect Defendants' personal and professional reputations, and to avoid accountability . . . .") and at 52 ("These actions were taken with malice, without regard for Plaintiffs [sic] rights, and in order to conceal their misconduct and the misconduct of other Defendants with whom they worked closely as part of the Child Advocacy Program."). For purposes of the pleading stage, they have sufficiently rebutted the presumption of good faith inherent in § 48.981(4). Whether, on summary judgment, there will be any showing of "evidence that [Defendants] made the report in bad faith," *Phillips*, 531 N.W.2d at 624, and whether there is any "evidence the [Defendants] engaged in any conscious or intentional wrongdoing," *Whetter*, 2006 Wisc. App. LEXIS 1258, at *12–13, is altogether another story and a question for another day.

Having evaluated the question of statutory immunity and having determined that its ultimate effect on these proceedings cannot yet be determined, the Court turns to evaluate Defendants' arguments regarding qualified immunity. *See* ECF Nos. 42 at 12, 47 at 29, and 44 at 5. "Qualified immunity protects government officials from individual liability under Section 1983 for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional

rights of which a reasonable person would have known." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000).

"Rarely do we see qualified immunity awarded at the pleading stage. The reason is because determinations of qualified immunity most often depend on facts a plaintiff is not required to plead at the outset of litigation to avoid dismissal." *Roldan v. Stroud*, No. 21-2722, 2022 U.S. App. LEXIS 29680, at *1 (7th Cir. Oct. 25, 2022). "[T]he plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (internal citation omitted).

"Our cases make clear that the motion-to-dismiss stage is rarely 'the most suitable procedural setting to determine whether an official is qualifiedly immune.'" *Roldan*, 2022 U.S. App. LEXIS 29680, at *5 (quoting *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020)). "The facts essential to this defense typically emerge during discovery, and so we most commonly see qualified immunity invoked in a motion for summary judgment." *Id*. at *6. For these reasons, "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Hardeman*, 933 F.3d at 823 (internal citation omitted). This inevitably creates tension "at this stage of litigation between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018).

*Rolan,* and the Seventh Circuit generally, have not set a bright line prohibition against consideration of qualified immunity for purposes of a motion to dismiss. Rather, the Seventh Circuit has instructed that issues of qualified immunity should be decided at the pleading stage only in very

limited circumstances. In situations such as that in *Roldan*, where "[d]iscovery is needed to shed light on" the applicability of the immunity defense, dismissal of the suit based on qualified immunity at the pleading stage is inappropriate. *Roldan*, 2022 U.S. App. LEXIS 29680, at *7. Where no such discovery is needed, however, deciding a motion to dismiss on the basis of qualified immunity may be appropriate. *Tang v. Ill. Dep't of Children & Family Servs.*, No. 17-cv-05790, 2021 U.S. Dist. LEXIS 188947, at *17 (N.D. Ill. Sep. 30, 2021) ("Although the Court ordinarily does not address affirmative defenses in connection with a motion to dismiss, it can address an affirmative defense if the complaint alleges all facts needed to satisfy that defense."). In such a case, the plaintiff may be said to have "plead itself out of court by alleging (and thus admitting) the ingredients of a defense[.]" *Knowles,* 2019 U.S. Dist. LEXIS 154884, at *7 (internal citation omitted).

The Children's Defendants point out that because "the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established." ECF No. 47 at 39 (quoting *Berman v. Young*, 291 F.3d 976, 984 (7th Cir. 2002)). But *Berman* decided that issue on summary judgment, not on a motion to dismiss. Moreover, the court that originally enunciated the language quoted by the Children's Defendants went on to say that "[w]hile we agree that that is generally the case, . . . , as noted above, some governmental actions are so clearly beyond the pale that a reasonable person should have known of their unconstitutionality even without a closely analogous case." *Brokaw*, 235 F.3d at 1023.

As noted above, disposing of a case or of individual claims therein based on qualified immunity at the pleadings stage should be undertaken in very limited circumstances, such as where no "[d]iscovery is needed to shed light on" the applicability of the immunity defense. *Roldan*, 2022 U.S. App. LEXIS 29680, at *7. The Court must therefore determine whether this is such a case. Because the Court cannot say with confidence that it is, the Court will decline to dispose of Plaintiffs' case, or of discrete claims therein, based on qualified immunity at this stage.[28]

Despite the exorbitant length of the amended complaint, the true motives and precise contours of the participation of Defendants in the alleged conduct remains unclear. Discovery and a better developed record of the events would benefit both the parties and the Court, both as a general matter and for purposes of determining the applicability of qualified immunity. *See Brokaw*, 235 F.3d at 1023 ("[A]t this time, we cannot conclude that the individual defendants are entitled to qualified immunity because the facts once uncovered may turn out to be so severe and obviously wrong that the defendants should have known they were violating [Plaintiffs'] constitutional rights.").

Plaintiffs additionally argue that CHW, CHHS, and MCW—as corporations, *see* ECF Nos. 30 at 2, 32—are not entitled to the protections of

---

[28]"Qualified immunity may be appropriate at the pleadings stage if 'the plaintiff asserts the violation of a broad constitutional right that has not been articulated at the time the violation is alleged to have occurred.'" *Jones v. Parker*, No. 1:19-cv-04625-TWP-DLP, 2021 U.S. Dist. LEXIS 41608, at *2 (S.D. Ind. Mar. 5, 2021) (quoting *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019)). Plaintiffs' equal protection claims based on class membership perhaps may be characterized as such. Even if they were so characterized, however, the Court is not confident that Plaintiffs' class-of-one equal protection claim would be similarly characterized.

qualified immunity as a matter of law. The Children's Defendants and MCW Defendants do not substantively address that contention. In support of their contention, Plaintiffs cite only *Owen v. City of Independence, Missouri*, 445 U.S. 622, 638 (1980). But that case is not on point. *Owen* held that "municipalities have no immunity from damages liability flowing from their constitutional violations . . . ." *Id*. at 657. The corporate defendants at issue in this case, however—MCW, CHW, and CHHS—are private corporations, not municipal corporations. In light of the scant argument on the issue, the Court will decline to substantively address it at this time. The Court declines to grant Defendants' motions to dismiss on the basis of qualified immunity, both as to the Individual Defendants and the Entity Defendants.

**6.    CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendants' motions to dismiss, ECF Nos. 41, 43, and 46, be and the same are hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order;

**IT IS FURTHER ORDERED** that Count IX (Negligence) be and the same is hereby **DISMISSED without prejudice** as to all those Defendants against whom it was asserted;

**IT IS FURTHER ORDERED** that Count XI (Professional Negligence) be and the same is hereby **DISMISSED without prejudice** as to all those Defendants against whom it was asserted;

**IT IS FURTHER ORDERED** that Count I (42 U.S.C. § 1983 Due Process) be and the same is hereby **DISMISSED with prejudice** as to all those Defendants against whom it was asserted;

**IT IS FURTHER ORDERED** that Count V (42 U.S.C. § 1983 First Amendment Retaliation) be and the same is hereby **DISMISSED with prejudice** as to all those Defendants against whom it was asserted;

**IT IS FURTHER ORDERED** that Count XII (Negligent Infliction of Emotional Distress) be and the same is hereby **DISMISSED with prejudice** as to all those Defendants against whom it was asserted;

**IT IS FURTHER ORDERED** that Plaintiffs, should they choose to address the deficiencies noted herein regarding those Counts for which the Court has granted leave to amend (i.e., those for which amendment would not be futile), shall **FILE** a second amended complaint by **February 16, 2023;** and

**IT IS FURTHER ORDERED** that Defendants' joint motion to stay discovery, ECF No. 51, be and the same is hereby **DENIED as moot.**

Dated at Milwaukee, Wisconsin, this 17th day of January, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge